Roland Tellis (SBN 186269)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698
E-mail: rtellis@baronbudd.com

Paul J. Geller (to be admitted *Pro Hac Vice*)
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561.750.3000
Facsimile: 561.750.3364
Email: pgeller@rgrdlaw.com

David Boies (to be admitted *Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: 914.749.8200
Facsimile: 914.749.8300
E-mail: dboies@bsfllp.com

Peter Prieto (to be admitted *Pro Hac Vice*)
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue, Suite 2700
Miami, Florida 33131
Telephone: (305) 358-2800
Facsimile: (305) 358-2382
E-mail: pprieto@podhurst.com

Elizabeth J. Cabraser (SBN 083151)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
E-mail: ecabraser@lchb.com

David S. Stellings (to be admitted *Pro Hac Vice*)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500
Facsimile: 212.355.9592
E-mail: dstellings@lchb.com

Lynn Lincoln Sarko (to be admitted *Pro Hac Vice*)
KELLER ROHRBACK L.L.P.
1201 3rd Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: 206.623.1900
Facsimile: 206.623.3384
E-mail: lsarko@kellerrohrback.com

Robert C. Gilbert (to be admitted *Pro Hac Vice*)
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Blvd., Suite 1100
Coral Gables, FL 33131
Telephone: 305-529-8858
Facsimile: 954-525-4300
Email: gilbert@kolawyers.com

*Attorneys for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| LUKE KITCHEL, GREGORY WILKERSON, JOSEPH MOYNIHAN, MARK RICHARDS, TIMOTHY GREEN, HAROLD BLAKE, TRAVIS MORGAN, JEFF PARISI, MICAH WILLIAMS, ADAM BURWELL, ELMER BRINKMAN, LOUIS BODIE, JAMIE BROOM, WALTER SWAN, CRAIG MCCULLY, AARON CARTER, DANIEL BROWN, NELSON DELGADO, BOBBY REICHERT, CHRISTOPHER MATTINGLY, MICAH MARTIN, MARIUS BIHOREAN, GN SYSTEMS, INC., and | Case No.: 3:17-cv-00538 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |
| *[caption cont'd next page]* | |

LESLIE GHRIST, individually, and on behalf of all others similarly situated,

Plaintiffs,

vs.

FCA US LLC, a Delaware Limited Liability Company; ROBERT BOSCH GMBH, a corporation organized under the laws of Germany; and ROBERT BOSCH LLC, a Delaware Limited Liability Company,

Defendants.

CLASS ACATION COMPLAINT

1336321.4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

NATURE OF THE CASE ........................................................................... 1

JURISDICTION AND VENUE ................................................................. 2

PARTIES ..................................................................................................... 3

FACTS COMMON TO ALL COUNTS .................................................... 8

TOLLING OF THE STATUTE OF LIMITATIONS ............................. 20

CLASS ACTION ALLEGATIONS .......................................................... 22

NATIONWIDE COUNT I Violations of Racketeer Influenced and Corrupt
    Organizations Act ("RICO"), 18 U.S.C. § 1962(C) – (D) ...................... 31

NATIONWIDE COUNT II Violation of Magnuson Moss Warranty Act, 15 U.S.C.
    §§ 2301, *et seq.* ..................................................................................... 42

NATIONWIDE COUNT III Fraud .......................................................... 44

NATIONWIDE COUNT IV Breach of Contract .................................... 48

NATIONWIDE COUNT V Unjust Enrichment ...................................... 49

ALASKA COUNTS ................................................................................... 60

ARIZONA COUNTS ................................................................................. 69

ARKANSAS COUNTS .............................................................................. 81

CALIFORNIA COUNTS .......................................................................... 93

COLORADO COUNTS ........................................................................... 110

CONNECTICUT COUNTS .................................................................... 122

DELAWARE COUNTS ........................................................................... 135

DISTRICT OF COLUMBIA COUNTS ................................................. 147

FLORIDA COUNTS ............................................................................... 159

GEORGIA COUNTS ............................................................................... 171

HAWAII COUNTS .................................................................................. 181

IDAHO COUNTS .................................................................................... 192

ILLINOIS COUNTS ............................................................................... 204

INDIANA COUNTS ................................................................................ 216

IOWA COUNTS ...................................................................................... 228

KANSAS COUNTS ................................................................................. 239

KENTUCKY COUNTS ........................................................................... 251

LOUISIANA COUNTS ........................................................................... 263

i

1336321.4

**TABLE OF CONTENTS**
(continued)

**Page**

**MAINE COUNTS** .................................................................................................. 272

**MARYLAND COUNTS** ........................................................................................ 281

**MASSACHUSETTS COUNTS** ........................................................................... 293

**MICHIGAN COUNTS** .......................................................................................... 303

**MINNESOTA COUNTS** ....................................................................................... 314

**MISSISSIPPI COUNTS** ........................................................................................ 327

**MISSOURI COUNTS** ........................................................................................... 338

**MONTANA COUNTS** .......................................................................................... 350

**NEBRASKA COUNTS** ......................................................................................... 362

**NEVADA COUNTS** .............................................................................................. 374

**NEW HAMPSHIRE COUNTS** ........................................................................... 386

**NEW JERSEY COUNTS** ...................................................................................... 397

**NEW MEXICO COUNTS** .................................................................................... 409

**NEW YORK COUNTS** ......................................................................................... 421

**NORTH CAROLINA COUNTS** ......................................................................... 435

**NORTH DAKOTA COUNTS** ............................................................................. 447

**OHIO COUNTS** .................................................................................................... 459

**OKLAHOMA COUNTS** ...................................................................................... 472

**OREGON COUNTS** ............................................................................................. 484

**PENNSYLVANIA COUNTS** ............................................................................... 495

**RHODE ISLAND COUNTS** ............................................................................... 507

**SOUTH CAROLINA COUNTS** ......................................................................... 519

**SOUTH DAKOTA COUNTS** ............................................................................. 532

**TENNESSEE COUNTS** ....................................................................................... 543

**TEXAS COUNTS** .................................................................................................. 555

**UTAH COUNTS** ................................................................................................... 565

**VERMONT COUNTS** .......................................................................................... 577

**VIRGINIA COUNTS** ............................................................................................ 589

**WASHINGTON STATE COUNTS** .................................................................... 601

**WEST VIRGINIA COUNTS** ............................................................................... 613

1336321.4

1

**TABLE OF CONTENTS**
(continued)

Page

**WISCONSIN COUNTS** ............................................................................ **623**

**WYOMING COUNTS** ............................................................................ **635**

**PRAYER FOR RELIEF** ............................................................................ **646**

CLASS ACATION COMPLAINT

1336321.4

**NATURE OF THE CASE**

1.    Plaintiffs Luke Kitchel, Gregory Wilkerson, Joseph Moynihan, Mark Richards, Timothy Green, Harold Blake, Travis Morgan, Jeff Parisi, Micah Williams, Adam Burwell, Elmer Brinkman, Louis Bodie, Jamie Broom, Walter Swan, Craig McCully, Aaron Carter, Daniel Brown, Nelson Delgado, Bobby Reichert, Christopher Mattingly, Micah Martin, Marius Bihorean, GN Systems, Inc., and Leslie Ghrist ("Plaintiffs") individually and on behalf of the other members of the nationwide class and statewide classes defined below (the "Class" or "Classes") bring this Class Action Complaint (the "Complaint") against Defendants FCA US LLC ("FCA"), Robert Bosch GMBH, and Robert Bosch LLC (collectively referred to as "Defendants") seeking redress and remedy for Defendants' failure to disclose that they equipped certain vehicles with Auxiliary Emission Control Devices ("AECDs") to evade governmental emissions regulation by tricking the public and regulators into thinking the vehicles emitted far less oxides of nitrogen ("NOx") than they actually do.  Plaintiffs make these allegations upon personal knowledge as to themselves and their own acts and, as to all other matters, upon information and belief.

2.    Plaintiffs were unaware that the vehicles they purchased are equipped with at least eight concealed AECDs.  Operation of one or more of the eight concealed AECDs, either alone or in combination with each other, results in excess emissions of NOx under various operating conditions that may reasonably be expected to be encountered in normal vehicle operation and use.

3.    The vehicles containing the concealed AECDs include certain model year 2014 through 2016 3.0 liter diesel light-duty vehicles, including, but not limited to, the 2014 FCA Dodge Ram 1500, 2014 FCA Jeep Grand Cherokee, 2015 FCA Dodge Ram 1500, 2015 FCA Jeep Grand Cherokee, 2016 FCA Dodge Ram 1500, and 2016 FCA Jeep Grand Cherokee (collectively the "Defective Vehicles").

4.    The Environmental Protection Agency ("EPA") has identified at least eight AECDs in the Defective Vehicles that Defendants failed to disclose to the public and regulators:  1) AECD 1 (Full EGR Shut-Off at Highway Speed); 2) AECD 2 (Reduced EGR with Increasing Vehicle Speed); 3) AECD 3 (EGR Shut-Off for Exhaust Valve Cleaning); 4) AECD 4 (DEF Dosing Disablement

during SCR Adaption); 5) AECD 5 (EGR Reduction due to Modeled Engine Temperature); 6) AECD 6 (SCR Catalyst Warm-Up Disablement); 7) AECD 7 (Alternative SCR Dosing Modes); 8) AECD 8 (Use of Load Governor to Delay Ammonia Refill of SCR Catalyst).

5.      Defendants sold the Defective Vehicles to Plaintiffs and Class members without informing them of the existence of the AECDs, and by falsely represented to them that the Defective Vehicles were compliant with all relevant emissions standards when in normal use.  Defendants also falsely represented the fuel efficiency of the Defective Vehicles.

6.      Plaintiffs and Class members suffered damages as a result of Defendants' misrepresentations and omissions regarding the Defective Vehicles.  Plaintiffs would not have purchased or leased the Defective Vehicles at all and/or—if the Defective Vehicles' true nature had been disclosed and mitigated, and the Defective Vehicles rendered legal to sell—would have paid significantly less for them.  At the very least, then, Plaintiffs and Class members overpaid for their vehicles, which are incapable of providing the balance of performance, fuel efficiency, and cleanliness that Defendants advertised.  Plaintiffs and Class members have also suffered diminution of vehicle value now that the existence of the AECDs has been revealed.

7.      Plaintiffs and similarly situated owners and lessees of the Defective Vehicles are entitled to compensation for their losses, including losses related to increased fuel expenditures.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the RICO Act, 18 U.S.C. § 1962.  The Court also has diversity jurisdiction because Plaintiffs and Defendants reside in different states.  The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.  This Court also has original jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1), as modified by the Class Action Fairness Act of 2005, because Plaintiffs and Defendants are citizens of different states; there are more than 100 members of the Class (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and Class members reside across the United States.  The citizenship of each party is described further below in the "Parties" section.

2

1336321.4

9.     This Court has personal jurisdiction over Defendants, pursuant to Code 18 U.S.C. § 1965(b) & (d), and/or Cal. Code Civ. P. § 410.10, because they have minimum contacts with the United States, this judicial district, and this State, and intentionally availed themselves of the laws of the United States and this state by conducting a substantial amount of business throughout the state, including the design, manufacture, distribution, testing, sale, lease, and/or warranty of FCA vehicles in this State and District.  At least in part because of Defendants' misconduct as alleged in this lawsuit, Defective Vehicles ended up on this state's roads and in dozens of franchise dealerships.

10.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Moreover, FCA has marketed, advertised, sold, and leased the Defective Vehicles within this District.

## INTRADISTRICT ASSIGNMENT

11.     This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in the counties served by the San Francisco Division.  Several proposed Class members purchased and maintained their Class Vehicles in the counties served by this Division.  Moreover, Defendants conduct substantial business in the counties served by this Division, FCA has marketed, advertised, and sold/leased the Class Vehicles in those counties, and has caused harm to Class members residing in those counties.

## PARTIES

*Plaintiffs*

12.     Plaintiff Luke Kitchel is a citizen of California and a resident of Santa Cruz, California.  Mr. Kitchel purchased his 2016 Dodge Ram 1500 EcoDiesel from Santa Cruz Volkswagen Dodge Ram in Santa Cruz, California.

13.     Plaintiff Gregory Wilkerson is a citizen of Alabama and a resident of Birmingham, Alabama.  Mr. Wilkerson purchased his 2014 Dodge Ram 1500 EcoDiesel from Jim Burk Dodge in Birmingham, Alabama.

1336321.4

14.    Plaintiff Joseph Moynihan is a citizen of Indiana and a resident of Selma, Indiana. Mr. Moynihan purchased his 2016 Jeep Grand Cherokee from Ed Martin Chrysler Dodge Jeep Ram in Anderson, Indiana.

15.     Plaintiff Mark Richards is a citizen of Indiana and a resident of Franklin, Indiana. Mr. Richards purchased his 2016 Dodge Ram 1500 EcoDiesel from Champion Chrysler in Indianapolis, Indiana.

16.    Plaintiff Timothy Green is a citizen of Alabama and resident of Brookwood, Alabama.   Mr. Green purchased his 2015 Dodge Ram 1500 EcoDiesel from Auto Nation in Columbus, Georgia.

17.    Plaintiff Harold Blake is a citizen of Vermont and a resident of Barre, Vermont. Mr. Blake purchased his 2016 Dodge Ram 1500 EcoDiesel from Goss Dodge in Burlington, Vermont.

18.    Plaintiff Travis Morgan is a citizen of Indiana and a resident of Paoli, Indiana. Mr. Morgan purchased his 2016 Dodge Ram 1500 EcoDiesel from Freedom Dodge Chrysler Jeep Ram in Lexington, Kentucky.

19.    Plaintiff Jeff Parisi is a citizen of Michigan and a resident of Holly, Michigan. Mr. Parisi purchased his 2014 Jeep Grand Cherokee EcoDiesel from Hall Chrysler in Feneon, Michigan.

20.    Plaintiff Micah Williams is a citizen of North Carolina and a resident of Yadkinville, North Carolina.  Mr. Williams purchased his 2016 Dodge Ram 1500 EcoDiesel from Kernersville Dodge in Kernersville, North Carolina.

21.    Plaintiff Adam Burwell is a citizen of Oregon and a resident of Klamath Falls, Oregon.  Mr. Burwell purchased his 2016 Dodge Ram 1500 EcoDiesel from Dave Smith Motors in Kellogg, Idaho.

22.    Plaintiff Elmer Brinkman is a citizen of South Dakota and a resident of Watertown, South Dakota.  Mr. Brinkman purchased his 2016 Dodge Ram 1500 EcoDiesel from Watertown Ford Chrysler in Watertown, South Dakota.

1336321.4

23.     Plaintiff Louis Bodie is a citizen of Texas and a resident of Mount Victoria, Texas. Mr. Richards purchased his 2016 Dodge Ram 1500 EcoDiesel from Port Lavaca Dodge in Port Lavaca, Texas.

24.     Plaintiff Jamie Broom is a citizen of Louisiana and a resident of Thibodaux, Louisiana.   Mr. Broom purchased his 2015 Dodge Ram 1500 EcoDiesel from Nyle Maxwell dealership in Taylor, Texas.

25.     Plaintiff Walter Swan is a citizen of Texas and a resident of Houston, Texas. Mr. Swan purchased his 2016 Dodge Ram 1500 EcoDiesel from Tomball Dodge in Tomball, Texas.

26.     Plaintiff Craig McCully is a citizen of Texas and a resident of Selman City, Texas. Mr. McCully purchased his 2016 Dodge Ram 1500 EcoDiesel from Bluebonnet Dodge in New Braunfels, Texas.

27.     Plaintiff Aaron Carter is a citizen of Illinois and a resident of Swansea, Illinois. Mr. Carter purchased his 2015 Jeep Grand Cherokee EcoDiesel from Oliver C. Joseph in Belleville, Illinois.

28.     Plaintiff Daniel Brown is a citizen of Indiana and a resident of Greenwood, Indiana. Mr. Brown purchased his 2016 Dodge Ram 1500 EcoDiesel from Fletcher Dodge in Franklin, Indiana.

29.     Plaintiff Nelson Delgado is a citizen of Texas and a resident of Spring, Texas. Mr. Delgado purchased his 2015 Dodge Ram 1500 EcoDiesel from Spring Dodge in Spring, Texas.

30.     Plaintiff Bobby Reichert is a citizen of Florida and a resident of Boca Raton, Florida. Mr. Reichert purchased his 2016 Dodge Ram 1500 EcoDiesel from Arrigo Dodge in Sunrise, Florida.

31.     Plaintiff Christopher Mattingly is a citizen of Nevada and a resident of Las Vegas, Nevada.  Mr. Mattingly purchased his 2016 Dodge Ram 1500 EcoDiesel from Chapman's Dodge Chrysler Jeep in Las Vegas, Nevada.

CLASS ACATION COMPLAINT

1336321.4

32.     Plaintiff Micah Martin is a citizen of Texas and a resident of Pinehurst, Texas. Mr. Martin purchased his 2015 Dodge Ram 1500 EcoDiesel from Tomball Dodge in Tomball, Texas.

33.     Plaintiff Marius Bihorean is a citizen of Georgia and a resident of Lawrenceville, Georgia.  Mr. Bihorean purchased his 2015 Dodge Ram 1500 EcoDiesel from Skyland AutoGroup in Asheville, North Carolina.

34.     Plaintiff GN Systems, Inc., is a citizen of Florida and a resident of Wellington, Florida.  GN Systems, Inc., purchased two 2014 Dodge Ram 1500 EcoDiesels from University Dodge in Davie, Florida, a 2015 Dodge Ram 1500 EcoDiesel from Atlantic Coast Automotive, Inc., in Davie, Florida, and two 2016 Dodge Ram 1500 EcoDiesels from Atlantic Coast Automotive, Inc., in Davie, Florida.

35.     Plaintiff Leslie Ghrist is a citizen of California and a resident of Simi Valley, California.  Ms. Ghrist leased her 2016 Dodge Ram 1500 EcoDiesel from Shaver Chrysler Jeep in Thousand Oaks, California.

***Defendants***

**FCA US LLC**

36.     FCA US LLC ("FCA") is a limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by holding company Fiat Chrysler Automobiles N.V., a Dutch corporation headquartered in London, United Kingdom.   FCA's principal place of business and headquarters is in Auburn Hills, Michigan.

37.     FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles.  FCA's Chrysler brand is one of the "Big Three" American automobile brands.  FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division.  As of 2015, FCA is the seventh largest automaker in the world by unit production.

1336321.4

38.     FCA, through its various entities, designs, manufactures, markets, distributes, and sells automobiles in California and multiple other locations in the U.S. and worldwide.  FCA and/or its agents designed, manufactured, and installed the EcoDiesel engine systems in the Defective Vehicles.  FCA also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Defective Vehicles.

**The Bosch Defendants**

39.     From at least 2005 to 2015, Robert Bosch GmbH, Robert Bosch LLC and currently unnamed Bosch employees (together, "Bosch") were knowing and active participants in the creation, development, marketing, and sale of illegal defeat devices specifically designed to evade U.S. emissions requirements in vehicles sold solely in the United States.  These vehicles include the Dodge Ram 1500 EcoDiesel and Jeep Grand Cherokee EcoDiesel, as well as diesels made by Volkswagen, Audi, Porsche, and Mercedes.  Bosch participated not just in the development of the defeat device, but in the scheme to prevent U.S. regulators from uncovering the device's true functionality.  Moreover, Bosch's participation was not limited to engineering the defeat device (in a collaboration described as unusually close).  Rather, Bosch marketed "Clean Diesel" in the United States and lobbied U.S. regulators to approve "Clean Diesel," another highly unusual activity for a mere supplier.  These lobbying efforts, taken together with evidence of Bosch's actual knowledge that the "akustikfunktion" operated as a defeat device, and participation in concealing the true functionality of the device from U.S. regulators, can be interpreted only one way under U.S. law: Bosch was a knowing and active participant in a massive, decade-long conspiracy with FCA, and others to defraud U.S. consumers, regulators, and diesel car purchasers or lessees.

40.     Robert Bosch GmbH is a German multinational engineering and electronics company headquartered in Gerlingen, Germany.  Robert Bosch GmbH is the parent company of Robert Bosch LLC.  Robert Bosch GmbH, directly and/or through its North-American subsidiary Robert Bosch LLC, at all material times, designed, manufactured, and supplied elements of the defeat device to FCA for use in the Defective Vehicles.  Bosch GmbH is subject to the personal jurisdiction of this Court because it has availed itself of the laws of the United States through its management and

control over Bosch, LLC, and over the design, development, manufacture, distribution, testing, and sale of hundreds of thousands of the defeat devices installed in the Defective Vehicles sold or leased in the U.S.

41.    Robert Bosch LLC is a Delaware Limited Liability Company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331.  Robert Bosch LLC is a wholly owned subsidiary of Robert Bosch Gmbh.  Robert Bosch LLC, directly and/or in conjunction with its parent Robert Bosch GmbH, at all material times, designed, manufactured, and supplied elements of the defeat device to FCA for use in the Defective Vehicles.

42.    Both Robert Bosch GmbH and Robert Bosch LLC operate under the umbrella of the Bosch Group, which encompasses some 340 subsidiaries and companies.  The Bosch Group is divided into four business sectors:  Mobility Solutions (formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology.  The Mobility Solutions sector, which supplies parts to the automotive industry, and its Diesel Systems division, which develops, manufacturers, and supplies diesel systems, are particularly at issue here and include the relevant individuals at both Bosch GmbH and Bosch LLC.  Bosch's sectors and divisions are grouped not by location, but by subject matter.  Mobility Solutions includes the relevant individuals at both Bosch GmbH and Bosch LLC.  Regardless of whether an individual works for Bosch in Germany or the U.S., the individual holds him or herself out as working for Bosch.  This collective identity is captured by Bosch's mission statement:  "We are Bosch," a unifying principle that links each entity and person within the Bosch Group.

**FACTS COMMON TO ALL COUNTS**

43. On January 12, 2017, the EPA issued a Notice of Violation to FCA based in part on vehicle emission testing it performed at the National Vehicle and Fuel Emissions Laboratory ("NVFEL").

44.    The EPA discovered at least eight concealed AECDs in the Defective Vehicles. These AECDs were used to circumvent the Defective Vehicles' emission control systems that exist to comply with U.S. emissions standards, and were not disclosed to the public or to regulators.  The

CLASS ACACTION COMPLAINT

1336321.4

concealed AECDs are as follows:  1) AECD 1 (Full EGR Shut-Off at Highway Speed);  2) AECD 2 (Reduced EGR with Increasing Vehicle Speed);  3) AECD 3 (EGR Shut-Off for Exhaust Valve Cleaning);  4) AECD 4 (DEF Dosing Disablement during SCR Adaption);  5) AECD 5 (EGR Reduction due to Modeled Engine Temperature); 6) AECD 6 (SCR Catalyst Warm-Up Disablement); 7) AECD 7 (Alternative SCR Dosing Modes);  8) AECD 8 (Use of Load Governor to Delay Ammonia Refill of SCR Catalyst).[1]

45.    According to information provided by FCA to the EPA, and additional testing conducted by the NVFEL, the Defective Vehicles emit high levels of NOx emissions.

46.    According to the EPA, "despite having the opportunity to do so, FCA has failed to demonstrate that FCA did not know, or should not have known, that a principal effect of one or more of these AECDs was to bypass, defeat, or render inoperative one or more elements of design installed to comply with emissions standards under the CAA."[2]

47.    The EPA has provided the following discrete examples where effectiveness of the emission control system is reduced:[3]

a.    Combined operation of AECD 3 with AECD 7 or AECD 8 reduces in certain situations the effectiveness of the overall emission control system by disabling one key component of that system, the EGR system, without compensating by increasing the effectiveness of the other critical component, the SCR system. AECD 3 employs a timer to shut-off EGR; this EGR disablement does not appear justified for protecting the vehicle, nor does it meet any of the other exceptions of the defeat device regulatory definition.  Under certain conditions reasonably expected to be encountered in normal vehicle operation and use, the SCR is unable to compensate for the reduced effectiveness caused by EGR shut-off and the overall effectiveness of the emission control system is reduced;

---

[1] *Notice of Violation for Model Year 2014-2016 diesel light-duty vehicles (Dodge Ram and Jeep Grand Cherokee)*, Environmental Protection Agency (Jan. 12, 2017), https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017-01-12.pdf.
[2] *Id.*
[3] *Id.*

CLASS ACATION COMPLAINT

b.      The operation of AECD 5, together with AECD 6, at temperatures outside of those found in the Federal emission test procedure reduces the effectiveness of the NOx emission control system under conditions reasonably expected to be encountered in normal vehicle operation and use.  In addition, a timer is used to discontinue warming of the SCR after treatment system, thereby reducing its effectiveness, in a manner that does not appear to be justified to protect the vehicle;

c.      The operation of AECD 4, particularly when combined with AECD 8, increases emissions of tailpipe NOx under conditions reasonably expected to be encountered in normal vehicle operation and use.  The operation of AECD 1, AECD 2 and/or AECD 5 increase the frequency of occurrence of AECD 4; and

d.      The operation of AECDs 7 and 8, particularly in variable grade and high load conditions, increases emissions of tailpipe NOx under conditions reasonably expected to be encountered in normal vehicle operation and use.

48.      The EPA has made it public that "despite having the opportunity to do so, FCA has failed to establish that these [AECDs] are not defeat devices."[4]

49.      In 2014, FCA introduced the Dodge Ram "EcoDiesel" and the Grand Cherokee Overland "EcoDiesel."

50.      FCA manufactures, designs, markets, sells, and leases these "EcoDiesel" vehicles as if they are "reduced emissions" cars that are cleaner than gasoline cars, when, in fact, these FCA vehicles are not "Eco" and emit far more pollutants than their gasoline-fueled counterparts.

51.      FCA also markets its EcoDiesel vehicles as "clean diesel" with ultra-low emissions, high fuel economy, and powerful torque and towing capacity.  FCA describes its EcoDiesel as "ultra clean," "emissions compliant," and claims that "no NOx" exits the tailpipe.  FCA charges a premium for EcoDiesel-equipped vehicles.  For example, selecting the 3.0-liter EcoDiesel engine for the 2016

---

[4] *Id.*

1336321.4

Dodge Ram 1500 Laramie adds $4,770 to the purchase price. And the 2016 Jeep Grand Cherokee Overland EcoDiesel costs $4,500 more than its gasoline model.

52.     In addition, FCA markets the vehicles as fuel efficient, if not the "best" of any full-sized pickup. Without cheating emissions, FCA could not achieve the fuel economy and range it promises.

53.     These representations are deceptive and false. FCA has programmed its EcoDiesel vehicles to significantly reduce the effectiveness of the NOx reduction systems during real-world driving conditions.

54.     FCA did not previously disclose to Plaintiffs or Class members that in real-world driving conditions, the Defective Vehicles can only achieve high fuel economy and powerful towing by spewing unmitigated NOx into the air. FCA never disclosed that it prioritizes engine power and profits over people.

55.     FCA also never disclosed to consumers that the Defective Vehicles may be "clean" diesels in very limited circumstances, but are "dirty" diesels under most driving conditions. FCA never disclosed that it prioritizes engine power and profits over the environment and people's time and money. FCA never disclosed that the Defective Vehicles' emissions materially exceed the emissions from gasoline-powered vehicles, that the emissions exceed what a reasonable consumer would expect from a "clean diesel," and that the emissions materially exceed applicable emissions limits in real-world driving conditions. And FCA collected a premium for these trucks by selling them at thousands of dollars over the cost of a comparable gas truck.

56.     FCA did not act alone. Bosch GmbH and Bosch LLC (together, "Bosch") was an active and knowing participant in the scheme to evade U.S. emissions requirements. Bosch manufactured and tested the electronic diesel control that allowed FCA to implement the defeat device.

57.     The U.S. government, through the Environmental Protection Agency (EPA), has passed and enforced laws designed to protect U.S. citizens from pollution and, in particular, certain

1336321.4

chemicals and agents known to cause disease in humans.  Automobile manufacturers must abide by these laws and must adhere to EPA rules and regulations.

58.    The U.S. Clean Air Act has strict emissions standards for vehicles, and it requires vehicle manufacturers to certify to the EPA that the vehicles sold in the U.S. meet applicable federal emissions standards to control air pollution.  An EPA-issued certificate of conformity must cover every vehicle sold in the United States

59.    There is a very good reason that these laws and regulations exist, particularly in regards to vehicles with diesel engines:  In 2012, the World Health Organization declared diesel vehicle emissions to be carcinogenic, and about as dangerous as asbestos.

60.    Diesel engines pose a particularly difficult challenge to the environment because they have an inherent trade-off between power, fuel efficiency, and emissions:  the greater the power and fuel efficiency, the dirtier and more harmful the emissions.

61.    Instead of using a spark plug to combust highly refined fuel with short hydrocarbon chains, as gasoline engines do, diesel engines compress a mist of liquid fuel and air to very high temperatures and pressures, which causes the diesel to spontaneously combust.  This causes a more powerful compression of the pistons, which produces greater engine torque (that is, more power).

62.    The diesel engine is able to do this both because it operates at a higher compression ratio than a gasoline engine and because diesel fuel contains more energy than gasoline.

63.    But this greater energy and fuel efficiency comes at a cost:  diesel produces dirtier and more dangerous emissions.  One byproduct of diesel combustion is NOx, which includes a variety of nitrogen and oxygen chemical compounds that only form at high temperatures.

64.    NOx pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone.  Exposure to these pollutants has been linked with serious health dangers, including asthma attacks and other respiratory illnesses serious enough to send people to the hospital.  Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects.  Children, the elderly,

and people with pre-existing respiratory illness are at acute risk of health effects from these pollutants.

65.     Vehicle manufacturers have struggled to produce diesel engines that have high power and strong fuel efficiency but also cleaner emissions.  Removing NOx from the untreated exhaust is difficult, and diesel vehicle makers have reacted by trying to remove NOx from vehicles' exhaust using catalysts.

66.     FCA's response to the challenge has been the EcoDiesel engine.

67.     Emission reductions start in the cylinder with advanced fuel injection strategies. After the byproducts of combustion leave the engine, the EcoDiesel technology treats these emissions using a diesel oxidation catalyst, diesel particulate filter, and selective catalyst reduction.

68.     The EcoDiesel approach, when it is operational, results in cleaner emissions without compromising power or fuel economy.

69.     In order to counter beliefs that diesel engines produce "dirty" emissions and to capitalize on consumers' desire to protect the environment, FCA aggressively markets the EcoDiesel engine as being environmentally friendly.

70.     The central theme in FCA's diesel engine marketing is the promise of clean diesel.

71.     In its EcoDiesel advertising, FCA specifically targets consumers "who want to drive an efficient, environmentally-friendly truck without sacrificing capability or performance."[5] Indeed, it claims that the Ram 1500 was "the NAFTA market's first and only light-duty pickup powered by clean diesel technology."[6]

---

[5] *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, Ram Zone (July 16, 2013), https://blog.ramtrucks.com/features/the-2014-ram-1500-with-ecodiesel-engine-available-soon-at-a-dealer-near-you/attachment/2014-ram-1500-4/.

[6] *Chrysler Group's 3.0-liter EcoDiesel V-6, 500e Battery-Electric Drive System Among Ward's 10 Best Engines for 2014*, Chrysler Group LLC (FCA) (Dec. 12, 2013), http://www.prnewswire.com/news-releases/chrysler-groups-30-liter-ecodiesel-v-6-500e-battery-electric-drive-system-among-wards-10-best-engines-for-2014-235575231.html.

CLASS ACACTION COMPLAINT

1336321.4

72.    To convince these consumers, FCA expressly markets the Defective Vehicles as EcoDiesel vehicles, with EPA certifications throughout the U.S., claiming as follows throughout its advertising, specifications, and public-facing statements:

73.    "Thanks to advanced emissions-control technology ... [EcoDiesel's] exhaust is ultra-clean, making this engine available in all 50 states."[7]

74.    "Equipped with a diesel oxidation catalyst, diesel particulate filter and selective catalyst reduction, the EcoDiesel V6 engine will be emissions-compliant in all 50 states."[8]

75.    "Chrysler Group engineers adapted the engine—manufactured by Fiat-owned V.M. Motori—to meet the NAFTA region's stringent emissions and on-board diagnostic regulations.  The new EcoDiesel V-6 is Tier 2/Bin 5 compliant."[9]

76.    The emissions on the EcoDiesel engine data sheet meet Tier2 Bin5 requirements.[10]

77.    FCA further claims "the Bosch emissions control system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the tailpipe."[11]

78.    And FCA holds itself out as a protector of the environment:  "We are in a race against time.  Climate change and the increasing scarcity of traditional sources of energy require new approaches to mobility.  Fiat Group is addressing this challenge head-on by ensuring individual freedom of movement with maximum consideration for the environment and local communities."[12] Step one, according to FCA is to "minimize environmental impacts related to the use of our products."

---

[7] *Id.*

[8] *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You* (July 16, 2013), https://blog.ramtrucks.com/features/ the-2014-ram-1500-with-ecodiesel-engine-available-soon-at-a-dealer-near-you/.

[9] *Chrysler Group's 3.0-liter EcoDiesel V-6, 500e Battery-Electric Drive System Among Ward's 10 Best Engines for 2014*, Chrysler Group LLC (FCA) (Dec. 12, 2013), http://www.fcanorth america.com/News/ChryslerDocuments/ChryslerGroupLLC_Sustain2013Dec12.pdf.

[10] Specification Sheet, *available at* http://www.vmmotori.com/images/data_sheet/L630_DOHC-NEW.pdf.

[11] Dale Jewett, *EcoDiesel: An Essential Tool for Every Outdoorsman* (May 22, 2015), https://blog.fcanorthamerica.com/2015/05/ 22/ecodiesel-an-essential-tool-for-every-outdoorsman/.

[12] Fiat Chrysler's 2014 Sustainability Report at 4, *available at* http://www.fcanorthamerica.com/ company/sustainability/Documents/Fiat%20Chrysler%20Sustainability%20Brochure%202014.pdf.

CLASS ACTION COMPLAINT

1336321.4

79.    FCA promises that the EcoDiesel vehicles provide greater fuel economy, "30% better than a comparable gasoline engine."  According to FCA, "a Jeep Grand Cherokee or Ram 1500 with the EcoDiesel V-6 has a driving range of about 730 miles on one tank of fuel.  That's more than enough range to make the drive from Detroit to Traverse City and back without a refueling stop."[13]

80.    FCA's website claims that "[t]he 3.0-liter V-6 EcoDiesel engine available on the Jeep Grand Cherokee and Ram 1500 pickup has been listed among Ward's "10 Best Engines" for three consecutive years.  On the Ram 1500, the engine delivers the highest fuel economy among all full-size truck competitors – 12% higher than the next-closest competitor.  On the Jeep Grand Cherokee, it offers fuel economy of 30 miles per gallon highway with a driving range of more than 730 miles."[14]

81.    FCA further claims that the 2014 Ram 1500 "exceeds the EPA highway rating for the top-ranked small pickup.  The breakthrough results mean Ram keeps the half-ton fuel-economy record set last year by the 2013 Ram 1500."

82.    FCA provides a chart on its website, which claims that Ram 1500 has the "best fuel economy of any full-size pick-up."[15]

83.    FCA also offers prospective Ram 1500 buyers a calculator to determine how much money they can save with "fewer fill-ups day-by-day."[16]

84.    FCA's advertising has been effective.  According to one press release,"[i]t's every truck manufacturer's dream to have this kind of initial order demand for a product.  Fuel economy is the No. 1 request of half-ton buyers and the Ram 1500 EcoDiesel delivers without compromising capability."[17]

---

[13] Dale Jewett, EcoDiesel: An Essential Tool for Every Outdoorsman, Objects in the Mirror… (May 22, 2015), https://blog.fcanorthamerica.com/2015/05/22/ecodiesel-an-essential-tool-for-every-outdoorsman/.
[14] *Fuel Efficiency*, FCA US LLC, http://www.fcanorthamerica.com/Innovation/Pages/Fuel-Efficiency2.aspx.
[15] *EcoDiesel – Ram 1500 HFE*, Ram Trucks (FCA), http://www.ramtrucks.com/en/ecodiesel/#
[16] *Id.*
[17] 2014 Ram 1500 EcoDiesel Orders Top More Than 8,000 Units in Three Days, Filling Initial Allocation, Chrysler Group LLC (FCA) (Feb. 19, 2014),

1336321.4

85.    FCA's Jeep Grand Cherokee advertising is similarly deceptive, claiming that diesel technology reduces the number of fill-ups.[18]

86.    FCA further claims that the EcoDiesel fuel efficiency equips the Jeep Grand Cherokee "with an incredible 730-mile highway driving range, you can find hundreds of miles of discovered roads and be confident you'll find your way back."[19]

87.    Without cheating emissions, FCA could not achieve the fuel economy and range that it promises.  Moreover, when and if FCA recalls the Defective Vehicles and degrades the EcoDiesel engine performance in order to make the Defective Vehicles compliant with EPA standards, Plaintiff and Class members will be required to spend additional sums on fuel and will not obtain the performance characteristics of their vehicles when purchased.  And Defective Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency and increased wear on their vehicles' engines.

88.    Another major concern for consumers of trucks and SUVs is power, including torque and towing capacity.  FCA claims that the 2015 Jeep Grand Cherokee equipped with a 3.0-liter EcoDiesel V6 engine has best-in-class towing capability of up to 7,400 pounds.[20]

89.    FCA also claims that the EcoDiesel engine has best-in-class torque:  "The EcoDiesel engine delivers best-in-class 420 lb-ft of torque.  Paired with an impressive 240 horsepower, this engine has serious muscle."[21]

90.    Without cheating emissions, FCA could not achieve the power and performance that it boasts about.  Moreover, when and if FCA recalls the Defective Vehicles and degrades the EcoDiesel engine performance in order to make the Defective Vehicles compliant with EPA standards, Plaintiff and Class members will be required to spend additional sums on fuel and will not

---

http://www.fcanorthamerica.com/News/ChryslerDocuments/ChryslerGroupLLC_Sustain2014Feb19.pdf.
[18] EcoDiesel, Jeep (FCA), http://www.jeep.com/en/jeep-capabilities/eco-diesel-calculator/.
[19] *Id.*
[20] *Id.*
[21] *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, Ram Zone (July 16, 2013), https://blog.ramtrucks.com/features/the-2014-ram-1500-with-ecodiesel-engine-available-soon-at-a-dealer-near-you/.

CLASS ACATION COMPLAINT

1336321.4

retain the towing capacity advertised. Also, Defective Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and increased wear on their vehicles' engine.

91.    All modern engines are integrated with sophisticated computer components to manage the vehicle's operation, such as an electronic diesel control ("EDC"). Bosch tested, manufactured and sold the EDC system used by FCA in the Defective Vehicles. This system is more formally referred to as the Electronic Diesel Control Unit 17 ("EDC Unit 17"). Upon its introduction, EDC Unit 17 was publicly-touted by Bosch as follows:[22]

> EDC17 ... controls every parameter that is important for effective, low-emission combustion.
>
> Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets. In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides. The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary. This improves the precision of injection throughout the vehicle's entire service life. The system therefore makes an important contribution to observing future exhaust gas emission limits.

92.    Bosch worked with each vehicle manufacturer that utilized EDC Unit 17 to create a unique set of specifications and software code to manage the vehicles' engine operation.

93.    With respect to the Defective Vehicles, however, EDC Unit 17 was also enabled by Bosch and FCA to surreptitiously evade emissions regulations. Bosch and FCA worked hand in glove to develop and implement a specific set of software algorithms for implementation in the Defective Vehicles, which enabled FCA to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates (for applicable vehicles).[23]    Once the software had been implemented, Bosch continued to work hand in glove with FCA to ensure specific software

---

[22] *See* Bosch Press Release, *The brain of diesel injection: New Bosch EDC17 engine management system* (Feb. 28, 2006), http://www.bosch-presse.de/presseforum/details.htm?txtID =2603&locale=en.

[23] *See, e.g.*, *Engine management*, Bosch Auto Parts, http://de.bosch-automotive.com/en/parts_ and_accessories/motor_and_sytems/diesel/engine_management_2/engine_control_unit_1

CLASS ACTION COMPLAINT

1336321.4

algorithms it developed functioned properly.  When carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (large rollers) and then perform a series of specific maneuvers prescribed by federal regulations.  Bosch's EDC Unit 17 gave FCA, and other manufacturers the power to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure, and even the position of the steering wheel.  When the EDC Unit 17's detection algorithm detected that the vehicle was on a dynamometer (and undergoing an emission test), additional software code within the EDC Unit 17 downgraded the engine's power and performance and upgraded the emissions control systems' performance by switching to a "dyno calibration" to cause a subsequent reduction in emissions to legal levels.  Once the EDC Unit 17 detected that the emission test was complete, the EDC Unit would then enable a different "road calibration" that caused the engine to return to full power while reducing the emissions control systems' performance, and consequently caused the car to spew the full amount of illegal NOx emissions out on the road.[24]

94.    This workaround was illegal.  The Clean Air Act expressly prohibits defeat devices, defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use."  40 C.F.R. § 86.1803-01; *see also id.* § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device.").  Moreover, the Clean Air Act prohibits the sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use."  42 U.S.C. § 7522(a)(3).  Finally, in order to obtain a certificate of compliance ("COC"), automakers must submit an application, which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

---

[24] Russell Hotten, *Volkswagen: The scandal explained*, BBC (Dec. 10, 2015), http://www.bbc.com/news/business-34324772.

CLASS ACATION COMPLAINT

1336321.4

95.     Thus, in order to obtain the COCs necessary to sell their vehicles, FCA did not disclose, and affirmatively concealed, the presence of the test-detecting and performance-altering software code that it developed with Bosch from government regulators, thus making that software an illegal defeat device.  In other words, FCA lied to the government, its customers, its dealers, and the public at large.

96.     Because the COCs were fraudulently obtained, and because the Defective Vehicles did not conform "in all material respects" to the specifications provided in the COC applications, the Defective Vehicles were never covered by a valid COC, and thus, were never legal for sale, nor were they EPA and/or CARB compliant, as represented.  FCA and Bosch hid these facts from the EPA, other regulators, its dealers and consumers, and it continued to sell and lease the Defective Vehicles to the driving public, despite their illegality, and with the complicity of Bosch.

97.     FCA's illegal workaround was enabled by its close partnership with Bosch, which enjoyed a sizable portion of its annual revenue from manufacturing parts used in FCA's and other manufacturers' diesel vehicles.[25]  Bosch was well aware that FCA was using its emissions control components as a defeat device and, in fact, worked with FCA to develop and refine the software algorithm specifically tailored for the Defective Vehicles.

98.     Because the COCs were fraudulently obtained, the Defective Vehicles were never covered by valid COCs, and thus, were never offered legally for sale.  FCA hid these facts from the EPA, CARB and other state regulators, and consumers, and it continued to sell and lease the Defective Vehicles despite their illegality, and with the complicity of Bosch.

99.     FCA will not be able to make the Defective Vehicles comply with emissions standards without substantially degrading their performance characteristics, including their horsepower and efficiency.  As a result, even if FCA is able to make the Defective Vehicles EPA-

---

[25] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel technology operations branch of Bosch, and Volkswagen was the biggest diesel manufacturer in the world.  *See Bosch probes whether its staff helped VW's emissions rigging*, Automotive News (Jan. 27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes-whether-its-staffhelped-vws-emissions-rigging.

CLASS AACTION COMPLAINT

1336321.4

compliant, Plaintiff and Class members will nonetheless suffer actual harm and damages because their vehicles will no longer perform as they did when purchased and as advertised. This will necessarily result in a diminution in value of every Defective Vehicle, and it will cause owners of Defective Vehicles to pay more for fuel while using their Defective Vehicles.

100.    As a result of FCA's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that under normal operating conditions the Defective Vehicles are not "clean" diesels and emit more pollutants than permitted under federal and state laws, owners and/or lessees of the Defective Vehicles have suffered losses in money and/or property. Had Plaintiff and Class members known of the higher emissions at the time they purchased or leased their Defective Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did. Moreover, when and if FCA recalls the Defective Vehicles and degrades the EcoDiesel Clean Diesel engine performance in order to make the Defective Vehicles compliant with EPA standards, Plaintiff and Class members will be required to spend additional sums on fuel and will not obtain the performance characteristics of their vehicles when purchased. Moreover, Defective Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency and increased wear on their vehicles' engines.

101.    FCA was aware that emissions and fuel consumption were decisive factors for customers making purchase decisions. In response, FCA began representing to consumers that its vehicles consumed less fuel and emitted less NOx than they actually do in normal driving conditions.

### TOLLING OF THE STATUTE OF LIMITATIONS

#### Discovery Rule Tolling

102.    Plaintiffs could not have discovered through reasonable diligence that their Defective Vehicles were defective within the time period of any applicable statutes of limitation.

103.    Among other things, Plaintiffs did not know and could not have known until January 12, 2017, when published reports disclosed that FCA was concealing the conduct complained of

1336321.4

herein and misrepresenting FCA's true position with respect to the emission qualities of the Defective Vehicles.

104. Plaintiffs and the Class did not discover, and did not know of, facts that would have caused a reasonable person to suspect that FCA did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that FCA had concealed information about the true emissions of the Defective Vehicles, which was discovered by Plaintiffs only shortly before this action was filed. Nor, in any event, would such an investigation on the part of Plaintiffs and the Class disclosed that FCA valued profits over truthful marketing and compliance with federal and state law.

105. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Defective Vehicles.

**Fraudulent Concealment Tolling**

106. All applicable statutes of limitation have also been tolled by FCA's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

107. Instead of disclosing its emissions scheme, or that the quality and quantity of emissions from the Defective Vehicles were far worse than represented, and of its disregard of federal and state law, FCA falsely represented that the Defective Vehicles complied with federal and state emissions standards, that the diesel engines were "clean," and that it was a reputable manufacturer whose representations could be trusted.

**Estoppel**

108. FCA was under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of emissions from the Defective Vehicles, and of those vehicles' emissions systems, and of the compliance of those systems with applicable federal and state law.

109. FCA knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the emissions systems, and the emissions, of the Defective Vehicles.

21

1336321.4

110.     FCA was also under a continuous duty to disclose to Plaintiffs and Class members that it had engaged in the conduct complained of herein contrary to federal and state emissions and clean air standards, and that it systematically devalued compliance with federal and state law regulating vehicle missions and clean air.

111.     Based on the foregoing, FCA is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

112.     Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action on behalf of themselves and on behalf of a Nationwide Class, defined as:

**Nationwide Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within the United States (including its Territories and the District of Columbia).

113.     In the alternative to the Nationwide Class, and pursuant to Federal Rules of Civil Procedure Rule 23(c)(5), Plaintiffs seek to represent the following State Classes (collectively the "Subclasses") as well as any subclasses or issue classes as Plaintiffs may propose and/or the Court may designate at the time of class certification:

**Alabama State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Alabama.

**Alaska State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Alaska.

**Arizona State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Arizona.

1336321.4

**Arkansas State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Arkansas.

**California State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within California.

**Colorado State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Colorado.

**Connecticut State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Connecticut.

**Delaware State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Delaware.

**District of Columbia State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within District of Columbia.

**Florida State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Florida.

**Georgia State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Georgia.

**Hawaii State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Hawaii.

1336321.4

**Idaho State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Idaho.

**Illinois State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Illinois.

**Indiana State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Indiana.

**Iowa State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Iowa.

**Kansas State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Kansas.

**Kentucky State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Kentucky.

**Louisiana State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Louisiana.

**Maine State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Maine.

**Maryland State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Maryland.

CLASS ACATION COMPLAINT

1336321.4

**Massachusetts State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Massachusetts.

**Michigan State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Michigan.

**Minnesota State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Minnesota.

**Mississippi State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Mississippi.

**Missouri State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Missouri.

**Montana State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Montana.

**Nebraska State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Nebraska.

**Nevada State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Nevada.

**New Hampshire State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within New Hampshire.

25

1336321.4

**New Jersey State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within New Jersey.

**New Mexico State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within New Mexico.

**New York State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within New York.

**North Carolina State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within North Carolina.

**North Dakota State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within North Dakota.

**Ohio State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Ohio.

**Oklahoma State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Oklahoma.

**Oregon State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Oregon.

**Pennsylvania State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Pennsylvania.

1336321.4

**Rhode Island State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Rhode Island.

**South Carolina State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within South Carolina.

**South Dakota State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within South Dakota.

**Tennessee State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Tennessee.

**Texas State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Texas.

**Utah State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Utah.

**Vermont State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Vermont.

**Virginia State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Virginia.

**Washington State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Washington.

CLASS ACATION COMPLAINT

1336321.4

**West Virginia State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within West Virginia.

**Wisconsin State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Wisconsin.

**Wyoming State Class:**

All current and former owners and lessees of a Defective Vehicle (as defined herein) that was purchased or leased within Wyoming.

114.   Excluded from all classes are Defendants, as well as Defendants' employees, affiliates, officers and directors, including franchised dealers, any individuals who experienced physical injury as a result of the defect at issue in this litigation, and the judge and court staff to whom this case is assigned.

115.   Plaintiffs reserve the right to modify and/or add to the Nationwide and/or State Classes prior to class certification.

## Fed. R. Civ. P. 23(a) Prerequisites

116.   Both the Nationwide and State Classes are so numerous that joinder of all members is impracticable.   The precise number of Class Members is unknown and is within the exclusive control of FCA and its affiliated dealerships.

117.   **Numerosity** - According to publically available information, FCA has sold more than one hundred thousand Defective Vehicles.  Accordingly, joinder of claims would be impractical.

118.   **Commonality** - The Claims of Plaintiffs and the Nationwide and State Classes involve common questions of fact and law that will predominate over any individual issues.  These common questions include, but are not limited to:

119.   Whether FCA and Bosch engaged in the conduct alleged herein;

120.   Whether FCA designed, advertised, marketed, distributed, leased, sold, or otherwise placed Defective Vehicles into the stream of commerce in the United States;

28

1336321.4

121.    Whether the EcoDiesel Clean Diesel engine system in the Defective Vehicles emits pollutants at levels that do not make them "clean" diesels and that do not comply with EPA requirements and federal and state emissions regulations;

122.    Whether the EcoDiesel Clean Diesel engine system in Defective Vehicles can be made to comply with EPA and state standards without substantially degrading the performance and/or efficiency of the Defective Vehicles;

123.    Whether FCA and Bosch knew about the concealed AECDs and, if so, how long FCA has known;

124.    Whether Bosch designed and manufactured the concealed AECDs;

125.    Whether Bosch supplied the AECDs to FCA with the knowledge that FCA would use it in production of Defective Vehicles;

126.    Whether Bosch acted in concert with FCA and aided and abetted FCA's fraud;

127.    Whether FCA designed, manufactured, marketed, and distributed Defective Vehicles with defective or otherwise inadequate emission controls;

128.    Whether FCA knew about the unlawfully high emissions and, if so, how long FCA has known;

129.    Whether FCA's and Bosch's conduct violates RICO and other laws as asserted herein;

130.    Whether FCA's and Bosch's conduct violates consumer protection statutes and false advertising laws;

131.    Whether Plaintiffs and the other Class members overpaid for their Defective Vehicles;

132.    Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

133.    Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

1336321.4

134.  **Typicality** - Plaintiffs' claims are typical of Nationwide and State Classes Members' claims.  As described herein, Plaintiffs and the other Class members purchased or leased a Defective Vehicle, which was designed, manufactured, marketed, distributed, leased, and/or sold by FCA. Plaintiffs' and the other Class members have been damaged by Defendants' illegal conduct. Plaintiffs' and the other Class members have incurred similar or identical losses relating to the Defective Vehicles.  Furthermore, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all Class members.

135.  **Adequacy** - Plaintiffs will fully and adequately represent and protect the interests of the Nationwide and State Classes because they share common interests with Class members as a result of Defendants' illegal conduct.

136.  Plaintiffs have retained counsel with experience in complex, commercial, multi-party, mass tort, consumer, and class action litigation.  Plaintiffs' counsel have prosecuted dozens of complex class actions, including those involving defective automobiles, in state and federal courts across the country.

137.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

### Fed. R. Civ. P. 23(b) Prerequisites

138.  **Predominance.**  Questions of law and fact common to the Nationwide and State Classes predominate over questions affecting individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Individual damages on the matter can be readily calculated.  Thus, the question of individual damages will not predominate over legal and factual questions common to the Nationwide and State Classes. Additionally, Defendants have acted or refused to act on grounds that apply generally to the Nationwide and State Classes, so that final injunctive relief and/or corresponding declaratory relief is appropriate with respect to the Nationwide and State Classes.

139.    **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs and Class members have all suffered and will continue to suffer economic harm and damage as a result of Defendants' unlawful and wrongful conduct, which was directed toward Class members and the public as a whole, rather than specifically or uniquely against any individual Class members.  Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class members' claims, it is likely that only a few Class members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class members will continue to incur damages, and Defendants' misconduct will continue without effective remedy.

140.    **Declaratory and Injunctive Relief.**  Classwide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the Class, and inconsistent adjudications with respect to Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class members to protect their interests.  Classwide relief and Court supervision under Rule 23 assures fair, consistent, and equitable treatment and protection of all Class members, and uniformity and consistency in Defendants' discharge of its duties to perform corrective action regarding the Defective Vehicles.

**Violations of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(C) – (D)**
**(On Behalf of the Nationwide Class)**

141.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

142.    Plaintiffs brings this Count individually and on behalf of the Nationwide RICO Class against Defendants FCA, Robert Bosch GmbH, and Robert Bosch LLC (collectively, "RICO Defendants").

1336321.4

CLASS ACACTION COMPLAINT

143.    The RICO Defendants are all "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

144.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."   Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate."

145.    For years now, the RICO Defendants have aggressively sought to increase the sales of Defective Vehicles in an effort to bolster revenue, augment profits and increase FCA's share of the diesel vehicle market.  Finding it impossible to achieve their goals lawfully, however, the RICO Defendants resorted instead to orchestrating a fraudulent scheme and conspiracy.  In particular, the RICO Defendants, along with other entities and individuals, created and/or participated in the affairs of an illegal enterprise ("EcoDiesel RICO Enterprise") whose direct purpose was to deceive the regulators and the public into believing the Defective Vehicles offered "clean-diesel technology" and were environmentally friendly.  As explained in greater detail below, the RICO Defendants' acts in furtherance of the EcoDiesel RICO Enterprise violate § 1962(c) and (d).

**Members of the EcoDiesel RICO Enterprise**

146.    Upon information and belief, the EcoDiesel RICO Enterprise consisted of the following entities and individuals:  FCA, Robert Bosch GmbH, and Robert Bosch LLC.

147.    Robert Bosch GmbH and Robert Bosch LLC (together, "Bosch" or "Bosch Defendants") tested, manufactured, and sold the electronic control module ("ECM") that managed the emissions control system used by FCA in the Defective Vehicles.  This particular ECM is more formally referred to as the Electronic Diesel Control Unit 17 ("EDC Unit 17").[26]

148.    FCA Bosch GmbH is a multinational engineering and electronics company headquartered in Gerlingen, Germany, which has hundreds of subsidiaries and companies.  It wholly

---

[26] http://www.bosch-presse.de/presseforum/details.htm?txtID=7421&tk_id=108.

1336321.4

owns FCA Bosch LLC, a Delaware limited liability company headquartered in Farmington Hills, Michigan.  As explained above, Bosch's sectors and divisions are grouped by subject matter, not location.  The Mobility Solutions (formerly Automotive Technology) is the Bosch sector at issue, particularly its Diesel Services division, and it encompasses employees of Bosch GmbH and Bosch LLC.  These individuals were responsible for the design, manufacture, development, customization, and supply of the defeat device to FCA for use in the Defective Vehicles.

149.    Bosch worked with FCA to develop and implement a specific and unique set of software algorithms to surreptitiously evade emissions regulations.  Bosch customized their EDC Unit 17s for installation in the Defective Vehicles with unique software code to detect when it was undergoing emissions testing.

150.    EDC Unit 17 could not effectively lower NOx emissions to legal levels during normal operating conditions.  In order to pass the emissions test, then, EDC Unit 17 is equipped with a "defeat device," which is software that allows the vehicle to determine whether it is being operated under normal conditions or testing conditions.

151.    As was publicly reported, the Bosch Defendants, seeking to conceal their involvement in the unlawful EcoDiesel RICO Enterprise, sent a letter to Volkswagen AG in 2007 stating that Volkswagen Diesels *could not be lawfully operated* if the LNT or SCR after-treatment system was disabled.[27]  The exact same logic applies to the FCA Defective Vehicles.

152.    Indeed, notwithstanding their knowledge that the Volkswagen Diesels *could not be lawfully operated* if the emissions system was disabled, the Bosch Defendants, driven to cement their position as a leading supplier of diesel emissions equipment, went on to sell more than one hundred thousand to FCA for the Defective Vehicles.

153.    The persons and entities described in the preceding section are members of and constitute an "association-in-fact" enterprise.

---

[27] Stef Shrader, *Feds Are Now Investigating Volkswagen Supplier Bosch Over Dieselgate*, Jalopnik (Nov. 19, 2015), http://jalopnik.com/feds-are-now-investigating-volkswagen-supplierbosch-ov-1743624448.

CLASS ACACTION COMPLAINT

1336321.4

154.    At all relevant times, the EcoDiesel RICO Enterprise:  (a) had an existence separate and distinct from each FCA; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing organization consisting of legal entities, including FCA, the Bosch Defendants, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Defective Vehicles through fraudulent COCs and EOs, false emissions tests, deceptive and misleading marketing and materials, and deriving profits and revenues from those activities.  Each member of the EcoDiesel RICO Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud consumers and franchise dealers alike nationwide.

155.    The EcoDiesel RICO Enterprise functioned by selling vehicles and component parts to the consuming public.  Many of these products are legitimate, including vehicles that do not contain defeat devices.  However, the RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Defective Vehicles.

156.    The EcoDiesel RICO Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Defective Vehicles throughout the country, and the receipt of monies from the sale of the same.

157.    Within the EcoDiesel RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis.  The EcoDiesel RICO Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Defective Vehicles to the general public nationwide.

158.    Each participant in the EcoDiesel RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.    Through the EcoDiesel RICO Enterprise, the RICO Defendants functioned as a

1336321.4

continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

159.    The RICO Defendants participated in the operation and management of the EcoDiesel RICO Enterprise by directing its affairs, as described herein.    While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

160.    FCA exerted substantial control and participated in the affairs of the EcoDiesel RICO Enterprise by:

161.    Designing the Defective Vehicles with defeat devices;

162.    Failing to correct or disable the defeat devices when warned;

163.    Manufacturing, distributing, and selling the Defective Vehicles that emitted greater pollution than allowable under the applicable regulations;

164.    Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

165.    Introducing the Defective Vehicles into the stream of U.S. commerce without a valid EPA COC and/or CARB EO;

166.    Concealing the existence of the defeat devices and the unlawfully high emissions from the public and regulators;

167.    Persisting in the manufacturing, distribution, and sale of the Defective Vehicles even after questions were raised about the emissions testing and discrepancies concerning the same;

168.    Misleading government regulators as to the nature of the defeat devices and the defects in the Defective Vehicles;

169.    Misleading the driving public as to the nature of the defeat devices and the defects in the Defective Vehicles;

170.    Designing and distributing marketing materials that misrepresented and concealed the defect in the vehicles;

CLASS ACATION COMPLAINT

171.    Otherwise misrepresenting or concealing the defective nature of the Defective Vehicles from the public and regulators;

172.    Illegally selling and/or distributing the Defective Vehicles;

173.    Collecting revenues and profits from the sale of the Defective Vehicles; and

174.    Ensuring that the other RICO Defendants and unnamed co-conspirators complied with the fraudulent scheme.

175.    Bosch also participated in, operated and/or directed the EcoDiesel RICO Enterprise. Bosch participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC Unit 17 which operated as a "defeat device" in the Defective Vehicles.  Bosch exercised tight control over the coding and other aspects of the defeat device software and was closely collaborated with FCA to develop, customize, and calibrate the defeat devices.  Additionally, Bosch continuously cooperated with FCA to ensure that the EDC Unit 17 was fully integrated into the Defective Vehicles.  Bosch also participated in the affairs of the Enterprise by concealing the defeat devices on U.S. documentation and in communications with U.S. regulators.  Bosch collected tens of millions of dollars in revenues and profits from the hidden defeat devices installed in the Defective Vehicles.

176.    Without the RICO Defendants' willing participation, including Bosch's active involvement in developing and supplying the critical defeat devices for the Defective Vehicles, the EcoDiesel RICO Enterprise's scheme and common course of conduct would not have been successful.

177.    The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

178.    The members of the EcoDiesel RICO Enterprise all served a common purpose; namely, to outsell their law-abiding competitors and increase their revenues through the sale of as many Defective Vehicles (including the emissions components made and sold by Bosch) as possible. Each member of the EcoDiesel RICO Enterprise shared the bounty generated by the enterprise, *i.e.*,

by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. FCA sold more Defective Vehicles by utilizing an emissions control system that was cheaper to install and allowed for generous performance and efficiency tuning, all the while charging consumers a premium for Defective Vehicles that purportedly offers "clean-diesel technology" that is "efficient, increases range and improves power—all while leaving little trace of being there." The Bosch Defendants, in turn, sold more EDC Units because FCA manufactured and sold more Defective Vehicles. The RICO Defendants achieved their common purpose by repeatedly misrepresenting and concealing the nature of the Defective Vehicles and the ability of the emissions control systems (including the Bosch-supplied parts) to effectively reduce toxic emissions during normal operating conditions.

**The Predicate Acts**

179.    To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants conducted or participated in the conduct of the affairs of the EcoDiesel RICO Enterprise through a pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

180.    Specifically, the RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit writings travelling in interstate or foreign commerce.

181.    The RICO Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

182.    Application for certificates submitted to the EPA and CARB;

183.    The Defective Vehicles themselves;

184.    Component parts for the defeat devices;

185.    Essential hardware for the Defective Vehicles;

186.    Falsified emission tests;

187.    Fraudulently-obtained EPA COCs and CARB EOs;

1336321.4

188.    Vehicle registrations and plates as a result of the fraudulently obtained EPA COCs and CARB EOs;

189.    Documents and communications that facilitated the falsified emission tests;

190.    False or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

191.    Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Defective Vehicles;

192.    Documents intended to facilitate the manufacture and sale of the Defective Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

193.    Documents to process and receive payment for the Defective Vehicles by unsuspecting franchise dealers, including invoices and receipts;

194.    Payments to Bosch;

195.    Deposits of proceeds; and

196.    Other documents and things, including electronic communications.

197.    The RICO Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described therein.

198.    The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.    Specifically, FCA made misrepresentations about the Defective Vehicles on their websites and through ads online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics.

199.    The RICO Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

1336321.4

200.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Defective Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Defective Vehicles were "clean" diesel cars.

201.    Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records.  However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred.  They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

202.    The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.  In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein.  Various other persons, firms and corporations, including third-party entities and individuals not named as Defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

203.    The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

204.    To achieve their common goals, the RICO Defendants hid from the general public the unlawfulness and emission dangers of the Defective Vehicles and obfuscated the true nature of the defect.

205.    The RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course

CLASS ACATION COMPLAINT

1    of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing,

2    marketing, testing, and/or selling the Defective Vehicles (and the defeat devices contained therein).

3    206.    Indeed, for the conspiracy to succeed each of the RICO Defendants and their

4    coconspirators had to agree to implement and use the similar devices and fraudulent tactics—

5    specifically complete secrecy about the defeat devices in the Defective Vehicles.

6    207.    The RICO Defendants knew and intended that Plaintiffs and the Class, as well as

7    government regulators, would rely on the material misrepresentations and omissions made by them

8    about the Defective Vehicles.    The RICO Defendants knew and intended Plaintiffs and the Class

9    would incur costs and damages as a result.    As fully alleged herein, Plaintiffs and the Class relied

10    upon Defendants' representations and omissions that were made or caused by them.    Plaintiffs' and

11    the Class's reliance is made obvious by the fact that:  (1) they purchased more than one hundred

12    thousand Defective Vehicles that never should have been introduced into the U.S. stream of

13    commerce and whose worth is far less.  In addition, the EPA, CARB, and other regulators relied on

14    the misrepresentations and material omissions made or caused to be made by the RICO Defendants;

15    otherwise FCA could not have obtained valid COCs and EOs to sell the Defective Vehicles.

16    208.    The RICO Defendants' conduct in furtherance of this scheme was intentional.

17    Plaintiffs and the Class were harmed as a result of the RICO Defendants' intentional conduct.

18    Plaintiffs, the Class, regulators and consumers, among others, relied on the RICO Defendants'

19    material misrepresentations and omissions.

20    209.    As described herein, the RICO Defendants engaged in a pattern of related and

21    continuous predicate acts for many years.    The predicate acts constituted a variety of unlawful

22    activities, each conducted with the common purpose of defrauding Plaintiffs and the Class and

23    obtaining significant monies and revenues from them and through them while providing Defective

24    Vehicles worth significantly less than the invoice price paid.  The predicate acts also had the same or

25    similar results, participants, victims, and methods of commission.  The predicate acts were related

26    and not isolated events.

27

28

1336321.4

210.    The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and the Class, and consumers.  The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the EcoDiesel RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and the Class's funds, artificially inflating the brand and dealership goodwill values, and avoiding the expenses associated with remediating the Defective Vehicles.

211.    During the design, manufacture, testing, marketing and sale of the Defective Vehicles, the RICO Defendants shared technical, marketing and financial information that plainly revealed the emissions control systems in the Defective Vehicles as the ineffective, illegal and fraudulent piece of technology they were and are.  Nevertheless, the RICO Defendants shared and disseminated information that deliberately represented Defective Vehicles as offering "clean-diesel technology" that is "efficient, increases range and improves power—all while leaving little trace of being there."

212.    By reason of and as a result of the conduct of the RICO Defendants, and, in particular, its pattern of racketeering activity, Plaintiffs and the Class have been injured in multiple ways, including, but not limited to:

213.    Overpayment for Defective Vehicles, in that Plaintiffs and the Class believed they were paying for vehicles that met certain emission and fuel efficiency standards and obtained vehicles that were not legal to sell in the U.S.; and

214.    The value of the Defective Vehicles has diminished, thus reducing their sale and resale value.

215.    The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).  Each of the RICO Defendants knew, understood and intended for members of the Class to purchase the Defective

Vehicles, and knew, understood, and foresaw that revelation of the truth would injure members of the Class.

**Violation of Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.***
**(On Behalf of the Nationwide Class)**

216.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

217.    Plaintiffs bring this Count on behalf of themselves and the Nationwide Class.

218.    This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act (for the purpose of this Count, the "Act") by virtue of 28 U.S.C. § 1332(a)-(d).

219.    FCA is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5) because the company regularly sells FCA vehicles accompanied by a written Limited Warranty.

220.    Plaintiffs and other Class Members are "consumers" who purchased "consumer products" for purposes of 15 U.S.C. § 2301(1) and (3) because they purchased Defective Vehicles for personal, family, or household purposes.

221.    The Defective Vehicles are "consumer products" within the meaning of the Act. 15 U.S.C. § 2301(1).

222.    The Act provides a cause of action for any consumer who is damages by the failure of a warrantor to comply with a written or implied warranty.  15 U.S.C. § 2310(d)(1).

223.    The amount in controversy of the Plaintiffs' individual claims meets or exceeds $25.00 in value.  In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) on the basis of all claims to be determined in this suit.

224.    Under the Act, damaged "consumers" have a private cause of action against any warrantor that fails to comply with a written or implied warranty.

225.    FCA provided Plaintiffs and the Nationwide Class with the following express warranties:  (1) a 5-year/100,000-mile Diesel Powertrain Limited Warranty, which "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation" (2) a California Emissions

42

1336321.4

Standard Warranty for 3 years or 50,000 miles (whichever occurs first); (3) a California Emissions Standard Warranty for 7 years or 70,000 miles (whichever occurs first), and (4) a federal emissions warranty that covers the repair and replacement of all emission control and emission-related parts for two years or 24,000 miles (whichever comes first), and covers specified major emission control components, including catalytic converters, electronic emissions control unit or computer and on-board emissions diagnostic device or computer for 8 years or 80,000 miles (whichever comes first). These express warranties constitute written warranties within the meaning of 15 U.S.C. § 2301(6). The Defective Vehicles' implied warranties are covered by 15 U.S.C. § 2301(7).

226. The terms of written warranties and implied warranty became part of the basis of the bargain between Plaintiffs and all other Class members when deciding to purchase a Defective Vehicle.

227. FCA breached these written and implied warranties as described in detail above. Without limitation, the Defective Vehicles share a common design defect in that they emit more $NO_x$ than: (a) is allowable under the applicable regulations, and (b) FCA represented were emitted to their customers, the public, and regulators.

228. Plaintiffs and each of the other Nationwide Class members have had sufficient direct dealings with either FC or its agents (including FCA dealerships) to establish privity of contract between FC, on the one hand, and Plaintiffs and each of the other Nationwide Class members, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

229. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Defective Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations concerning the

1336321.4

Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the design defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

230. As a direct and proximate result of FCA's breach of the written warranties and the implied warranty of merchantability, Plaintiffs and Class members have suffered damages in an amount to be determined at trial.

231. Plaintiffs, individually and on behalf of the Nationwide Class, seek all damages permitted by law, including compensation for the monetary difference between the Defective Vehicles as warranted and as sold; compensation for the reduction in resale value; the cost of purchasing, leasing, or renting replacement vehicles, along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

**Fraud**
**(On Behalf of the Nationwide Class or, in the Alternative, the Subclasses)**

232. Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

233. Plaintiffs bring this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the Subclasses against FCA and Bosch.

234. FCA designed, manufactured, marketed, sold, and/or leased Defective Vehicles to Plaintiffs and the Class. FCA represented to Plaintiffs and the Class in advertising and other forms of communication, including standard and uniform material provided with each Defective Vehicle, that the Defective Vehicles had no significant defects, complied with EPA and state emissions regulations, and would perform and operate properly when driven in normal usage. Bosch was aware of FCA's representations and their falsity.

1336321.4

235.    The Defective Vehicles purchased or leased by Plaintiffs s and the Class were, in fact, defective, non-EPA compliant, and unreliable, because the NOx reduction system in the Defective Vehicles does not effectively mitigate emissions.

236.    FCA intentionally concealed, suppressed, and failed to disclose the facts that the Defective Vehicles had defective emissions controls, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements.

237.    At all relevant times, FCA has held out the Defective Vehicles to be EPA-compliant reduced emissions vehicles.  FCA disclosed certain details about the EcoDiesel Clean Diesel engine, but nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles had defective emissions controls, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

238.    The truth about the defective emissions controls, unlawfully high emissions, and noncompliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Class did not know of these facts and FCA actively concealed these facts from Plaintiffs and the Class.

239.    Plaintiffs and the Class reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and the Class did not and could not unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and the Class by concealing the true facts about the Defective Vehicles' emissions.

240.    FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air law, and emissions regulations that are meant to protect the public and consumers.  It also emphasized profits and sales above the trust that Plaintiffs and the Class placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing during real-world driving conditions.

1336321.4

241.    FCA's false representations were material to consumers because they concerned the quality of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the omissions played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and the Class, highly valued that the vehicles they were purchasing or leasing were clean diesel cars with reduced emissions, and they paid accordingly.

242.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or the Class.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to them as reduced emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs, FCA had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and the Class.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and the Class that they were purchasing or leasing *reduced emission* diesel

vehicles, when in fact, they were purchasing or leasing defective and unlawfully high emission vehicles.

243. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and the Class.

244. On information and belief, FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and the Class by concealing material information regarding the emissions qualities of the Defective Vehicles.

245. Plaintiffs and the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Class's actions were justified. FCA was in exclusive control of the material facts, and the public, Plaintiffs, or the Class did not generally know such facts.

246. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and FCA's failure to timely disclose the defect or defective design of the EcoDiesel Clean Diesel engine system, the actual emissions qualities and quantities of FCA-branded vehicles, and the serious issues engendered by FCA's corporate policies. Had Plaintiffs and the Class been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, Plaintiffs and members of the Class who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1336321.4

247.    The value of Plaintiffs' and the Class's vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and of the non-compliance with EPA emissions requirements, all of which has greatly tarnished the FCA brand name, which is attached to Plaintiffs' and the Class's vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

248.    Bosch aided and abetted FCA's fraudulent concealment.

249.    Accordingly, FCA is liable to Plaintiffs and the Class for damages in an amount to be proven at trial.

250.    FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**Breach of Contract**
**(On Behalf of the Nationwide Class or, in the Alternative, the Subclasses)**

1.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

2.    Plaintiffs bring this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the Subclasses.

3.    Every purchase or lease of a Defective Vehicle from an authorized dealer of FCA constitutes a contract between FCA and the purchaser or lessee.  FCA materially breached these contracts by selling or leasing Plaintiffs and all other Class members defective, non-compliant Defective Vehicles and by programming Defective Vehicles to significantly reduce the effectiveness of the NOx reduction systems during real-world driving conditions, rendering the Defective Vehicles substantially less valuable than the vehicles that FCA advertised and promised to deliver to Plaintiffs and the Class.

CLASS ACATION COMPLAINT

1336321.4

4.    FCA's misrepresentations and omissions alleged herein caused Plaintiffs and the other Class members to enter into their agreements to purchase or lease their Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and other Class members would not have purchased or leased their Defective Vehicles and/or would not have purchased or leased their Defective Vehicles at the prices they paid.  Accordingly Plaintiffs and the Class overpaid for their Defective Vehicles and did not receive the benefit of their bargain.

5.    FCA also breached their implied covenant of good faith and fair dealing under the laws of all 50 states and the District of Columbia.  By delivering a vehicle that was non-compliant and by programming Defective Vehicles to significantly reduce the effectiveness of the NOx reduction systems during real-world driving conditions, FCA violated Plaintiffs and the other Class members' fair and reasonable expectations under their respective contracts.  In addition, FCA's misrepresentations and omissions violated FCA's implied duty to deal honestly, and within reasonable commercial standards of fair dealing, with Plaintiffs and the other Class members.

6.    As a direct and proximate result of FCA's breach, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**Unjust Enrichment**
**(On Behalf of the Nationwide Class or, in the Alternative, the Subclasses)**

7.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

8.    Plaintiffs bring this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the Subclasses against FCA.

9.    FCA benefitted from selling and leasing, at an unjust profit, Defective Vehicles that had artificially inflated values due to FCA's concealment of the defeat devices, and Plaintiffs and the other Class members have overpaid for these vehicles.

1336321.4

10.     FCA received and retained unjust benefits from the Plaintiffs and the other Class members, and inequity has resulted.

11.     It is inequitable and unconscionable for FCA to retain these benefits.

12.     Because FCA concealed their fraud and deception, Plaintiffs and the other Class members were not aware of the true facts concerning the Defective Vehicles and did not benefit from FCA's misconduct.

13.     FCA knowingly accepted the unjust benefits of their fraudulent conduct. As a result of FCA's misconduct, the mount of their unjust enrichment should be disgorged and returned to Plaintiffs and the other Class members, in an amount to be proven at trial.

## **ALABAMA**

### **ALABAMA COUNT I**
**Violations of the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1 *et seq*.**
**(On Behalf of the Alabama State Class)**

14.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

15.     Plaintiffs bring this Count on behalf of the Alabama Subclass against FCA.

16.     Plaintiffs and the Alabama State Class members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

17.     Plaintiffs, the Alabama State Class members, and FCA are "persons" within the meaning of Ala. Code § 8-19-3(5).

18.     The Defective Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

19.     FCA was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

20.     The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including:  "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other

CLASS ACACTION COMPLAINT

1336321.4

unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

21.    Plaintiffs intend to assert a claim under the Alabama DTPA.  Plaintiffs will make a demand in satisfaction of Ala. Code § 8-19-3 and may amend this Complaint to assert claims under the Alabama DTPA once the required 15 days have elapsed.  This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Alabama DTPA.

**ALABAMA COUNT II**
**<u>Fraud</u>**
**(Based on Alabama Law)**
**(On Behalf of the Alabama State Class)**

22.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

23.    This claim is brought on behalf of the Alabama State Class against FCA.

24.    FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were noncompliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the Alabama State Class members information that is highly relevant to their purchasing decision.

25.    FCA further affirmatively misrepresented to Plaintiffs and Alabama State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

26.    FCA knew these representations were false when made.

27.    The Defective Vehicles purchased or leased by Plaintiffs and the other Alabama State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of

1336321.4

1    FCA's advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system

2    in the Defective Vehicles turns off or is limited during normal driving conditions.

3         28.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

4    turns off or is limited during normal driving conditions and that the Defective Vehicles were

5    defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

6    pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

7    those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

8    Plaintiffs and the other Alabama State Class members relied on FCA's material representations that

9    the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free

10   from defects.

11        29.    As alleged in this Complaint, at all relevant times, FCA has held out the Defective

12   Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about the

13   diesel engine, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx

14   reduction system in the Defective Vehicles turns off or is limited during normal driving conditions,

15   and that the Defective Vehicles had defective emissions controls, employ a "defeat device," emitted

16   higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels

17   of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures

18   about the emission system deceptive.

19        30.    The truth about the defective emissions controls and FCA's manipulations of those

20   controls, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions

21   requirements was known only to FCA; Plaintiffs and the Alabama State Class members did not

22   know of these facts, and FCA actively concealed these facts from Plaintiffs and Alabama State Class

23   members.

24        31.    Plaintiffs and Alabama State Class members reasonably relied upon FCA's deception.

25   They had no way of knowing that FCA's representations were false and/or misleading.  As

26   consumers, Plaintiffs and Alabama State Class members did not, and could not, unravel FCA's

27

28

52

1336321.4

deception on their own.   Rather, FCA intended to deceive Plaintiffs and Alabama State Class members by concealing the true facts about the Defective Vehicles' emissions.

32.    FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.   FCA also emphasized profits and sales above the trust that Plaintiffs and Alabama State Class members placed in its representations.   Consumers buy diesel cars from FCA because they feel they are clean diesel cars.   They do not want to be spewing noxious gases into the environment.   And yet, that is precisely what the Defective Vehicles are doing.

33.    FCA's false representations were material to consumers because they concerned the quality of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.   As FCA well knew, its customers, including Plaintiffs and Alabama State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

34.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Alabama State Class members.   FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual

CLASS ACATION COMPLAINT

philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Alabama State Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Alabama State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and Alabama State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

35.    FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Alabama State Class members.

36.    FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Alabama State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

37.    Plaintiffs and Alabama State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs'  and Alabama State Class members' actions were justified. FCA was in

1336321.4

exclusive control of the material facts, and the public, Plaintiffs, or Alabama State Class members, did not generally know such facts.

38.     Because of the concealment and/or suppression of the facts, Plaintiffs and Alabama State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and FCA's failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.   Had Plaintiffs and Alabama State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, Plaintiffs and Alabama State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

39.     The value of Plaintiffs' and Alabama State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Alabama State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

40.     Accordingly, FCA is liable to Plaintiffs and Alabama State Class members for damages in an amount to be proven at trial.

41.     FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Alabama State Class members' rights and the representations that FCA made to them, in order to enrich FCA.   FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

1336321.4

## ALABAMA COUNT III
### Breach of Express Warranty, Ala. Code §§ 7-2-313 and 7-2A-210
### (On Behalf of the Alabama State Class)

42.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

43.     This Count is brought on behalf of the Alabama State Class against FCA.

44.     FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under § 7-2-103(1)(d).

45.     With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

46.     The Defective Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

47.     In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

48.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

49.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission

56

1336321.4

control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

50.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

51.    As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

52.    FCA's warranties formed a basis of the bargain that was reached when Alabama State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

53.    Despite the existence of warranties, FCA failed to inform Alabama State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

54.    FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

55.    Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

CLASS ACATION COMPLAINT

1336321.4

56.     Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Alabama State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

57.     Accordingly, recovery by the Alabama State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

58.     Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Alabama State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

59.     Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Alabama State Class members' remedies would be insufficient to make them whole.

60.     Finally, because of FCA's breach of warranty as set forth herein, Alabama State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

61.     FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

As a direct and proximate result of FCA's breach of express warranties, Alabama State Class members have been damaged in an amount to be determined at trial.

**ALABAMA COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Ala. Code §§ 7-2-313 and 7-2A-210**
**(On Behalf of the Alabama State Class)**

62.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

63.    This Count is brought on behalf of the Alabama State Class, against FCA.

64.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under § 7-2-103(1)(d).

65.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

66.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

67.    A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ala. Code §§ 7-2-314 and 7-2A-212.

68.    These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

69.    FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

70.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Alabama State Class members have been damaged in an amount to be proven at trial.

CLASS ACATION COMPLAINT

# I.  ALASKA COUNTS

### ALASKA COUNT I
### Violations of the Alaska Unfair Trade Practices and Consumer Protection Act
### Alaska Stat. Ann. § 45.50.471 *et seq.*
### (On Behalf of the Alaska State Class)

71.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

72.     Plaintiffs bring this Count on behalf of the Alaska State Class against FCA.

73.     The Alaska Consumer Protection Act ("Alaska CPA") proscribes unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including:  "(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(8) advertising goods or services with intent not to sell them as advertised;" or "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged."  Alaska Stat. Ann. § 45.50.471.

74.     Plaintiffs will make a demand in satisfaction of Alaska Stat. Ann. § 45.50.535, and may amend this Complaint to assert claims under the Alaska CPA once the required notice period has elapsed.  This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Alaska CPA.

### ALASKA COUNT II
### Fraud
### (Based on Alaska Law)
### (On Behalf of the Alaska State Class)

75.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1336321.4

1      76.     This claim is brought on behalf of the Alaska State Class against FCA.

2      77.     FCA intentionally concealed that the NOx reduction system in the Defective Vehicles

3  turns off or is limited during normal driving conditions, that the Defective Vehicles had defective

4  emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted

5  pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign,

6  emitted unlawfully high levels of pollutants such as NOx, and were noncompliant with EPA

7  emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and

8  the other Alaska State Class members information that is highly relevant to their purchasing

9  decision.

10      78.     FCA further affirmatively misrepresented to Plaintiffs and Alaska State Class

11  members in advertising and other forms of communication, including standard and uniform material

12  provided with each car, that the Defective Vehicles it was selling had no significant defects, were

13  low-emission vehicles, complied with EPA regulations, and would perform and operate properly

14  when driven in normal usage.

15      79.     FCA knew these representations were false when made.

16      80.     The Defective Vehicles purchased or leased by Plaintiffs and the other Alaska State

17  Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-

18  powered vehicles and at a much higher rate than a reasonable consumer would expect in light of

19  FCA's advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system

20  in the Defective Vehicles turns off or is limited during normal driving conditions.

21      81.     FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

22  turns off or is limited during normal driving conditions and that the Defective Vehicles were

23  defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

24  pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

25  those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

26  Plaintiffs and the other Alaska State Class members relied on FCA's material representations that the

27

28

1336321.4

Defective Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

82.    As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about the diesel engine, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

83.    The truth about the defective emissions controls and FCA's manipulations of those controls, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Alaska State Class members did not know of these facts, and FCA actively concealed these facts from Plaintiffs and Alaska State Class members.

84.    Plaintiffs and Alaska State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Alaska State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Alaska State Class members by concealing the true facts about the Defective Vehicles' emissions.

85.    FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Alaska State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

1336321.4

86.     FCA's false representations were material to consumers because they concerned the quality of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Alaska State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

87.     FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Alaska State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Alaska State Class members, FCA had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Alaska State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and

1336321.4

Alaska State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

88.    FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Alaska State Class members.

89.    FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Alaska State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

90.    Plaintiffs and Alaska State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'   and Alaska State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Alaska State Class members, did not generally know such facts.

91.    Because of the concealment and/or suppression of the facts, Plaintiffs and Alaska State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and FCA's failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Alaska State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, Plaintiffs and Alaska State Class members who

CLASS ACACTION COMPLAINT

1336321.4

purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

92.     The value of Plaintiffs' and Alaska State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Alaska State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

93.     Accordingly, FCA is liable to Plaintiffs and Alaska State Class members for damages in an amount to be proven at trial.

94.     FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Alaska State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### ALASKA COUNT III
### Breach of Express Warranty,
### Alaska Stat. §§ 45.02.313 and 45.12.210
### (On Behalf of the Alaska State Class)

95.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

96.     This Count is brought on behalf of the Alaska State Class against FCA.

97.     FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Alaska Stat. §§ 45.02.104(a) and 45.12.103(c)(11), and a "seller" of motor vehicles under Alaska Stat. § 45.02.103(a)(4).

98.     With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Alaska Stat. § 45.12.103(a)(16).

1336321.4

99.     The Defective Vehicles are and were at all relevant times "goods" within the meaning of Alaska Stat. §§ 45.02.105(a) and 45.12.103(a)(8).

100.     In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

101.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

102.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

103.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty

1336321.4

provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

104.    As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

105.    FCA's warranties formed a basis of the bargain that was reached when Alaska State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

106.    Despite the existence of warranties, FCA failed to inform Alaska State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

107.    FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

108.    Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

109.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Alaska State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

110.    Accordingly, recovery by the Alaska State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

111.    Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts

regarding the Defective Vehicles.  Alaska State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

112.    Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Alaska State Class members' remedies would be insufficient to make them whole.

113.    Finally, because of FCA's breach of warranty as set forth herein, Alaska State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

114.    FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

115.    As a direct and proximate result of FCA's breach of express warranties, Alaska State Class members have been damaged in an amount to be determined at trial.

### ALASKA COUNT IV
### Breach of Implied Warranty of Merchantability,
### Alaska Stat. §§ 45.02.314 and 45.12.212
### (On Behalf of the Alaska State Class)

116.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

117.    This Count is brought on behalf of the Alaska State Class, against FCA.

118.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Alaska Stat. §§ 45.02.104(a) and 45.12.103(c)(11), and a "seller" of motor vehicles under Alaska Stat. § 45.02.103(a)(4).

119.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Alaska Stat. § 45.12.103(a)(16).

1336321.4

120. The Defective Vehicles are and were at all relevant times "goods" within the meaning of Alaska Stat. §§ 45.02.105(a) and 45.12.103(a)(8).

121. A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Alaska Stat. §§ 45.02.314 and 45.12.212.

122. These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

123. FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

124. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Alaska State Class members have been damaged in an amount to be proven at trial.

## II.      ARIZONA COUNTS

### ARIZONA COUNT I
**Violations of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521 *et seq*.**
**(On Behalf of the Arizona State Class)**

125. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

126. Plaintiffs bring this Count on behalf of the Arizona State Class against FCA.

127. The Arizona Consumer Fraud Act ("Arizona CFA") provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

1336321.4

128.    In the course of FCA's business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.   Accordingly, FCA engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Defective Vehicles.

129.    In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Arizona State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

130.    Plaintiffs and Arizona State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Arizona State Class members did not, and could not, unravel FCA's deception on their own.

131.    FCA's actions as set forth above occurred in the conduct of trade or commerce.

132.    FCA's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

133.    FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Arizona State Class.

134.    FCA knew or should have known that its conduct violated the Arizona CFA.

135.    FCA owed Plaintiffs and the Arizona State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

CLASS ACATION COMPLAINT

1336321.4

136.    Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

137.    Intentionally concealed the foregoing from Plaintiffs and the Arizona State Class; and/or

138.    Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Arizona State Class that contradicted these representations.

139.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Arizona State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

140.    FCA's conduct proximately caused injuries to Plaintiffs and the other Arizona State Class members.

141.    Plaintiffs and the other Arizona State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Arizona State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.   These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

142.    FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1336321.4

143.    Plaintiffs and the Arizona State Class seek monetary relief against FCA in an amount to be determined at trial.  Plaintiffs and the Arizona State Class also seek punitive damages because FCA engaged in aggravated and outrageous conduct with an evil mind.   Plaintiffs also seek attorneys' fees and any other just and proper relief available.

### ARIZONA COUNT II
### Fraud
### (Based on Arizona Law)
### (On Behalf of the Arizona State Class)

144.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

145.    This claim is brought on behalf of Plaintiffs and the Arizona State Class against FCA.

146.    FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were noncompliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Arizona State Class members information that is highly relevant to their purchasing decision.

147.    FCA further affirmatively misrepresented to Plaintiffs and Arizona State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

148.    FCA knew these representations were false when made.

149.    The Defective Vehicles purchased or leased by Plaintiffs and the other Arizona State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of

CLASS ACATION COMPLAINT

1336321.4

FCA's advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

150.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Arizona State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

151.    As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

152.    The truth about the defective emissions controls and FCA's manipulations of those controls, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Arizona State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Arizona State Class members.

153.    Plaintiffs and Arizona State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Arizona State Class members did not, and could not, unravel FCA's

1336321.4

1   deception on their own.   Rather, FCA intended to deceive Plaintiffs and Arizona State Class

2   members by concealing the true facts about the Defective Vehicles' emissions.

3       154.   FCA also concealed and suppressed material facts concerning what is evidently the

4   true culture of FCA—a culture characterized by an emphasis on profits and sales above compliance

5   with federal and state clean air laws and emissions regulations that are meant to protect the public

6   and consumers.   FCA also emphasized profits and sales above the trust that Plaintiffs and Arizona

7   State Class members placed in its representations.   Consumers buy diesel cars from FCA because

8   they feel they are clean diesel cars.   They do not want to be spewing noxious gases into the

9   environment.   And yet, that is precisely what the Defective Vehicles are doing.

10      155.   FCA's false representations were material to consumers because they concerned the

11  quality of the Defective Vehicles, because they concerned compliance with applicable federal and

12  state laws and regulations regarding clean air and emissions, and also because the representations

13  played a significant role in the value of the vehicles.   As FCA well knew, its customers, including

14  Plaintiffs and Arizona State Class members, highly valued that the vehicles they were purchasing or

15  leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

16      156.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

17  turns off or is limited during normal driving conditions and that the Defective Vehicles were

18  defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

19  pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

20  those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

21  FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known

22  to or reasonably discoverable by Plaintiffs or Arizona State Class members.   FCA also had a duty to

23  disclose because it made general affirmative representations about the qualities of the vehicles with

24  respect to emissions, starting with references to them as reduced-emissions diesel cars and as

25  compliant with all laws in each state, which were misleading, deceptive, and incomplete without the

26  disclosure of the additional facts set forth above regarding the actual emissions of the vehicles,

27  FCA's actual philosophy with respect to compliance with federal and state clean air laws and

28

1336321.4

emissions regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Arizona State Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Arizona State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and Arizona State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

157. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Arizona State Class members.

158. FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Arizona State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

159. Plaintiffs and Arizona State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Arizona State Class members' actions were justified. FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Arizona State Class members, did not generally know such facts.

160.    Because of the concealment and/or suppression of the facts, Plaintiffs and Arizona State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.   Had Plaintiffs and Arizona State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, Plaintiffs and Arizona State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

161.    The value of Plaintiffs' and Arizona State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Arizona State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

162.    Accordingly, FCA is liable to Plaintiffs and Arizona State Class members for damages in an amount to be proven at trial.

163.    FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Arizona State Class members' rights and the representations that FCA made to them, in order to enrich FCA.   FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

1336321.4

**ARIZONA COUNT III**
**Breach of Express Warranty,**
**Ariz. Rev. Stat. §§ 47-2313 and 47-2A210**
**(On Behalf of the Arizona State Class)**

164.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

165.    This Count is brought on behalf of the Arizona State Class against FCA.

166.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and is a "seller" of motor vehicles under Ariz. Rev. Stat. § 47-2103(A)(4).

167.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

168.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

169.    In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

170.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

171.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission

control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

172. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

173. As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

174. FCA's warranties formed a basis of the bargain that was reached when Arizona State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

175. Despite the existence of warranties, FCA failed to inform Arizona State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

176. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

177. Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1336321.4

178.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Arizona State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

179.    Accordingly, recovery by the Arizona State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

180.    Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Arizona State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

181.    Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Arizona State Class members' remedies would be insufficient to make them whole.

182.    Finally, because of FCA's breach of warranty as set forth herein, Arizona State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

183.    FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

184.    As a direct and proximate result of FCA's breach of express warranties, Arizona State Class members have been damaged in an amount to be determined at trial.

CLASS ACTION COMPLAINT

**ARIZONA COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Ariz. Rev. Stat. §§ 47-2314 and 47-2A212**
**(On Behalf of the Arizona State Class)**

185.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

186.    This Count is brought on behalf of the Arizona State Class, against FCA.

187.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and is a "seller" of motor vehicles under Ariz. Rev. Stat. § 47-2103(A)(4).

188.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

189.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

190.    A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ariz. Rev. Stat. §§ 47-2314 and 47-2a212.

191.    These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

192.    FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

193.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Arizona State Class members have been damaged in an amount to be proven at trial.

CLASS ACACTION COMPLAINT

1336321.4

### III.    ARKANSAS COUNTS

**ARKANSAS I**
**Violations of the Deceptive Trade Practices Act,**
**Ark. Code Ann. § 4-88-101 *et seq*.**
**(On Behalf of the Arkansas State Class)**

194.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

195.    This claim is brought on behalf of the Arkansas State Class against FCA.

196.    FCA, Plaintiffs, and Arkansas State Class members are "persons" within the meaning of the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

197.    The "Defective Vehicles" are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

198.    The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission." Ark. Code Ann. § 4-88-108.

199.    In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses,

81

1336321.4

benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

200.     In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Arkansas State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

201.     Plaintiffs and Arkansas State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Arkansas State Class members did not, and could not, unravel FCA's deception on their own.

202.     FCA's actions as set forth above occurred in the conduct of trade or commerce.

203.     FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

204.     FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Arkansas State Class.

205.     FCA knew or should have known that its conduct violated the Arkansas DTPA.

206.     FCA owed Plaintiffs and the Arkansas State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

207.     Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

82

1336321.4

208.    Intentionally concealed the foregoing from Plaintiffs and the Arkansas State Class; and/or

209.    Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Arkansas State Class that contradicted these representations.

210.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Arkansas State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

211.    FCA's conduct proximately caused injuries to Plaintiffs and the other Arkansas State Class members.

212.    Plaintiffs and the other Arkansas State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Arkansas State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.   These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

213.    FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

214.    Plaintiffs seeks monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial; (b) statutory damages in the amount of $250 for Plaintiffs and each Arkansas State Class member; (c) reasonable attorneys' fees; and (d) any other just and proper relief

available under Arkansas law.  Plaintiffs also seek punitive damages against FCA because it carried out despicable conduct with willful and conscious disregard of the rights of others.  FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

**ARKANSAS II**
**Fraud**
**(Based on Arkansas Law)**
**(On Behalf of the Arkansas State Class)**

215.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

216.    This claim is brought on behalf of the Arkansas State Class against FCA.

217.    FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, did not meet and maintain the advertised MPG rate, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Arkansas State Class members information that is highly relevant to their purchasing decision.

218.    FCA further affirmatively misrepresented to Plaintiffs and Arkansas State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

219.    FCA knew these representations were false when made.

220.    The Defective Vehicles purchased or leased by Plaintiffs and the other Arkansas State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Arkansas State Class members had to pay more for fuel than they reasonably expected, and unreliable because the

1336321.4

NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

221.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Arkansas State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

222.    As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

223.    The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Arkansas State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Arkansas State Class members.

224.    Plaintiffs and Arkansas State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and Arkansas State Class members did not, and could not, unravel FCA's

1336321.4

1  deception on their own.  Rather, FCA intended to deceive Plaintiffs and Arkansas State Class

2  members by concealing the true facts about the Defective Vehicles' emissions.

3      225.    FCA also concealed and suppressed material facts concerning what is evidently the

4  true culture of FCA—one characterized by an emphasis on profits and sales above compliance with

5  federal and state clean air laws and emissions regulations that are meant to protect the public and

6  consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Arkansas State

7  Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel

8  they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And

9  yet, that is precisely what the Defective Vehicles are doing.

10     226.    FCA's false representations were material to consumers because they concerned the

11  quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with

12  applicable federal and state laws and regulations regarding clean air and emissions, and also because

13  the representations played a significant role in the value of the vehicles.  As FCA well knew, its

14  customers, including Plaintiffs and Arkansas State Class members, highly valued that the vehicles

15  they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and

16  they paid accordingly.

17     227.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

18  turns off or is limited during normal driving conditions and that the Defective Vehicles were

19  defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

20  pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

21  those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

22  details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

23  knowledge as to such facts, and because FCA knew these facts were not known to or reasonably

24  discoverable by Plaintiffs or Arkansas State Class members.  FCA also had a duty to disclose

25  because it made general affirmative representations about the qualities of the vehicles with respect to

26  emissions, starting with references to them as reduced-emissions diesel cars and as compliant with

27  all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of

28

1336321.4

the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Arkansas State Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Arkansas State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and Arkansas State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

228. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Arkansas State Class members.

229. FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Arkansas State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

230. Plaintiffs and Arkansas State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Arkansas State Class members' actions were justified. FCA was in

exclusive control of the material facts, and the public, Plaintiffs, or Arkansas State Class members, did not generally know such facts.

231. Because of the concealment and/or suppression of the facts, Plaintiffs and Arkansas State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies. Had Plaintiffs and Arkansas State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Arkansas State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

232. The value of Plaintiffs' and Arkansas State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Arkansas State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

233. Accordingly, FCA is liable to Plaintiffs and Arkansas State Class members for damages in an amount to be proven at trial.

234. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Arkansas State Class members' rights and the representations that FCA made to them, in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

1336321.4

**ARKANSAS III**
**Breach of Express Warranty,**
**Ark Code Ann. §§ 4-2-313 and 4-2A-210**
**(On Behalf of the Arkansas State Class)**

235.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

236.   This Count is brought on behalf of the Arkansas State Class against FCA.

237.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ark. Code §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under § 4-2-103(1)(d).

238.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ark. Code § 4-2A-103(1)(p).

239.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code §§ 4-2-105(1) and 4-2A-103(1)(h).

240.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

241.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:   a "Performance Warranty" and a "Design and Defect Warranty."

242.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission

89

control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

243.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

244.    As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

245.    FCA's warranties formed a basis of the bargain that was reached when Arkansas State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

246.    Despite the existence of warranties, FCA failed to inform Arkansas State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

247.    FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

248.    Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1336321.4

249.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Arkansas State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

250.    Accordingly, recovery by the Arkansas State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

251.    Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Arkansas State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

252.    Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Arkansas State Class members' remedies would be insufficient to make them whole.

253.    Finally, because of FCA's breach of warranty as set forth herein, Arkansas State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

254.    FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

255.    As a direct and proximate result of FCA's breach of express warranties, Arkansas State Class members have been damaged in an amount to be determined at trial.

1336321.4

1
2

**ARKANSAS IV**
**Breach of Implied Warranty of Merchantability,**
**Ark. Code Ann. §§ 4-2-314 and 4-2A-212**
**(On Behalf of the Arkansas State Class)**

3
4

256.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

5

257.    This Count is brought on behalf of the Arkansas State Class, against FCA.

6
7
8

258.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ark. Code §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under § 4-2-103(1)(d).

9
10

259.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ark. Code § 4-2A-103(1)(p).

11
12

260.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code §§ 4-2-105(1) and 4-2A-103(1)(h).

13
14
15

261.    A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ark. Code §§ 4-2-314 and 4-2A-212.

16
17
18
19
20

262.    These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

21
22
23

263.    FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

24
25
26

264.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Arkansas State Class members have been damaged in an amount to be proven at trial.

27
28

92

## IV.    CALIFORNIA COUNTS

**CALIFORNIA COUNT I**
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(On Behalf of the California State Class)**

265.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

266.    This claim is brought on behalf of the California Class against FCA.

267.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

268.    FCA's conduct, as described herein, was and is in violation of the UCL.  FCA's conduct violates the UCL in at least the following ways:

269.    By failing to disclose that the NOx reduction system in the Defective Vehicles does not effectively mitigate emissions;

270.    By selling and leasing Defective Vehicles that suffer from a defective emissions control system and that emit unlawfully high levels of pollutants under normal driving conditions;

271.    By knowingly and intentionally concealing from Plaintiffs and the California Class members that the Defective Vehicles suffer from a defective emissions control system and emit unlawfully high levels of pollutants under normal driving conditions;

272.    By marketing Defective Vehicles as reduced emissions vehicles possessing functional and defect-free, EPA-compliant diesel engine systems;

273.    By deceptively obtaining EPA certification for Defective Vehicles;

274.    By violating federal laws, including the Clean Air Act; and

275.    By violating other California laws, including California consumer protection laws and California laws governing vehicle emissions and emission testing requirements.

276.    FCA's misrepresentations and omissions alleged herein caused Plaintiffs and the California State Class members to make their purchases or leases of their Defective Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the California State Class members

1336321.4

would not have purchased or leased these vehicles, would not have purchased or leased Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain defective EcoDiesel Clean Diesel engine systems that failed to comply with EPA and California emissions standards.

277.   Accordingly, Plaintiffs and the California State Class members have suffered injury in fact, including lost money or property, as a result of FCA's misrepresentations and omissions.

278.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by FCA under Cal. Bus. & Prof. Code § 17200.

279.   Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin FCA from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the California State Class any money it acquired by unfair competition, including restitution and/or disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345, and for such other relief set forth below.

**CALIFORNIA COUNT II**
**Violations of the California Consumer Legal Remedies Act**
**Cal. Civ. Code § 1750 *et seq.***
**(On Behalf of the California State Class)**

280.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

281.   This claim is brought on behalf of the California State Class against FCA.

282.   California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

283.   The Defective Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

284.   Plaintiffs and the California State Class members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiffs, the California State Class members, and FCA are "persons" as defined in Cal. Civ. Code § 1761(c).

1336321.4

285.    As alleged above, FCA made representations concerning the benefits, efficiency, performance and safety features of the EcoDiesel Clean Diesel engine systems that were misleading.

286.    In purchasing or leasing the Defective Vehicles, Plaintiffs and the California State Class members were deceived by FCA's failure to disclose that the Defective Vehicles were equipped with defective EcoDiesel Clean Diesel engine systems that failed EPA and California emissions standards.

287.    FCA's conduct, as described herein, was and is in violation of the CLRA. FCA's conduct violates at least the following enumerated CLRA provisions:

288.    Cal. Civ. Code § 1770(a)(2):  misrepresenting the approval or certification of goods.

289.    Cal. Civ. Code § 1770(a)(3):  misrepresenting the certification by another.

290.    Cal. Civ. Code § 1770(a)(5):  representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities, which they do not have.

291.    Cal. Civ. Code § 1770(a)(7):  representing that goods are of a particular standard, quality, or grade, if they are of another.

292.    Cal. Civ. Code § 1770(a)(9):  advertising goods with intent not to sell them as advertised.

293.    Cal. Civ. Code § 1770(a)(16):  representing that goods have been supplied in accordance with a previous representation when they have not.

294.    Plaintiffs and the California State Class members have suffered injury in fact and actual damages resulting from FCA's material omissions and misrepresentations and sale of Defective Vehicles with defective emissions controls because they paid an inflated purchase or lease price for the Defective Vehicles and because they stand to pay additional fuel costs if and when their Defective Vehicles are made to comply with FCA's promises.

295.    FCA knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the EcoDiesel Clean Diesel engine systems, and that the Defective Vehicles were not suitable for their intended use.

95

1336321.4

296.    The facts concealed and omitted by FCA to Plaintiffs and the California Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Defective Vehicles or pay a lower price.  Had Plaintiffs and the California State Class members known about the defective nature of the Defective Vehicles, and their non-compliance with EPA requirements, they would not have purchased or leased the Defective Vehicles or would not have paid the prices they paid.

297.    Plaintiffs and the California State Class members have provided FCA with notice of its violations of the CLRA pursuant to Cal. Civ. Code § 1782(a).  The notice was transmitted to FCA on November 28, 2016.

298.    Plaintiffs' and the California State Class members' injuries were proximately caused by FCA's unlawful and deceptive business practices.

299.    In accordance with Cal. Civ. Code § 1780(a), Plaintiffs and members of the California State Class seek injunctive relief for FCA's violations of the CLRA.

300.    While Plaintiffs and the California State Class members do not seek to recover damages under the CLRA in this initial Complaint, after mailing appropriate notice and demand in accordance with Cal. Civ. Code § 1782(a) & (d), Plaintiffs will subsequently amend this Complaint to also include a request for compensatory and punitive damages.

**CALIFORNIA COUNT III**
**Violations of the California False Advertising Law**
**Cal. Civ. Code § 17500 *et seq.***
**(On Behalf of the California State Class)**

301.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

302.    This claim is brought on behalf of the California State Class against FCA.

303.    Cal. Bus. & Prof. Code § 17500 states:  "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any

96

1336321.4

1  statement … which is untrue or misleading, and which is known, or which by the exercise of

2  reasonable care should be known, to be untrue or misleading."

3      304.    FCA caused to be made or disseminated through California and the U.S., through

4  advertising, marketing, and other publications, statements that were untrue or misleading, and which

5  were known, or which by the exercise of reasonable care should have been known, to FCA to be

6  untrue and misleading to consumers, including Plaintiffs and the California State Class members.

7      305.    FCA has violated Cal. Bus. & Prof. Code § 17500 because the misrepresentations and

8  omissions regarding the functionality, reliability, environmental-friendliness, lawfulness, and safety

9  of Defective Vehicles as set forth in this Complaint were material and likely to deceive a reasonable

10  consumer.

11     306.    Plaintiffs and the California State Class members have suffered injury in fact,

12  including the loss of money or property, as a result of FCA's unfair, unlawful, and/or deceptive

13  practices.  In purchasing or leasing their Defective Vehicles, Plaintiffs and the California State Class

14  members relied on the misrepresentations and/or omissions of FCA with respect to the functionality,

15  reliability, environmental-friendliness, lawfulness, and safety of the Defective Vehicles.  FCA's

16  representations turned out not to be true because the Defective Vehicles are distributed with

17  EcoDiesel engine systems that include defective emissions controls.  Had Plaintiffs and the

18  California State Class members known this, they would not have purchased or leased their Defective

19  Vehicles and/or paid as much for them.  Accordingly, Plaintiffs and the California State Class

20  members overpaid for their Defective Vehicles and did not receive the benefit of their bargain.

21     307.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the

22  conduct of FCA's business.  FCA's wrongful conduct is part of a pattern or generalized course of

23  conduct that is still perpetuated and repeated, both in the State of California and nationwide.

24     308.    Plaintiffs, individually and on behalf of the California State Class, requests that this

25  Court enter such orders or judgments as may be necessary to enjoin FCA from continuing their

26  unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other members any

27

28

1336321.4

money FCA acquired by unfair competition, including restitution and/or disgorgement, and for such other relief set forth below.

### CALIFORNIA COUNT IV
### Fraud
### (Based on California Law)
### (On Behalf of the California State Class)

309.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

310.    This claim is brought on behalf of the California State Class against FCA.

311.    FCA designed, manufactured, marketed, sold, and/or leased Defective Vehicles to Plaintiffs and the California State Class members.  FCA represented to Plaintiffs and the California State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles had no significant defects, complied with EPA and state emissions regulations, and would perform and operate properly when driven in normal usage.

312.    The Defective Vehicles purchased or leased by Plaintiffs and the California State Class members were, in fact, defective, non-EPA compliant, and unreliable, because the NOx reduction system in the Defective Vehicles does not effectively mitigate emissions.

313.    FCA intentionally concealed, suppressed, and failed to disclose the facts that the Defective Vehicles had defective emissions controls, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements.

314.    As alleged in this complaint, at all relevant times, FCA has held out the Defective Vehicles to be EPA-compliant reduced emissions vehicles.  FCA disclosed certain details about the EcoDiesel Clean Diesel engine, but nonetheless, FCA intentionally failed to disclose the important facts that the Defective Vehicles had defective emissions controls, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

315.    The truth about the defective emissions controls, unlawfully high emissions, and noncompliance with EPA emissions requirements was known only to FCA; Plaintiffs and the

98

1    California State Class members did not know of these facts and FCA actively concealed these facts

2    from Plaintiffs and California State Class members.

3      316.    Plaintiffs and California State Class members reasonably relied upon FCA's

4    deception.  They had no way of knowing that FCA's representations were false and/or misleading.

5    As consumers, Plaintiffs and California State Class members did not and could not unravel FCA's

6    deception on their own.  Rather, FCA intended to deceive Plaintiffs and California State Class

7    members by concealing the true facts about the Defective Vehicles' emissions.

8      317.    FCA also concealed and suppressed material facts concerning what is evidently the

9    true culture of FCA—one characterized by an emphasis on profits and sales above compliance with

10    federal and state clean air law, and emissions regulations that are meant to protect the public and

11    consumers.  It also emphasized profits and sales above the trust that Plaintiffs and California State

12    Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel

13    they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And

14    yet, that is precisely what the Defective Vehicles are doing during real-world driving conditions.

15      318.    FCA's false representations were material to consumers because they concerned the

16    quality of the Defective Vehicles, because they concerned compliance with applicable federal and

17    state laws and regulations regarding clean air and emissions, and also because the omissions played a

18    significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs

19    and California State Class members, highly valued that the vehicles they were purchasing or leasing

20    were clean diesel cars with reduced emissions, and they paid accordingly.

21      319.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

22    turns off or is limited during normal driving conditions and that the Defective Vehicles were

23    defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

24    pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

25    those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

26    details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

27    knowledge as to such facts, and because FCA knew these facts were not known to or reasonably

28

1336321.4

discoverable by Plaintiffs or California State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to them as *reduced emissions* diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs, FCA had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and California State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and California State Class members that they were purchasing or leasing reduced emission diesel vehicles, when in fact, they were purchasing or leasing defective and unlawfully high emission vehicles.

320.    FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and California State Class members.

321.    On information and belief, FCA has still not made full and adequate disclosures and continues to defraud Plaintiffs and California State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

322.    Plaintiffs and California State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced

1336321.4

1   emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily

2   polluting vehicles, or would have taken other affirmative steps in light of the information concealed

3   from them.  Plaintiffs' and members' actions were justified.  FCA was in exclusive control of the

4   material facts, and the public, Plaintiffs, or California State Class members, did not generally know

5   such facts.

6        323.    Because of the concealment and/or suppression of the facts, Plaintiffs and California

7   Class members have sustained damage because they own vehicles that are diminished in value as a

8   result of FCA's concealment of the true quality and quantity of those vehicles' emissions and FCA's

9   failure to timely disclose the defect or defective design of the EcoDiesel Clean Diesel engine system,

10   the actual emissions qualities and quantities of FCA-branded vehicles, and the serious issues

11   engendered by FCA's corporate policies.  Had Plaintiffs and California State Class members been

12   aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the

13   truth and compliance with applicable federal and state laws and regulations, Plaintiffs and California

14   State Class members who purchased or leased new or certified pre-owned vehicles would have paid

15   less for their vehicles or would not have purchased or leased them at all.

16        324.    The value of Plaintiffs' and California State Class members' vehicles has diminished

17   as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective

18   Vehicles, the unlawfully high emissions of the Defective Vehicles, and of the non-compliance with

19   EPA emissions requirements, all of which has greatly tarnished the FCA brand name, which is

20   attached to Plaintiffs' and California State Class members' vehicles, and made any reasonable

21   consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would

22   have been fair market value for the vehicles.

23        325.    Accordingly, FCA is liable to Plaintiffs and California State Class members for

24   damages in an amount to be proven at trial.

25        326.    FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent

26   to defraud, and in reckless disregard of Plaintiffs' and California State Class members' rights and the

27   representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an

28

CLASS ACATION COMPLAINT

1336321.4

assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**CALIFORNIA COUNT V**
**Breach of Express Warranty,**
**Cal. Com. Code §§ 2313 and 10210**
**(On Behalf of the California State Class)**

327.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

328.    This Count is brought on behalf of the California State Class against FCA.

329.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

330.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

331.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

332.    In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

333.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

334.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required

1336321.4

by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

335.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

336.    As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

337.    FCA's warranties formed a basis of the bargain that was reached when California State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

338.    Despite the existence of warranties, FCA failed to inform California State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

339.    FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1336321.4

340.    Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

341.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make California State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

342.    Accordingly, recovery by the California State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

343.    Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  California State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

344.    Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the California State Class members' remedies would be insufficient to make them whole.

345.    Finally, because of FCA's breach of warranty as set forth herein, California State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

346.    FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1336321.4

CLASS ACACION COMPLAINT

347.    As a direct and proximate result of FCA's breach of express warranties, California State Class members have been damaged in an amount to be determined at trial.

## CALIFORNIA COUNT VI
### Breach of Implied Warranty of Merchantability, Cal. Com. Code §§ 2314 and 10212
### (On Behalf of the California State Class)

348.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

349.    This Count is brought on behalf of the California State Class, against FCA.

350.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

351.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

352.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

353.    A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

354.    These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

355.    FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

As a direct and proximate result of FCA's breach of the implied warranty of merchantability, California State Class members have been damaged in an amount to be proven at trial.

1336321.4

**CALIFORNIA COUNT VII**
**Violations of Song-Beverly Consumer Warranty Act for Breach of Express Warranties,**
**Cal. Civ. Code §§ 1791.2 and 1793.2(d)**
**(On Behalf of the California State Class)**

356.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

357.    Plaintiffs bring this Count on behalf of the California State Class, against FCA.

358.    Plaintiffs and the other California State Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

359.    The Defective Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

360.    FCA is a "manufacturer" of the Defective Vehicles within the meaning of Cal. Civ. Code § 1791(j).

361.    Plaintiffs and the other California State Class members bought/leased new motor vehicles manufactured by FCA.

362.    FCA made express warranties to Plaintiffs and the other California State Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

363.    In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

364.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

365.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its

1336321.4

1  vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required
2  by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever
3  occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission
4  control components are covered for the first eight years or 80,000 miles, whichever comes first.
5  These major emission control components subject to the longer warranty include the catalytic
6  converters, the electronic emission control unit, and the onboard emission diagnostic device or
7  computer.

8      366.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with
9  respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their
10  vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect
11  Warranty required by the EPA covers repair of emission control or emission related parts which fail
12  to function or function improperly because of a defect in materials or workmanship.  This warranty
13  provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission
14  control components, for eight years or 80,000 miles, whichever comes first.

15      367.    As manufacturers of light-duty vehicles, FCA were required to provide these
16  warranties to purchasers or lessees of Defective Vehicles.

17      368.    FCA's warranties formed a basis of the bargain that was reached when Colorado
18  State Class members purchased or leased their Defective Vehicles equipped with the non-compliant
19  "clean" diesel engine and emission systems.

20      369.    Plaintiffs and the California Class Members experienced defects within the warranty
21  period.  Despite the existence of warranties, FCA failed to inform Colorado State Class members
22  that the Defective Vehicles were intentionally designed and manufactured to be out of compliance
23  with applicable state and federal emissions laws, and failed to fix the defective emission components
24  free of charge.

25      370.    Plaintiffs and California State Class members gave FCA or their authorized repair
26  facilities opportunities to fix the defects unless only one repair attempt was possible because the
27  vehicle was later destroyed or because FCA or their authorized repair facility refused to attempt the

28

CLASS ACTION COMPLAINT

repair.  FCA did not promptly replace or buy back the Defective Vehicles of Plaintiffs and the other California State Class members.

371.    As a result of FCA's breach of its express warranties, Plaintiffs and the other California State Class  members received goods whose dangerous condition substantially impairs their value to Plaintiffs and the other California State Class members.  Plaintiffs and the other California State Class members have been damaged as a result of the diminished value of FCA's products, the products' malfunctioning, and the nonuse of their Defective Vehicles.

372.    Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiffs and the other California State Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Defective Vehicles, or the overpayment or diminution in value of their Defective Vehicles.

373.    Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

**CALIFORNIA COUNT VIII**
**Breach of Express California Emissions Warranties,**
**Cal. Civ. Code §§ 1793.2, *et seq.***
**(On Behalf of the California State Class)**

374.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

375.    Plaintiffs bring this Count on behalf of the California State Class, against FCA.

376.    Each class vehicle is covered by express California Emissions Warranties as a matter of law.  *See* Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.

377.    The express California Emissions Warranties generally provide "that the vehicle or engine is…[d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board."  *Id*.  This provision applies without any time or mileage limitation. *See id.*

378.    The California Emissions Warranties also specifically warrant California State Class members against any performance failure of the emissions control system for three years or 50,000

108

miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first. *See id.*

379.    California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty."  Cal. Civ. Code § 1793.2.

380.    Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle…to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option.  *See* Cal. Civ. Code § 1793.2(d)(2).

381.    Class members are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because FCA is refusing to accept them and delivery of the California Vehicles "cannot reasonably be accomplished."  Cal. Civ. Code § 1793.2(c).

382.    This complaint is written notice of nonconformity to FCA and "shall constitute return of the goods."  *Id.*

383.    Class members are excused from any requirement that they allow a "reasonable number of attempts" to bring California Vehicles into conformity with their California Emissions Warranties based on futility because FCA has no ability to do so at this time.  *See In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 970-71 (N.D. Cal. 2014).

384.    In addition to all other damages and remedies, Class members are entitled to "recover a civil penalty of up to two times the amount of damages" for the aforementioned violation.  *See* Cal. Civ. Code § 1794(e)(1).

### CALIFORNIA COUNT IX
### Breach of Express California Emissions Warranties, Failure to Recall/Retrofit
### (On Behalf of the California State Class)

385.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

109

1336321.4

386.    Plaintiffs bring this Count on behalf of the California State Class against FCA.

387.    FCA manufactured, marketed, distributed, sold, or otherwise placed into the stream of U.S. commerce the Defective Vehicles, as set forth above.

388.    FCA knew or reasonably should have known that the Defective Vehicles were dangerous when used in a reasonably foreseeable manner, and posed an unreasonable.

389.    FCA became aware that the Defective Vehicles were dangerous when used in a reasonably foreseeable manner, and posed an unreasonable after the Vehicles were sold.

390.    FCA failed to recall the Defective Vehicles in a timely manner or warn of the dangers posed by Defective Vehicles.  In addition, FCA's 2015 for AECD 1, referred to as the "2014 Field Fix" was ineffective because it did not mitigate or otherwise resolve the illegal and excessive NOx emissions from all Defective Vehicles.

391.    A reasonable manufacturer in same or similar circumstances would have timely and properly recalled the Defective Vehicles.

392.    Plaintiffs and California State Class members were harmed by FCA's failure to recall the Defective Vehicles properly and in a timely manner and, as a result, have suffered damages, including their out-of-pocket costs, losses, and inconvenience expended in complying with the false recall, and caused by FCA's ongoing failure to properly recall, retrofit, and fully repair the Defective Vehicles.

393.    FCA's failure to timely recall the Defective Vehicles was a substantial factor in causing the harm to Plaintiffs and California State Class members as alleged herein.

## V.    COLORADO COUNTS

### COLORADO COUNT I
### Violations of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101 *et seq*.
### (On Behalf of the Colorado State Class)

394.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein. Plaintiffs bring this Count on behalf of the Colorado State Class against FCA.

395.    Colorado's Consumer Protection Act (the "Colorado CPA") prohibits a person from engaging in a "deceptive trade practice," which includes knowingly making "a false representation

as to the source, sponsorship, approval, or certification of goods," or "a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods." Colo. Rev. Stat. § 6-1-105(1)(b), (e). The Colorado CPA further prohibits "represent[ing] that goods … are of a particular standard, quality, or grade…if he knows or should know that they are of another," and "advertis[ing] goods …with intent not to sell them as advertised." Colo. Rev. Stat. § 6-1-105(1)(g), (i).

396. FCA is a "person" under § 6-1-102(6) of the Colorado CPA, Colo. Rev. Stat. § 6-1-101 *et seq.*

397. Plaintiffs and Colorado State Class members are "consumers" for the purpose of Colo. Rev. Stat. § 6-1-113(1)(a) who purchased or leased one or more Defective Vehicles.

398. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

399. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Colorado State Class members were deceived by FCA's failure to disclose that the NOx reduction system in

CLASS ACACION COMPLAINT

the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

400.    Plaintiffs and Colorado State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Colorado State Class members did not, and could not, unravel FCA's deception on their own.

401.    FCA's actions as set forth above occurred in the conduct of trade or commerce.

402.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

403.    FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Colorado State Class.

404.    FCA knew or should have known that its conduct violated the Colorado CPA.

405.    FCA owed Plaintiffs and the Colorado State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

406.    Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

407.    Intentionally concealed the foregoing from Plaintiffs and the Colorado State Class; and/or

408.    Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Colorado State Class that contradicted these representations.

409.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

1336321.4

pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Colorado State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

410. FCA's conduct proximately caused injuries to Plaintiffs and the other Colorado State Class members.

411. Plaintiffs and the other Colorado State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Colorado State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

412. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

413. Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs and the Colorado State Class seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and the discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for Plaintiffs and each Colorado State Class member.

414. Plaintiffs and the Colorado State Class also seek declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

**COLORADO COUNT II**
**Fraud**
**(Based on Colorado Law)**
**(On Behalf of the Colorado State Class)**

415. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

416. This claim is brought on behalf of the Colorado State Class against FCA.

417.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Colorado State Class members information that is highly relevant to their purchasing decision.

418.   FCA further affirmatively misrepresented to Plaintiffs and Colorado State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

419.   FCA knew these representations were false when made.

420.   The Defective Vehicles purchased or leased by Plaintiffs and the other Colorado State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Colorado State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

421.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defect device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Colorado State Class members relied on FCA's material representations that

114

1336321.4

the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

422.    As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

423.    The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Colorado State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Colorado State Class members.

424.    Plaintiffs and Colorado State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading .  As consumers, Plaintiffs and Colorado State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Colorado State Class members by concealing the true facts about the Defective Vehicles' emissions.

425.    FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Colorado State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

115

1336321.4

426.    FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Colorado State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

427.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Colorado State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Colorado State Class members, FCA had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Colorado State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with

1336321.4

respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Colorado State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

428.    FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Colorado State Class members.

429.    FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Colorado State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

430.    Plaintiffs and Colorado State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Colorado State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Colorado State Class members, did not generally know such facts.

431.    Because of the concealment and/or suppression of the facts, Plaintiffs and Colorado State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Colorado State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the

CLASS ACATION COMPLAINT

truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Colorado State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

432.    The value of Plaintiffs' and Colorado State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Colorado State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

433.    Accordingly, FCA is liable to Plaintiffs and Colorado State Class members for damages in an amount to be proven at trial.

434.    FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Colorado State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COLORADO COUNT III**
**Breach of Express Warranty,**
**Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210**
**(On Behalf of the Colorado State Class)**

435.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

436.    This Count is brought on behalf of the Colorado State Class against FCA.

437.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

438.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

439.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

440.    In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

441.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

442.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

443.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail

119

1336321.4

to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

444.    As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

445.    FCA's warranties formed a basis of the bargain that was reached when Colorado State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

446.    Despite the existence of warranties, FCA failed to inform Colorado State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

447.    FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

448.    Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

449.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Colorado State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

450.    Accordingly, recovery by the Colorado State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

451.    Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not

1336321.4

conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Colorado State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

452.    Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Colorado State Class members' remedies would be insufficient to make them whole.

453.    Finally, because of FCA's breach of warranty as set forth herein, Colorado State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

454.    FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

455.    As a direct and proximate result of FCA's breach of express warranties, Colorado State Class members have been damaged in an amount to be determined at trial.

**COLORADO COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212**
**(On Behalf of the Colorado State Class)**

456.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

457.    This Count is brought on behalf of the Colorado State Class, against FCA.

458.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

1336321.4

459.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

460.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

461.    A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Colo. Rev. Stat. § § 4-2-313 and 4-2.5-212.

462.    These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

463.    FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

464.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Colorado State Class members have been damaged in an amount to be proven at trial.

## VI.    CONNECTICUT COUNTS

### CONNECTICUT COUNT I
**Violations of the Colorado Consumer Protection Act,**
**Colo. Rev. Stat. § 6-1-101 *et seq.***
**(On Behalf of the Connecticut State Class)**

465.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein. Plaintiffs bring this Count on behalf of the Connecticut State Class against FCA.

466.    FCA and Plaintiffs are each "persons" as defined by Conn. Gen. Stat. Ann. § 42-110a(3).

1336321.4

467. The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a). The Connecticut UTPA further provides a private right of action under Conn. Gen. Stat. Ann. § 42-110g(a). In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, FCA engaged in unfair and deceptive trade practices because its conduct (1) offends public policy as it has been established by statutes, the common law or other established concept of unfairness; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers, competitors, or other business persons. The harm caused to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and FCA fraudulently concealed the defective nature of the Defective Vehicles from consumers.

468. FCA has also engaged in deceptive conduct because (1) it made representations, omissions, or engaged in other conduct likely to mislead consumers; (2) consumers interpret the message reasonably under the circumstances; and (3) the misleading representation, omission, or practice is material—that is, likely to affect consumer decisions or conduct.

469. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive

1336321.4

acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

470.    In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Connecticut State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

471.    Plaintiffs and Connecticut State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Connecticut State Class members did not, and could not, unravel FCA's deception on their own.

472.    FCA's actions as set forth above occurred in the conduct of trade or commerce.

473.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

474.    FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Connecticut State Class.

475.    FCA knew or should have known that its conduct violated the Connecticut UTPA.

476.    FCA owed Plaintiffs and the Connecticut State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

477.    Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

478.    Intentionally concealed the foregoing from Plaintiffs and the Connecticut State Class; and/or

479.    Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Connecticut State Class that contradicted these representations.

480.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Connecticut State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

481.    FCA's conduct proximately caused injuries to Plaintiffs and the other Connecticut State Class members.

482.    Plaintiffs and the other Connecticut State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Connecticut State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

483.    FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1336321.4

484.   Plaintiffs and the other Connecticut State Class members sustained damages as a result of FCA's unlawful acts, and are therefore entitled to damages and other relief as provided under the Connecticut UTPA.

485.   Plaintiffs also seek court costs and attorneys' fees as a result of FCA's violation of the Connecticut UTPA as provided in Conn. Gen. Stat. Ann. § 42-110g(d).   A copy of this Complaint shall be mailed to the Attorney General and the Commissioner of Consumer Protection of the State of Connecticut in accordance with Conn. Gen. Stat. Ann. § 42-110g(c).

**CONNECTICUT COUNT II**
**Fraud**
**(Based on Connecticut Law)**
**(On Behalf of the Connecticut State Class)**

486.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

487.   This claim is brought on behalf of the Connecticut State Class against FCA.

488.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Connecticut State Class members information that is highly relevant to their purchasing decision.

489.   FCA further affirmatively misrepresented to Plaintiffs and Connecticut State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

490.   FCA knew these representations were false when made.

1336321.4

491.    The Defective Vehicles purchased or leased by Plaintiffs and the other Connecticut State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Connecticut State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

492.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Connecticut State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

493.    As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

494.    The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA;

127

1336321.4

Plaintiffs and the Connecticut State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Connecticut State Class members.

495.   Plaintiffs and Connecticut State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Connecticut State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Connecticut State Class members by concealing the true facts about the Defective Vehicles' emissions.

496.   FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Connecticut State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

497.   FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Connecticut State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

498.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Connecticut State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Connecticut State Class members, FCA had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Connecticut State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Connecticut State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

499.    FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Connecticut State Class members.

500.    FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Connecticut State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1336321.4

501.    Plaintiffs and Connecticut State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Connecticut State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Connecticut State Class members, did not generally know such facts.

502.    Because of the concealment and/or suppression of the facts, Plaintiffs and Connecticut State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Connecticut State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Connecticut State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

503.    The value of Plaintiffs' and Connecticut State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Connecticut State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1336321.4

504.     Accordingly, FCA is liable to Plaintiffs and Connecticut State Class members for damages in an amount to be proven at trial.

505.     FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Connecticut State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**CONNECTICUT COUNT III**
**Breach of Express Warranty,**
**Conn. Gen. Stat. Ann. § 42A-2-313**
**(On Behalf of the Connecticut State Class)**

506.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

507.     This Count is brought on behalf of the Connecticut State Class against FCA.

508.     FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

509.     In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

510.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:    a "Performance Warranty" and a "Design and Defect Warranty."

511.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its

1336321.4

vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

512.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

513.    As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

514.    FCA's warranties formed a basis of the bargain that was reached when Connecticut State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

515.    Despite the existence of warranties, FCA failed to inform Connecticut State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

516.    FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

CLASS ACATION COMPLAINT

517. Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

518. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Connecticut State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

519. Accordingly, recovery by the Connecticut State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

520. Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles. Connecticut State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

521. Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Connecticut State Class members' remedies would be insufficient to make them whole.

522. Finally, because of FCA's breach of warranty as set forth herein, Connecticut State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

523. FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1336321.4

524.    As a direct and proximate result of FCA's breach of express warranties, Connecticut State Class members have been damaged in an amount to be determined at trial.

## CONNECTICUT COUNT IV
### Breach of Implied Warranty of Merchantability, Conn. Gen. Stat. Ann. § 42A-2-314
### (On Behalf of the Connecticut State Class)

525.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

526.    This Count is brought on behalf of the Connecticut State Class, against FCA.

527.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

528.    A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Conn. Gen. Stat. Ann. § 42a-2-314.

529.    These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

530.    FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

531.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Connecticut State Class members have been damaged in an amount to be proven at trial.

1336321.4

## VII.   DELAWARE COUNTS

### DELAWARE COUNT I
**Violations of the Delaware Consumer Fraud Act,**
**Del. Code § 2513 *et seq*.**
**(On Behalf of the Delaware State Class)**

532.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

533.   Plaintiffs bring this Count on behalf of the Delaware State Class against FCA.

534.   FCA is a "person" within the meaning of 6 Del. Code § 2511(7).

535.   The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaigns, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.   Accordingly, FCA has engaged in deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of the Defective Vehicles.

536.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted

unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

537.    In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Delaware State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

538.    Plaintiffs and Delaware State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Delaware State Class members did not, and could not, unravel FCA's deception on their own.

539.    FCA's actions as set forth above occurred in the conduct of trade or commerce.

540.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

541.    FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Delaware State Class.

542.    FCA knew or should have known that its conduct violated the Delaware CFA.

136

1336321.4

543.    FCA owed Plaintiffs and the Delaware State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

544.    Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

545.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

546.    Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

547.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Delaware State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

548.    FCA's conduct proximately caused injuries to Plaintiffs and the other Delaware State Class members.

549.    Plaintiffs and the other Delaware State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Delaware State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.    These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

550.    FCA's violations present a continuing risk to Plaintiffs as well as to the general public.    FCA's unlawful acts and practices complained of herein affect the public interest.

1336321.4

551.    Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of FCA's unlawful conduct.  *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983).  Plaintiffs also seek declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

552.    FCA engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

**DELAWARE COUNT II**

**Fraudulent Concealment**
**(Based on Delaware Law)**
**(On Behalf of the Delaware State Class)**

553.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

554.    This claim is brought on behalf of the Delaware State Class against FCA.

555.    FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Delaware State Class members information that is highly relevant to their purchasing decision.

556.    FCA further affirmatively misrepresented to Plaintiffs and Delaware State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

557.    FCA knew these representations were false when made.

558.    The Defective Vehicles purchased or leased by Plaintiffs and the other Delaware State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-

1336321.4

powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Delaware State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

559.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Delaware State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

560.    As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

561.    The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Delaware State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Delaware State Class members.

1336321.4

562.    Plaintiffs and Delaware State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Delaware State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Delaware State Class members by concealing the true facts about the Defective Vehicles' emissions.

563.    FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Delaware State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

564.    FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Delaware State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

565.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Delaware State Class members.  FCA also had a duty to disclose

CLASS ACATION COMPLAINT

because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Delaware State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Delaware State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and Delaware State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

566. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Delaware State Class members.

567. FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Delaware State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

568. Plaintiffs and Delaware State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-

1    emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily

2    polluting vehicles, or would have taken other affirmative steps in light of the information concealed

3    from them.  Plaintiffs' and Delaware State Class members' actions were justified.  FCA was in

4    exclusive control of the material facts, and the public, Plaintiffs, or Delaware State Class members,

5    did not generally know such facts.

6          569.    Because of the concealment and/or suppression of the facts, Plaintiffs and Delaware

7    State Class members have sustained damage because they own vehicles that are diminished in value

8    as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and

9    fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel

10   engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues

11   engendered by FCA's corporate policies.  Had Plaintiffs and Delaware State Class members been

12   aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the

13   truth and compliance with applicable federal and state laws and regulations, and its failure to meet

14   and maintain the advertised MPG rate, Plaintiffs and Delaware State Class members who purchased

15   or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not

16   have purchased or leased them at all.

17         570.    The value of Plaintiffs' and Delaware State Class members' vehicles has diminished

18   as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective

19   Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with

20   EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is

21   attached to Plaintiffs' and Delaware State Class members' vehicles, and made any reasonable

22   consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would

23   have been fair market value for the vehicles.

24         571.    Accordingly, FCA is liable to Plaintiffs and Delaware State Class members for

25   damages in an amount to be proven at trial.

26         572.    FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent

27   to defraud, and in reckless disregard of Plaintiffs' and Delaware State Class members' rights and the

28

142

1336321.4

representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### DELAWARE COUNT III
### Breach of Express Warranty,
### 6 Del. Code §§ 2-313 and 2A-210
### (On Behalf of the Delaware State Class)

573.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

574.    This Count is brought on behalf of the Delaware State Class against FCA.

575.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

576.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

577.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

578.    In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

579.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

580.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its

1336321.4

vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

581.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

582.    As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

583.    FCA's warranties formed a basis of the bargain that was reached when Delaware State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

584.    Despite the existence of warranties, FCA failed to inform Delaware State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

585.    FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1336321.4

586.   Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

587.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Delaware State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

588.   Accordingly, recovery by the Delaware State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

589.   Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.   Delaware State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

590.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Delaware State Class members' remedies would be insufficient to make them whole.

591.   Finally, because of FCA's breach of warranty as set forth herein, Delaware State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

592.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

CLASS ACACION COMPLAINT

593. As a direct and proximate result of FCA's breach of express warranties, Delaware State Class members have been damaged in an amount to be determined at trial.

**DELAWARE COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**6. Del. Code §§ 2-314 and 7-2A-212**
**(On Behalf of the Delaware State Class)**

594. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

595. This Count is brought on behalf of the Delaware State Class, against FCA.

596. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

597. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

598. The Defective Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

599. A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 6 Del. C. §§ 2-314 and 2A-212.

600. These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

601. FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

CLASS ACATION COMPLAINT

1336321.4

602.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Delaware State Class members have been damaged in an amount to be proven at trial.

## VIII.   DISTRICT OF COLUMBIA COUNTS

### DISTRICT OF COLUMBIA COUNT I
**Violations of the Consumer Protection Procedures Act,**
**D.C. Code § 28-3901 *et seq*.**
**(On Behalf of the District of Columbia Class)**

603.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

604.    Plaintiffs bring this Count on behalf of the District of Columbia Class against FCA.

605.    FCA is a "person" under the Consumer Protection Procedures Act ("District of Columbia CPPA"), D.C. Code § 28-3901(a)(1).

606.    District of Columbia Class members are "consumers," as defined by D.C. Code § 28-3901(1)(2), who purchased or leased one or more Defective Vehicles.

607.    FCA's actions as set forth herein constitute "trade practices" under D.C. Code § 28-3901.

608.    In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by

147

the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

609.    In purchasing or leasing the Defective Vehicles, Plaintiffs and the other District of Columbia Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

610.    Plaintiffs and District of Columbia Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception.  Plaintiffs and District of Columbia Class members did not, and could not, unravel FCA's deception on their own.

611.    FCA's actions as set forth above occurred in the conduct of trade or commerce.

612.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

613.    FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the District of Columbia Class.

614.    FCA knew or should have known that its conduct violated the District of Columbia CPPA.

615.    FCA owed Plaintiffs and the District of Columbia Class a duty to disclose the truth about its emissions systems manipulation because FCA:

616.    Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

617.    Intentionally concealed the foregoing from Plaintiffs and the District of Columbia Class; and/or

1336321.4

618.    Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the District of Columbia Class that contradicted these representations.

619.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other District of Columbia Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

620.    FCA's conduct proximately caused injuries to Plaintiffs and the other District of Columbia Class members.

621.    FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

622.    As a direct and proximate result of FCA's violations of the District of Columbia CPPA, Plaintiffs and District of Columbia Class members have suffered injury in fact and/or actual damage.

623.    Plaintiffs and District of Columbia Class members are entitled to recover treble damages or $1,500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the Court deems proper, under D.C. Code § 28-3901.

624.    Plaintiffs seek punitive damages against FCA because FCA's conduct evidences malice and/or egregious conduct.  FCA maliciously and egregiously misrepresented the safety, cleanliness, efficiency and reliability of the Defective Vehicles, deceived Subclass members, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting their defective and environmentally dirty engines.

1336321.4

625.    FCA's unlawful conduct constitutes malice warranting punitive damages.

**DISTRICT OF COLUMBIA COUNT II**
**Fraud**
**(Based on District of Columbia Law)**
**(On Behalf of the District of Columbia Class)**

626.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

627.    This claim is brought on behalf of the District of Columbia State Class against FCA.

628.    FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, did not meet and maintain the advertised MPG rate, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other District of Columbia State Class members information that is highly relevant to their purchasing decision.

629.    FCA further affirmatively misrepresented to Plaintiffs and District of Columbia State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

630.    FCA knew these representations were false when made.

631.    The Defective Vehicles purchased or leased by Plaintiffs and the other District of Columbia State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other District of Columbia State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1336321.4

632.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other District of Columbia State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

633.    As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

634.    The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the District of Columbia State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and District of Columbia State Class members.

635.    Plaintiffs and District of Columbia State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and District of Columbia State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and District of Columbia State Class members by concealing the true facts about the Defective Vehicles' emissions.

1336321.4

636.    FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and District of Columbia State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

637.    FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and District of Columbia State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

638.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or District of Columbia State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and

1336321.4

emissions regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and District of Columbia State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and District of Columbia State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and District of Columbia State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

639.    FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and District of Columbia State Class members.

640.    FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and District of Columbia State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

641.    Plaintiffs and District of Columbia State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and District of Columbia State Class members' actions were justified. FCA

CLASS ACACION COMPLAINT

1336321.4

1    was in exclusive control of the material facts, and the public, Plaintiffs, or District of Columbia State

2    Class members, did not generally know such facts.

3    642.    Because of the concealment and/or suppression of the facts, Plaintiffs and District of

4    Columbia State Class members have sustained damage because they own vehicles that are

5    diminished in value as a result of FCA's concealment of the true quality and quantity of those

6    vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective

7    design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and

8    the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and District of Columbia

9    State Class members been aware of the true emissions facts with regard to the Defective Vehicles,

10   and FCA's disregard for the truth and compliance with applicable federal and state laws and

11   regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and District of

12   Columbia State Class members who purchased or leased new or certified pre-owned vehicles would

13   have paid less for their vehicles or would not have purchased or leased them at all.

14   643.    The value of Plaintiffs' and District of Columbia State Class members' vehicles has

15   diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the

16   Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-

17   compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name,

18   which is attached to Plaintiffs' and District of Columbia State Class members' vehicles, and made

19   any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what

20   otherwise would have been fair market value for the vehicles.

21   644.    Accordingly, FCA is liable to Plaintiffs and District of Columbia State Class

22   members for damages in an amount to be proven at trial.

23   645.    FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent

24   to defraud, and in reckless disregard of Plaintiffs' and District of Columbia State Class members'

25   rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct

26   warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the

27   future, which amount is to be determined according to proof.

28

1336321.4

**DISTRICT OF COLUMBIA COUNT III**
**Breach of Express Warranty,**
**D.C. Code §§ 28:2-313 and 28:2A-210**
**(On Behalf of the District of Columbia State Class)**

646.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

647.    This Count is brought on behalf of the District of Columbia State Class against FCA.

648.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under D.C. Code §§ 28:2-104(1) and 28:2A-103(a)(20), and "sellers" of motor vehicles under § 28:2-103(1)(d).

649.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under D.C. Code § 28:2A-103(a)(16).

650.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of D.C. Code §§ 28:2-105(1) and 28:2A-103(a)(8).

651.    In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

652.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:   a "Performance Warranty" and a "Design and Defect Warranty."

653.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission

1336321.4

control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

654.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

655.    As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

656.    FCA's warranties formed a basis of the bargain that was reached when District of Columbia State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

657.    Despite the existence of warranties, FCA failed to inform District of Columbia State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

658.    FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

659.    Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

CLASS ACATION COMPLAINT

1336321.4

660.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make District of Columbia State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

661.    Accordingly, recovery by the District of Columbia State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

662.    Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  District of Columbia State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

663.    Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the District of Columbia State Class members' remedies would be insufficient to make them whole.

664.    Finally, because of FCA's breach of warranty as set forth herein, District of Columbia State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

665.    FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

666.    As a direct and proximate result of FCA's breach of express warranties, District of Columbia State Class members have been damaged in an amount to be determined at trial.

**DISTRICT OF COLUMBIA COUNT IV**
**Breach of Implied Warranty of Merchantability,**

**D.C. Code §§ 28:2-314 and 28:2A-212**
**(On Behalf of the District of Columbia State Class)**

667.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

668.    This Count is brought on behalf of the District of Columbia State Class, against FCA.

669.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under D.C. Code §§ 28:2-104(1) and 28:2A-103(a)(20), and "sellers" of motor vehicles under § 28:2-103(1)(d).

670.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under D.C. Code § 28:2A-103(a)(16).

671.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of D.C. Code §§ 28:2-105(1) and 28:2A-103(a)(8).

672.    A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to D.C. Code §§ 28:2-314 and 28:2A-212.

673.    These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

674.    FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

675.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, District of Columbia State Class members have been damaged in an amount to be proven at trial.

CLASS ACATION COMPLAINT

1336321.4

# IX.   FLORIDA COUNTS

## FLORIDA COUNT I

Violations of the Florida Unfair and Deceptive Trade Practices Act,

Fla. Stat. § 501.201 *et seq.*

(On Behalf of the Florida State Class)

676.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

677.   Plaintiffs bring this Count on behalf of the Florida State Class against FCA.

678.   Plaintiffs and Florida State Class members are "consumers" within the meaning of Florida Unfair and Deceptive Trade Practices Act ("Florida UDTPA"), Fla. Stat. § 501.203(7).

679.   FCA engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

680.   Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."   Fla. Stat. § 501.204(1).   FCA participated in unfair and deceptive trade practices that violated the Florida UDTPA as described herein.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.   Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in Fla. Stat. § 501.204(1).   FCA's conduct offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and is likely to mislead consumers.

681.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-

1336321.4

powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.   Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

682.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Florida State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

683.   Plaintiffs and Florida State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Florida State Class members did not, and could not, unravel FCA's deception on their own.

684.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

685.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

686.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Florida State Class.

1336321.4

687.    FCA knew or should have known that its conduct violated the Florida UDTPA.

688.    FCA owed Plaintiffs and the Florida State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

689.    Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

690.    Intentionally concealed the foregoing from Plaintiffs and the Florida State Class; and/or

691.    Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Florida State Class that contradicted these representations.

692.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Florida State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

693.    FCA's conduct proximately caused injuries to Plaintiffs and the other Florida State Class members

694.    Plaintiffs and the other Florida State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Florida State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.   These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

695.    FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

696.    Accordingly, FCA is liable to Plaintiffs and Florida State Class members for damages in an amount to be proven at trial.

**FLORIDA COUNT II**
**Fraud**
**(On Behalf of the Florida State Class)**

697.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

698.    This claim is brought on behalf of the Florida State Class against FCA.

699.    FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Florida State Class members information that is highly relevant to their purchasing decision.

700.    FCA further affirmatively misrepresented to Plaintiffs and Florida State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

701.    FCA knew these representations were false when made.

702.    The Defective Vehicles purchased or leased by Plaintiffs and the other Florida State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Florida State Class members had to pay more for fuel than they reasonably expected, and unreliable because the

162

1  NOx reduction system in the Defective Vehicles turns off or is limited during normal driving

2  conditions.

3  703.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

4  turns off or is limited during normal driving conditions and that the Defective Vehicles were

5  defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

6  pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

7  those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

8  Plaintiffs and the other Florida State Class members relied on FCA's material representations that

9  the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free

10  from defects.

11  704.    As alleged in this Complaint, at all relevant times, FCA has held out the Defective

12  Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its

13  EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx

14  reduction system in the Defective Vehicles turns off or is limited during normal driving conditions,

15  and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted

16  higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels

17  of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures

18  about the emission system deceptive.

19  705.    The truth about the defective emissions controls and FCA's manipulations of those

20  controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the

21  "defeat device," and non-compliance with EPA emissions requirements was known only to FCA;

22  Plaintiffs and the Florida State Class members did not know of these facts and FCA actively

23  concealed these facts from Plaintiffs and Florida State Class members.

24  706.    Plaintiffs and Florida State Class members reasonably relied upon FCA's deception.

25  They had no way of knowing that FCA's representations were false and/or misleading.  As

26  consumers, Plaintiffs and Florida State Class members did not, and could not, unravel FCA's

27

28

CLASS ACATION COMPLAINT

1336321.4

deception on their own.  Rather, FCA intended to deceive Plaintiffs and Florida State Class members by concealing the true facts about the Defective Vehicles' emissions.

707.    FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Florida State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

708.    FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Florida State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

709.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Florida State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of

the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Florida State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Florida State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and Florida State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

710. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Florida State Class members.

711. FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Florida State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

712. Plaintiffs and Florida State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Florida State Class members' actions were justified. FCA was in exclusive

control of the material facts, and the public, Plaintiffs, or Florida State Class members, did not generally know such facts.

713. Because of the concealment and/or suppression of the facts, Plaintiffs and Florida State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Florida State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Florida State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

714. The value of Plaintiffs' and Florida State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Florida State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

715. Accordingly, FCA is liable to Plaintiffs and Florida State Class members for damages in an amount to be proven at trial.

716. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Florida State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

1336321.4

**FLORIDA COUNT III**
**Breach of Express Warranty,**
**F.S.A. §§ 672.313 and 680.21**
**(On Behalf of the Florida State Class)**

717.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

718.     This Count is brought on behalf of the Florida State Class against FCA.

719.     FCA is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

720.     With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

721.     The Defective Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

722.     In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

723.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:   a "Performance Warranty" and a "Design and Defect Warranty."

724.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission

1336321.4

control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

725.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

726.    As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

727.    FCA's warranties formed a basis of the bargain that was reached when Florida State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

728.    Despite the existence of warranties, FCA failed to inform Florida State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

729.    FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

730.    Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

CLASS ACATION COMPLAINT

1336321.4

731.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Florida State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

732.    Accordingly, recovery by the Florida State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

733.    Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Florida State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

734.    Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Florida State Class members' remedies would be insufficient to make them whole.

735.    Finally, because of FCA's breach of warranty as set forth herein, Florida State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

736.    FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

737.    As a direct and proximate result of FCA's breach of express warranties, Florida State Class members have been damaged in an amount to be determined at trial.

1336321.4

**FLORIDA COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**F.S.A. §§ 672.314 and 680.212**
**(On Behalf of the Florida State Class)**

738.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

739.    This Count is brought on behalf of the Florida State Class, against FCA.

740.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

741.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

742.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

743.    A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to F.S.A. §§ 672.314 and 680.212.

744.    These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

745.    FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

746.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Florida State Class members have been damaged in an amount to be proven at trial.

CLASS ACACION COMPLAINT

1336321.4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## X.    GEORGIA COUNTS

### GEORGIA COUNT I

**Violations of Georgia's Fair Business Practices Act,
Ga. Code Ann. § 10-1-390 *et seq*.
(On Behalf of the Georgia State Class)**

747.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

748.    This claim is made on behalf of the Georgia State Class against FCA.

749.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised." Ga. Code. Ann. § 10-1-393(b).

750.    Plaintiffs will make a demand in satisfaction of Ga. Code. Ann. § 10-1-399(b), and may amend this Complaint to assert claims under the Georgia FBPA once the required notice period has elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Georgia FBPA.

### GEORGIA COUNT II
### Fraud
**(Based on Georgia Law)
(On Behalf of the Georgia State Class)**

751.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

752.    This claim is brought on behalf of the Georgia State Class against FCA.

753.    FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign,

171

emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Georgia State Class members information that is highly relevant to their purchasing decision.

754.   FCA further affirmatively misrepresented to Plaintiffs and Georgia State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

755.   FCA knew these representations were false when made.

756.   The Defective Vehicles purchased or leased by Plaintiffs and the other Georgia State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Georgia State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

757.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Georgia State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

758.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its

1336321.4

EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

759.    The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Georgia State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Georgia State Class members.

760.    Plaintiffs and Georgia State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.   As consumers, Plaintiffs and Georgia State Class members did not, and could not, unravel FCA's deception on their own.   Rather, FCA intended to deceive Plaintiffs and Georgia State Class members by concealing the true facts about the Defective Vehicles' emissions.

761.    FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.   FCA also emphasized profits and sales above the trust that Plaintiffs and Georgia State Class members placed in its representations.   Consumers buy diesel cars from FCA because they feel they are clean diesel cars.   They do not want to be spewing noxious gases into the environment.   And yet, that is precisely what the Defective Vehicles are doing.

762.    FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.   As FCA well knew, its

1336321.4

customers, including Plaintiffs and Georgia State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

763.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Georgia State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Georgia State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Georgia State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Georgia State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

CLASS ACACTION COMPLAINT

764.    FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Georgia State Class members.

765.    FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Georgia State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

766.    Plaintiffs and Georgia State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Georgia State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Georgia State Class members, did not generally know such facts.

767.    Because of the concealment and/or suppression of the facts, Plaintiffs and Georgia State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Georgia State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Georgia State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1336321.4

768.    The value of Plaintiffs' and Georgia State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Georgia State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

769.    Accordingly, FCA is liable to Plaintiffs and Georgia State Class members for damages in an amount to be proven at trial.

770.    FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Georgia State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## GEORGIA COUNT III
### Breach of Express Warranty,
### Ga. Code Ann. §§ 11-2-313 and 11-2A-210
### (On Behalf of the Georgia State Class)

771.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

772.    This Count is brought on behalf of the Georgia State Class against FCA.

773.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

774.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

775.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

CLASS ACATION COMPLAINT

776.    In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

777.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

778.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

779.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

CLASS ACATION COMPLAINT

1336321.4

780.   As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

781.   FCA's warranties formed a basis of the bargain that was reached when Georgia State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

782.   Despite the existence of warranties, FCA failed to inform Georgia State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

783.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

784.   Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

785.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Georgia State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

786.   Accordingly, recovery by the Georgia State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

787.   Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Georgia State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1336321.4

788.    Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Georgia State Class members' remedies would be insufficient to make them whole.

789.    Finally, because of FCA's breach of warranty as set forth herein, Georgia State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

790.    FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

791.    As a direct and proximate result of FCA's breach of express warranties, Georgia State Class members have been damaged in an amount to be determined at trial.

CLASS ACATION COMPLAINT

1336321.4

### GEORGIA COUNT IV
### Breach of Implied Warranty of Merchantability,
### Ga. Code Ann. §§ 11-2-314 and 11-2A-212
### (On Behalf of the Georgia State Class)

792.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

793.    This Count is brought on behalf of the Georgia State Class, against FCA.

794.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

795.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

796.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

797.    A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

798.    These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

799.    FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

800.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Georgia State Class members have been damaged in an amount to be proven at trial.

# XI.    HAWAII COUNTS

### HAWAII COUNT I
### Unfair and Deceptive Acts in Violation of Hawaii Law,
### Haw. Rev. Stat. § 480 *et seq*.
### (On Behalf of the Hawaii State Class)

801.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

802.    This claim is brought on behalf of the Hawaii State Class against FCA.

803.    FCA is a "person" under Haw. Rev. Stat. § 480-1.

804.    Plaintiffs and Hawaii State Class members are "consumer[s]" as defined by Haw. Rev. Stat. § 480-1, who purchased or leased one or more Defective Vehicles.

805.    FCA's acts or practices as set forth above occurred in the conduct of trade or commerce.

806.    Haw. Rev. Stat. § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

807.    In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it

181

1336321.4

actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

808.    In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Hawaii State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

809.    Plaintiffs and Hawaii State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Hawaii State Class members did not, and could not, unravel FCA's deception on their own.

810.    FCA's actions as set forth above occurred in the conduct of trade or commerce.

811.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

812.    FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Hawaii State Class.

813.    FCA knew or should have known that its conduct violated Haw. Rev. Stat. § 480 *et seq.*

814.    FCA owed Plaintiffs and the Hawaii State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

815.    Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

816.    Intentionally concealed the foregoing from Plaintiffs and the Hawaii State Class; and/or

817.    Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully

1336321.4

1    withholding material facts from Plaintiffs and the Hawaii State Class that contradicted these

2    representations.

3        818.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

4    turns off or is limited during normal driving conditions and that the Defective Vehicles were

5    defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-

6    powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and

7    were non-EPA-compliant and unreliable, because Plaintiffs and the other Hawaii State Class

8    members relied on FCA's material representations that the Defective Vehicles they were purchasing

9    were reduced-emission vehicles, efficient, and free from defects.

10        819.    Pursuant to Haw. Rev. Stat. § 480-13, Plaintiffs and the Hawaii State Class seek

11    monetary relief against FCA measured as the greater of (a) $1,000 and (b) threefold actual damages

12    in an amount to be determined at trial.

13        820.    Under Haw. Rev. Stat. § 480-13.5, Plaintiffs seeks an additional award against FCA

14    of up to $10,000 for each violation directed at a Hawaiian elder.  FCA knew or should have known

15    that its conduct was directed to one or more Hawaii State Class members who are elders.  FCA's

16    conduct caused one or more of these elders to suffer a substantial loss of property set aside for

17    retirement or for personal or family care and maintenance, or assets essential to the health or welfare

18    of the elder.  One or more Hawaii State Class members who are elders are substantially more

19    vulnerable to FCA's conduct because of age, poor health or infirmity, impaired understanding,

20    restricted mobility, or disability, and each of them suffered substantial physical, emotional, or

21    economic damage resulting from FCA's conduct.

22                          **HAWAII COUNT II**
23                                **Fraud**
                          **(Based on Hawaii Law)**
24                **(On Behalf of the Hawaii State Class)**

25        821.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

26        822.    This claim is brought on behalf of the Hawaii State Class against FCA.

27

28
                                    183

1336321.4

823.    FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Hawaii State Class members information that is highly relevant to their purchasing decision.

824.    FCA further affirmatively misrepresented to Plaintiffs and Hawaii State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

825.    FCA knew these representations were false when made.

826.    The Defective Vehicles purchased or leased by Plaintiffs and the other Hawaii State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Hawaii State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

827.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Hawaii State Class members relied on FCA's material representations that

CLASS ACACION COMPLAINT

the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

828.    As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

829.    The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Hawaii State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Hawaii State Class members.

830.    Plaintiffs and Hawaii State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.   As consumers, Plaintiffs and Hawaii State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Hawaii State Class members by concealing the true facts about the Defective Vehicles' emissions.

831.    FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Hawaii State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

1336321.4

832.   FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.   As FCA well knew, its customers, including Plaintiffs and Hawaii State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

833.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Hawaii State Class members.   FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.   Having volunteered to provide information to Plaintiffs and Hawaii State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.   These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Hawaii State Class members.   Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with

186

1336321.4

respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Hawaii State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

834.    FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Hawaii State Class members.

835.    FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Hawaii State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

836.    Plaintiffs and Hawaii State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Hawaii State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Hawaii State Class members, did not generally know such facts.

837.    Because of the concealment and/or suppression of the facts, Plaintiffs and Hawaii State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Hawaii State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the

1336321.4

truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Hawaii State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

838.    The value of Plaintiffs' and Hawaii State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Hawaii State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

839.    Accordingly, FCA is liable to Plaintiffs and Hawaii State Class members for damages in an amount to be proven at trial.

840.    FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Hawaii State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**HAWAII COUNT III**
**Breach of Express Warranty,**
**Haw. Rev. Stat. §§ 490:2-313 and 490:2A-210**
**(On Behalf of the Hawaii State Class)**

841.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

842.    This Count is brought on behalf of the Hawaii State Class against FCA.

843.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Haw. Rev. Stat. §§ 490:2-104(1) and 490:2A-103(b), and a "seller" of motor vehicles under § 490:2-103(1)(d).

844.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Haw. Rev. Stat. § 490:2A-103(a)(16).

845.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Haw. Rev. Stat. §§ 490:2-105(1) and 490:2A-103(a)(8).

846.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

847.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

848.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

849.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail

1336321.4

to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

850. As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

851. FCA's warranties formed a basis of the bargain that was reached when Hawaii State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

852. Despite the existence of warranties, FCA failed to inform Hawaii State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

853. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

854. Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

855. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Hawaii State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

856. Accordingly, recovery by the Hawaii State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

857. Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not

CLASS ACACTION COMPLAINT

conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles. Hawaii State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

858. Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Hawaii State Class members' remedies would be insufficient to make them whole.

859. Finally, because of FCA's breach of warranty as set forth herein, Hawaii State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

860. FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

861. As a direct and proximate result of FCA's breach of express warranties, Hawaii State Class members have been damaged in an amount to be determined at trial.

## HAWAII COUNT IV

### Breach of Implied Warranty of Merchantability,
### Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212
### (On Behalf of the Hawaii State Class)

862. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

863. This Count is brought on behalf of the Hawaii State Class, against FCA.

864. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Haw. Rev. Stat. §§ 490:2-104(1) and 490:2A-103(b), and a "seller" of motor vehicles under § 490:2-103(1)(d).

1336321.4

865.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Haw. Rev. Stat. § 490:2A-103(a)(16).

866.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of Haw. Rev. Stat. §§ 490:2-105(1) and 490:2A-103(a)(8).

867.    A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212

868.    These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

869.    FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

870.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Hawaii State Class members have been damaged in an amount to be proven at trial.

## XII.    IDAHO COUNTS

### IDAHO COUNT I
### Violations of the Idaho Consumer Protection Act,
### Idaho Code § 48-601 *et seq.*
### (On Behalf of the Idaho State Class)

871.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

872.    Plaintiffs bring this Count on behalf of the Idaho State Class against FCA.

873.    FCA is a "person" under the Idaho Consumer Protection Act ("Idaho CPA"), Idaho Code § 48-602(1).

874.    FCA's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code § 48-602(2).

192

875.    Idaho Code § 48-603 prohibits the following conduct in trade or commerce: engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer; and engaging in any unconscionable method, act or practice in the conduct of trade or commerce, as provided in section 48-603C.

876.    In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.   Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

877.    In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Idaho State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

878.    Plaintiffs and Idaho State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception.

1336321.4

Plaintiffs and Idaho State Class members did not, and could not, unravel FCA's deception on their own.

879.    FCA's actions as set forth above occurred in the conduct of trade or commerce.

880.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

881.    FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Idaho State Class.

882.    FCA knew or should have known that its conduct violated the Idaho CPA.

883.    FCA owed Plaintiffs and the Idaho State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

884.    Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

885.    Intentionally concealed the foregoing from Plaintiffs and the Idaho State Class; and/or

886.    Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Idaho State Class that contradicted these representations.

887.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Idaho State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

888.    FCA's conduct proximately caused injuries to Plaintiffs and the other Idaho State Class members.

1336321.4

889.    Plaintiffs and the other Idaho State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Idaho State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

890.    FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

891.    Plaintiffs also seek attorneys' fees and any other just and proper relief available under the Idaho CPA.

892.    Plaintiffs also seek punitive damages against FCA because FCA's conduct evidences an extreme deviation from reasonable standards.    FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## IDAHO COUNT II
### Fraud
### (Based on Idaho Law)
### (On Behalf of the Idaho State Class)

893.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

894.    This claim is brought on behalf of the Idaho State Class against FCA.

895.    FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Idaho State Class members information that is highly relevant to their purchasing decision.

896.    FCA further affirmatively misrepresented to Plaintiffs and Idaho State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-

1336321.4

1    emission vehicles, complied with EPA regulations, and would perform and operate properly when

2    driven in normal usage.

3        897.   FCA knew these representations were false when made.

4        898.   The Defective Vehicles purchased or leased by Plaintiffs and the other Idaho State

5    Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-

6    powered vehicles and at a much higher rate than a reasonable consumer would expect in light of

7    FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Idaho State

8    Class members had to pay more for fuel than they reasonably expected, and unreliable because the

9    NOx reduction system in the Defective Vehicles turns off or is limited during normal driving

10   conditions.

11       899.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

12   turns off or is limited during normal driving conditions and that the Defective Vehicles were

13   defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

14   pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

15   those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

16   Plaintiffs and the other Idaho State Class members relied on FCA's material representations that the

17   Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from

18   defects.

19       900.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective

20   Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its

21   EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx

22   reduction system in the Defective Vehicles turns off or is limited during normal driving conditions,

23   and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted

24   higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels

25   of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures

26   about the emission system deceptive.

27

28

1336321.4

901.    The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Idaho State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Idaho State Class members.

902.    Plaintiffs and Idaho State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Idaho State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Idaho State Class members by concealing the true facts about the Defective Vehicles' emissions.

903.    FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Idaho State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

904.    FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Idaho State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

905.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

197

1336321.4

pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Idaho State Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Idaho State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Idaho State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and Idaho State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

906.    FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Idaho State Class members.

1336321.4

907.    FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Idaho State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

908.    Plaintiffs and Idaho State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Idaho State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Idaho State Class members, did not generally know such facts.

909.    Because of the concealment and/or suppression of the facts, Plaintiffs and Idaho State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Idaho State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Idaho State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

910.    The value of Plaintiffs' and Idaho State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Idaho State Class members' vehicles, and made any reasonable consumer

1336321.4

reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

911.    Accordingly, FCA is liable to Plaintiffs and Idaho State Class members for damages in an amount to be proven at trial.

912.    FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Idaho State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**IDAHO COUNT III**
**Breach of Express Warranty,**
**Idaho Code §§ 28-2-313 and 28-12-210**
**(On Behalf of the Idaho State Class)**

913.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

914.    This Count is brought on behalf of the Idaho State Class against FCA.

915.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

916.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Idaho Code § 28-12-103(1)(p).

917.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of §§ 28-2-105(1) and 28-12-103(1)(h).

918.    In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3

1336321.4

1  years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever

2  occurs first).

3      919.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two

4  federal emission control warranties:  a "Performance Warranty" and a "Design and Defect

5  Warranty."

6      920.    The EPA requires vehicle manufacturers to provide a Performance Warranty with

7  respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its

8  vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required

9  by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever

10  occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission

11  control components are covered for the first eight years or 80,000 miles, whichever comes first.

12  These major emission control components subject to the longer warranty include the catalytic

13  converters, the electronic emission control unit, and the onboard emission diagnostic device or

14  computer.

15      921.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with

16  respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their

17  vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect

18  Warranty required by the EPA covers repair of emission control or emission related parts which fail

19  to function or function improperly because of a defect in materials or workmanship.  This warranty

20  provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission

21  control components, for eight years or 80,000 miles, whichever comes first.

22      922.    As manufacturers of light-duty vehicles, FCA were required to provide these

23  warranties to purchasers or lessees of Defective Vehicles.

24      923.    FCA's warranties formed a basis of the bargain that was reached when Idaho State

25  Class members purchased or leased their Defective Vehicles equipped with the non-compliant

26  "clean" diesel engine and emission systems.

27

28

CLASS ACACTION COMPLAINT

1336321.4

924.    Despite the existence of warranties, FCA failed to inform Idaho State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

925.    FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

926.    Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

927.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Idaho State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

928.    Accordingly, recovery by the Idaho State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

929.    Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Idaho State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

930.    Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a

CLASS ACATION COMPLAINT

1336321.4

reasonable time, and any limitation on the Idaho State Class members' remedies would be insufficient to make them whole.

931.    Finally, because of FCA's breach of warranty as set forth herein, Idaho State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

932.    FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

933.    As a direct and proximate result of FCA's breach of express warranties, Idaho State Class members have been damaged in an amount to be determined at trial.

**IDAHO COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Idaho Code §§ 28-2-314 and 28-12-212**
**(On Behalf of the Idaho State Class)**

934.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

935.    This Count is brought on behalf of the Idaho State Class, against FCA.

936.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

937.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Idaho Code § 28-12-103(1)(p).

938.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of §§ 28-2-105(1) and 28-12-103(1)(h).

939.    A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Idaho Code §§ 28-2-314 and 28-12-212.

CLASS ACATION COMPLAINT

1336321.4

940.    These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

941.    FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

942.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Idaho State Class members have been damaged in an amount to be proven at trial.

## XIII.   ILLINOIS COUNTS

### ILLINOIS COUNT I
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act,
815 Ill. Comp. Stat. 505/1 *et seq.* and 720 Ill. Comp. Stat. 295/1A
(On Behalf of the Illinois State Class)**

943.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

944.    This claim is brought on behalf of the Illinois State Class against FCA.

945.    FCA is a "person" as that term is defined in 815 Ill. Comp. Stat. 505/1(c).

946.    Plaintiffs and the Illinois State Class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. 505/1(e).

947.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 Ill. Comp. Stat. 505/2.

948.    In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during

1336321.4

normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

949.    In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Illinois State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

950.    Plaintiffs and Illinois State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Illinois State Class members did not, and could not, unravel FCA's deception on their own.

951.    FCA's actions as set forth above occurred in the conduct of trade or commerce.

952.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1336321.4

953.    FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Illinois State Class.

954.    FCA knew or should have known that its conduct violated the Illinois CFA.

955.    FCA owed Plaintiffs and the Illinois State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

956.    Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

957.    Intentionally concealed the foregoing from Plaintiffs and the Illinois State Class; and/or

958.    Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Illinois State Class that contradicted these representations.

959.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Illinois State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

960.    FCA's conduct proximately caused injuries to Plaintiffs and the other Illinois State Class members.

961.    Plaintiffs and the other Illinois State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Illinois State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in

206

1336321.4

value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

962. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

963. Pursuant to 815 Ill. Comp. Stat. 505/10a(a), Plaintiffs and the Illinois State Class members seek monetary relief against FCA in the amount of actual damages, as well as punitive damages because FCA acted with fraud and/or malice and/or was grossly negligent.

964. Plaintiffs also seek punitive damages, attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1 *et seq.*

**ILLINOIS COUNT II**
**Fraud**
**(Based on Illinois Law)**
**(On Behalf of the Illinois State Class)**

965. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

966. This claim is brought on behalf of the Illinois State Class against FCA.

967. FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Illinois State Class members information that is highly relevant to their purchasing decision.

968. FCA further affirmatively misrepresented to Plaintiffs and Illinois State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1336321.4

969.    FCA knew these representations were false when made.

970.    The Defective Vehicles purchased or leased by Plaintiffs and the other Illinois State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Illinois State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

971.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Illinois State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

972.    As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

973.    The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA;

208

1336321.4

Plaintiffs and the Illinois State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Illinois State Class members.

974.    Plaintiffs and Illinois State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Illinois State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Illinois State Class members by concealing the true facts about the Defective Vehicles' emissions.

975.    FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Illinois State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

976.    FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Illinois State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

977.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

1336321.4

knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Illinois State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Illinois State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Illinois State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Illinois State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

978.    FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Illinois State Class members.

979.    FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Illinois State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1336321.4

980.    Plaintiffs and Illinois State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Illinois State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Illinois State Class members, did not generally know such facts.

981.    Because of the concealment and/or suppression of the facts, Plaintiffs and Illinois State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Illinois State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Illinois State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

982.    The value of Plaintiffs' and Illinois State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Illinois State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

CLASS ACATION COMPLAINT

983.    Accordingly, FCA is liable to Plaintiffs and Illinois State Class members for damages in an amount to be proven at trial.

984.    FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Illinois State Class members' rights and the representations that FCA made to them, in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**ILLINOIS COUNT III**
**Breach of Express Warranty,**
**810 Ill. Comp. Stat. §§ 5/20313 and 5/2A-210**
**(On Behalf of the Illinois State Class)**

985.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

986.    This Count is brought on behalf of the Illinois State Class against FCA.

987.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

988.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

989.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

990.    In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first. This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation" FCA also provided two express California Emissions Standard Warranties. One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1336321.4

991.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:   a "Performance Warranty" and a "Design and Defect Warranty."

992.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.   Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.   The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.   Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

993.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.   Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.   The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.   This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

994.    As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

995.    FCA's warranties formed a basis of the bargain that was reached when Illinois State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

996.    Despite the existence of warranties, FCA failed to inform Illinois State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of

1336321.4

compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

997.    FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

998.    Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

999.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Illinois State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1000.   Accordingly, recovery by the Illinois State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1001.   Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Illinois State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1002.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Illinois State Class members' remedies would be insufficient to make them whole.

1336321.4

1003.  Finally, because of FCA's breach of warranty as set forth herein, Illinois State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1004.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1005.  As a direct and proximate result of FCA's breach of express warranties, Illinois State Class members have been damaged in an amount to be determined at trial.

**ILLINOIS COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212**
**(On Behalf of the Illinois State Class)**

1006.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1007.  This Count is brought on behalf of the Illinois State Class, against FCA.

1008.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

1009.  With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

1010.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

1011.  A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 810 Ill. Comp. Stat. §§ 28-2-314 and 28-12-212.

1012.  These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal

215

1336321.4

and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1013. FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1014. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Illinois State Class members have been damaged in an amount to be proven at trial.

## XIV.  INDIANA COUNTS

### INDIANA COUNT I
**Violations of the Indiana Deceptive Consumer Sales Act**
**Ind. Code § 24-5-0.5-3**
**(On Behalf of the Indiana State Class)**

1015. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1016. This claim is brought on behalf of the Indiana State Class against FCA.

1017. FCA is a "person" within the meaning of Ind. Code § 24-5-0.5-2(2) and a "supplier" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

1018. The Indiana State Class members' purchases of the Class Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

1019. Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive act," which includes representing:  "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (c) Any representations on or within a product or its packaging or in

advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false." Ind. Code § 24-5-0.5-3.

1020. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner. In purchasing or leasing the Defective Vehicles, Indiana State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Indiana State Class members reasonably relied upon FCA's false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. As alleged herein, FCA engaged in extremely sophisticated methods of deception. Indiana State Class members did not, and could not, unravel FCA's deception on their own.

1021.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

1022.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1023.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead the Indiana State Class.

1024.   FCA knew or should have known that its conduct violated the Indiana Deceptive Consumer Sales Act.

1025.   FCA owed the Indiana State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

1026.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

1027.   Intentionally concealed the foregoing from the Indiana State Class; and/or

1028.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from the Indiana State Class that contradicted these representations.

1029.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Indiana State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1030.   FCA's conduct proximately caused injuries to the Indiana State Class members.

1031.   Indiana State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Indiana State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and

CLASS ACACION COMPLAINT

1336321.4

their Defective Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1032. FCA's violations present a continuing risk to the Indiana State Class as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1033. Pursuant to Ind. Code § 24-5-0.5-4, the Indiana State Class seeks monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Indiana State Class member, including treble damages up to $1,000 for FCA's willfully deceptive acts.

1034. The Indiana State Class also seeks punitive damages based on the outrageousness and recklessness of FCA's conduct and FCA's high net worth.

1035. Plaintiffs intend to file a letter complying with Ind. Code § 24-5-0.5-5(a) and will amend the Complaint thereafter. Because FCA failed to remedy its unlawful conduct within the requisite time period, all damages and relief to which the Indiana State Class are entitled.

**INDIANA COUNT II**
**Fraud**
**(Based on Indiana Law)**
**(On Behalf of the Indiana State Class)**

1036. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1037. This claim is brought on behalf of Plaintiffs and the Indiana State Class against FCA.

1038. FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were noncompliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Indiana State Class members information that is highly relevant to their purchasing decision.

1336321.4

1039.  FCA further affirmatively misrepresented to Plaintiffs and Indiana State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1040.  FCA knew these representations were false when made.

1041.  The Defective Vehicles purchased or leased by Plaintiffs and the other Indiana State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1042.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Indiana State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1043.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

220

1336321.4

1044.  The truth about the defective emissions controls and FCA's manipulations of those controls, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Indiana State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Indiana State Class members.

1045.  Plaintiffs and Indiana State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Indiana State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Indiana State Class members by concealing the true facts about the Defective Vehicles' emissions.

1046.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Indiana State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

1047.  FCA's false representations were material to consumers because they concerned the quality of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Indiana State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1048.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

CLASS ACATION COMPLAINT

those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Indiana State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Indiana State Class members, FCA had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Indiana State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Indiana State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1049.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Indiana State Class members.

1050.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Indiana State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1336321.4

1051.  Plaintiffs and Indiana State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Indiana State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Indiana State Class members, did not generally know such facts.

1052.  Because of the concealment and/or suppression of the facts, Plaintiffs and Indiana State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Indiana State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, Plaintiffs and Indiana State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1053.  The value of Plaintiffs' and Indiana State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Indiana State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1054.  Accordingly, FCA is liable to Plaintiffs and Indiana State Class members for damages in an amount to be proven at trial.

CLASS ACACION COMPLAINT

1336321.4

FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Indiana State Class members' rights and the representations that FCA made to them, in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**INDIANA COUNT III**
**Breach of Express Warranty,**
**Ind. Code §§ 26-1-3-313 and 26-1-2.1-210**
**(On Behalf of the Indiana State Class)**

1055. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1056. This Count is brought on behalf of the Indiana State Class against FCA.

1057. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

1058. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

1059. The Defective Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

1060. In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first. This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation" FCA also provided two express California Emissions Standard Warranties. One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

224

1336321.4

1061.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

1062.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1063.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1064.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

1065.  FCA's warranties formed a basis of the bargain that was reached when Indiana State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1066.  Despite the existence of warranties, FCA failed to inform Indiana State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of

CLASS ACATION COMPLAINT

1336321.4

compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1067.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1068.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1069.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Indiana State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1070.  Accordingly, recovery by the Indiana State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1071.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Indiana State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1072.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Indiana State Class members' remedies would be insufficient to make them whole.

1336321.4

1073. Finally, because of FCA's breach of warranty as set forth herein, Indiana State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1074. FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1075. As a direct and proximate result of FCA's breach of express warranties, Indiana State Class members have been damaged in an amount to be determined at trial.

**INDIANA COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Ind. Code §§ 26-1-3-314 and 26-1-2.1-212**
**(On Behalf of the Indiana State Class)**

1076. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1077. This Count is brought on behalf of the Indiana State Class, against FCA.

1078. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

1079. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

1080. The Defective Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

1081. A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

1082. These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal

227

1336321.4

and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1083.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Indiana State Class members have been damaged in an amount to be proven at trial.

## XV.   IOWA COUNTS

### IOWA COUNT I
**Violations of the Private Right of Action For Consumer Frauds Act,
Iowa Code § 714h.1, *et seq.*
(On Behalf of the Iowa State Class)**

1084.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1085.   This claim is brought on behalf of Plaintiffs and the Iowa State Class against FCA.

1086.   FCA is "person" under Iowa Code § 714H.2(7).

1087.   The Iowa State Class are "consumers," as defined by Iowa Code § 714H.2(3), who purchased or leased one or more Class Vehicles.

1088.   The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3.

1089.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer

1336321.4

would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.  In purchasing or leasing the Defective Vehicles, Iowa State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Iowa State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Iowa State Class members did not, and could not, unravel FCA's deception on their own.

1090.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

1091.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1092. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead the Iowa State Class.

1093.  FCA knew or should have known that its conduct violated Iowa's Private Right of Action For Consumer Frauds Act.

1094.  FCA owed the Iowa State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

CLASS ACTION COMPLAINT

1095.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

1096.   Intentionally concealed the foregoing from the Iowa State Class; and/or

1097.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from the Iowa State Class that contradicted these representations.

1098.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Iowa State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1099.   FCA's conduct proximately caused injuries to the Iowa State Class members.

1100.   Iowa State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Iowa State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1101.   FCA's violations present a continuing risk to the Iowa State Class as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1102.   Pursuant to Iowa Code § 714H.5, The Iowa State Class seek an order enjoining FCA's unfair and/or deceptive acts or practices; actual damages; in addition to an award of actual damages, statutory damages up to three times the amount of actual damages awarded as a result of FCA's willful and wanton disregard for the rights or safety of others; attorneys' fees; and such other equitable relief as the Court deems necessary to protect the public from further violations of the Iowa CFA.

1336321.4

**IOWA COUNT II**
**Fraud**
**(Based on Iowa Law)**
**(On Behalf of the Iowa State Class)**

1103.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1104.  This claim is brought on behalf of Plaintiffs and the Iowa State Class against FCA.

1105.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were noncompliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Iowa State Class members information that is highly relevant to their purchasing decision.

1106.  FCA further affirmatively misrepresented to Plaintiffs and Iowa State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1107.  FCA knew these representations were false when made.

1108.  The Defective Vehicles purchased or leased by Plaintiffs and the other Iowa State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1109.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defect device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

231

1336321.4

Plaintiffs and the other Iowa State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1110.    As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1111.    The truth about the defective emissions controls and FCA's manipulations of those controls, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Iowa State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Iowa State Class members.

1112.    Plaintiffs and Iowa State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.   As consumers, Plaintiffs and Iowa State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Iowa State Class members by concealing the true facts about the Defective Vehicles' emissions.

1113.    FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Iowa State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

CLASS ACACTION COMPLAINT

1114.  FCA's false representations were material to consumers because they concerned the quality of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Iowa State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1115.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defect device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Iowa State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Iowa State Class members, FCA had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Iowa State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Iowa State Class members that they were purchasing or leasing

reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1116.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Iowa State Class members.

1117.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Iowa State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1118.  Plaintiffs and Iowa State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Iowa State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Iowa State Class members, did not generally know such facts.

1119.  Because of the concealment and/or suppression of the facts, Plaintiffs and Iowa State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Iowa State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, Plaintiffs and Iowa State Class members who purchased or

1336321.4

1    leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have

2    purchased or leased them at all.

3    1120.    The value of Plaintiffs' and Iowa State Class members' vehicles has diminished as a

4    result of FCA's fraudulent concealment of the defective emissions controls of the Defective

5    Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with

6    EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is

7    attached to Plaintiffs' and Iowa State Class members' vehicles, and made any reasonable consumer

8    reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been

9    fair market value for the vehicles.

10    1121.    Accordingly, FCA is liable to Plaintiffs and Iowa State Class members for damages in

11    an amount to be proven at trial.

12    FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and

13    in reckless disregard of Plaintiffs' and Iowa State Class members' rights and the representations that

14    FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive

15    damages in an amount sufficient to deter such conduct in the future, which amount is to be

16    determined according to proof.

**IOWA COUNT III**
**Breach of Express Warranty,**
**Iowa Code §§ 554.2313 and 554.13210**
**(On Behalf of the Iowa State Class)**

20    1122.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

21    fully set forth herein.

22    1123.    This Count is brought on behalf of the Iowa State Class against FCA.

23    1124.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles

24    under Iowa Code §§ 554.2104(1) and 554.13103(3), and "sellers" of motor vehicles under

25    § 554.2103(1)(d).

26    1125.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor

27    vehicles under Iowa Code § 554.13103(1)(p).

28

1336321.4

1126. The Defective Vehicles are and were at all relevant times "goods" within the meaning of Iowa Code §§ 554.2105(1) and 554.13103(1)(h).

1127. In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first. This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation" FCA also provided two express California Emissions Standard Warranties. One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1128. The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1129. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1130. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty

1336321.4

provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1131.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

1132.  FCA's warranties formed a basis of the bargain that was reached when Iowa State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1133.  Despite the existence of warranties, FCA failed to inform Iowa State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1134.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1135.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1136.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Iowa State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1137.  Accordingly, recovery by the Iowa State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1138.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts

regarding the Defective Vehicles. Iowa State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1139. Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Iowa State Class members' remedies would be insufficient to make them whole.

1140. Finally, because of FCA's breach of warranty as set forth herein, Iowa State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1141. FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1142. As a direct and proximate result of FCA's breach of express warranties, Iowa State Class members have been damaged in an amount to be determined at trial.

**IOWA COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Iowa Code §§ 554.2314 and 554.13212**
**(On Behalf of the Iowa State Class)**

1143. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1144. This Count is brought on behalf of the Iowa State Class, against FCA.

1145. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Iowa Code §§ 554.2104(1) and 554.13103(3), and "sellers" of motor vehicles under § 554.2103(1)(d).

1146. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Iowa Code § 554.13103(1)(p).

238

1336321.4

1147.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Iowa Code §§ 554.2105(1) and 554.13103(1)(h).

1148.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Iowa Code §§ 554.2314 and 554.13212.

1149.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1150.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1151.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Iowa State Class members have been damaged in an amount to be proven at trial.

## XVI.   KANSAS COUNTS

### KANSAS COUNT I
#### Violations of the Kansas Consumer Protection Act,
#### Kan. Stat. Ann. § 50-623 *et seq.*
#### (On Behalf of the Kansas State Class)

1152.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1153.   Plaintiffs bring this Count on behalf of the Kansas State Class against FCA.

1154.   FCA is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

1155.   Plaintiffs and Kansas State Class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Defective Vehicles. The sale of the Defective Vehicles to Plaintiffs and the Kansas State Class members was a consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

239

1156.  752.  The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include:  (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression, or omission of a material fact."  The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction."  Kan. Stat. Ann. § 50-627(a).

1157.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1336321.4

1158.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Kansas State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1159.   Plaintiffs and Kansas State Class members reasonably relied upon FCA's false misrepresentations.   They had no way of knowing that FCA's representations were false and gravely misleading.   As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Kansas State Class members did not, and could not, unravel FCA's deception on their own.

1160.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

1161.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1162.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Kansas State Class.

1163.   FCA knew or should have known that its conduct violated the Kansas CPA.

1164.   FCA owed Plaintiffs and the Kansas State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

1165.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

1166.   Intentionally concealed the foregoing from Plaintiffs and the Kansas State Class; and/or

1167.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Kansas State Class that contradicted these representations.

1336321.4

1168.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Kansas State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced- emission vehicles, efficient, and free from defects.

1169.  FCA's conduct proximately caused injuries to Plaintiffs and the other Kansas State Class members.

1170.  Plaintiffs and the other Kansas State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Kansas State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1171.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1172.  Pursuant to Kan. Stat. Ann. § 50-634, Plaintiffs and the Kansas State Class seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for Plaintiffs and each Kansas State Class member.

1173.  Plaintiffs also seeks an order enjoining FCA's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623 *et seq*.

1336321.4

**KANSAS COUNT II**
**Fraud**
**(Based on Kansas Law)**
**(On Behalf of the Kansas State Class)**

1174.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1175.   This claim is brought on behalf of the Kansas State Class against FCA.

1176.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Kansas State Class members information that is highly relevant to their purchasing decision.

1177.   FCA further affirmatively misrepresented to Plaintiffs and Kansas State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1178.   FCA knew these representations were false when made.

1179.   The Defective Vehicles purchased or leased by Plaintiffs and the other Kansas State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Kansas State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1180.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were

243

1336321.4

defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Kansas State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1181.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1182.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Kansas State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Kansas State Class members.

1183.  Plaintiffs and Kansas State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Kansas State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Kansas State Class members by concealing the true facts about the Defective Vehicles' emissions.

1184.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and

CLASS ACACTION COMPLAINT

consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Kansas State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

1185.  FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Kansas State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1186.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Kansas State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Kansas State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material

1336321.4

because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Kansas State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Kansas State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1187.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Kansas State Class members.

1188.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Kansas State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1189.  Plaintiffs and Kansas State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Kansas State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Kansas State Class members, did not generally know such facts.

1190.  Because of the concealment and/or suppression of the facts, Plaintiffs and Kansas State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and

1336321.4

fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies. Had Plaintiffs and Kansas State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Kansas State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1191.  The value of Plaintiffs' and Kansas State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Kansas State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1192.  Accordingly, FCA is liable to Plaintiffs and Kansas State Class members for damages in an amount to be proven at trial.

1193.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Kansas State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### KANSAS COUNT III
**Breach of Express Warranty,**
**Kan. Stat. §§ 84-2-313 and 84-2A-210**
**(On Behalf of the Kansas State Class)**

1194.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1336321.4

1195.   This Count is brought on behalf of the Kansas State Class against FCA.

1196.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under § 84-2-103(1)(d).

1197.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

1198.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

1199.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1200.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:   a "Performance Warranty" and a "Design and Defect Warranty."

1201.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1202.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1203.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

1204.  FCA's warranties formed a basis of the bargain that was reached when Kansas State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1205.  Despite the existence of warranties, FCA failed to inform Kansas State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1206.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1207.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1208.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Kansas State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1209.  Accordingly, recovery by the Kansas State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1210.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Kansas State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1211.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Kansas State Class members' remedies would be insufficient to make them whole.

1212.  Finally, because of FCA's breach of warranty as set forth herein, Kansas State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1213.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1214.  As a direct and proximate result of FCA's breach of express warranties, Kansas State Class members have been damaged in an amount to be determined at trial.

### KANSAS COUNT IV
### Breach of Implied Warranty of Merchantability,
### Kan. Stat. §§ 84-2-314 and 84-2A-212
### (On Behalf of the Kansas State Class)

1215.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1336321.4

1216.   This Count is brought on behalf of the Kansas State Class, against FCA.

1217.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under § 84-2-103(1)(d).

1218.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

1219.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

1220.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. §§ 84-2-314 and 84-2A-212.

1221.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1222.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1223.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Kansas State Class members have been damaged in an amount to be proven at trial.

## XVII.  KENTUCKY COUNTS

### KENTUCKY COUNT I
**Violations of the Kentucky Consumer Protection Act,
Ky. Rev. Stat. Ann. § 367.110 *et seq*.
(On Behalf of the Kentucky State Class)**

1224.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1225.   Plaintiffs bring this Count on behalf of the Kentucky State Class against FCA.

1336321.4

1226.  FCA, Plaintiffs, and each member of the Kentucky State Class is a "person" within the meaning of the Ky. Rev. Stat. Ann. § 367.110(1).

1227.  FCA engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. Ann. § 367.110(2).

1228.  The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Ky. Rev. Stat. Ann. § 367.170(1).  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, FCA engaged in deceptive business practices prohibited by the Kentucky CPA.

1229.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it

actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1230.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Kentucky State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1231.  Plaintiffs and Kentucky State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Kentucky State Class members did not, and could not, unravel FCA's deception on their own.

1232.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

1233.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1234.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Kentucky State Class.

1235.  FCA knew or should have known that its conduct violated the Kentucky CPA.

1236.  FCA owed Plaintiffs and the Kentucky State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

1237.  Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

1238.  Intentionally concealed the foregoing from Plaintiffs and the Kentucky State Class; and/or

1239.  Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully

1336321.4

withholding material facts from Plaintiffs and the Kentucky State Class that contradicted these representations.

1240.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Kentucky State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1241.  FCA's conduct proximately caused injuries to Plaintiffs and the other Kentucky State Class members.

1242.  Plaintiffs and the other Kentucky State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Kentucky State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1243.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1244.  Pursuant to Ky. Rev. Stat. Ann. § 367.220, Plaintiffs and the Kentucky State Class seek to recover actual damages in an amount to be determined at trial; declaratory relief; attorneys' fees; and any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

### KENTUCKY COUNT II
### Fraud
### (Based on Kentucky Law)
### (On Behalf of the Kentucky State Class)

1245.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1246.  This claim is brought on behalf of the Kentucky State Class against FCA.

1336321.4

1247.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Kentucky State Class members information that is highly relevant to their purchasing decision.

1248.  FCA further affirmatively misrepresented to Plaintiffs and Kentucky State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1249.  FCA knew these representations were false when made.

1250.  The Defective Vehicles purchased or leased by Plaintiffs and the other Kentucky State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Kentucky State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1251.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Kentucky State Class members relied on FCA's material representations that

1336321.4

the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1252.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1253.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Kentucky State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Kentucky State Class members.

1254.  Plaintiffs and Kentucky State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Kentucky State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Kentucky State Class members by concealing the true facts about the Defective Vehicles' emissions.

1255.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Kentucky State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

1336321.4

1256.  FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Kentucky State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1257.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Kentucky State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Kentucky State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Kentucky State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer,

including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and Kentucky State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1258. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Kentucky State Class members.

1259. FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Kentucky State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1260. Plaintiffs and Kentucky State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Kentucky State Class members' actions were justified. FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Kentucky State Class members, did not generally know such facts.

1261. Because of the concealment and/or suppression of the facts, Plaintiffs and Kentucky State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies. Had Plaintiffs and Kentucky State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the

truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Kentucky State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1262.  The value of Plaintiffs' and Kentucky State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Kentucky State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1263.  Accordingly, FCA is liable to Plaintiffs and Kentucky State Class members for damages in an amount to be proven at trial.

1264.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Kentucky State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### KENTUCKY COUNT III
### Breach of Express Warranty,
### Ky. Rev. Stat. §§ 335.2-313 and 355.2A-210
### (On Behalf of the Kentucky State Class)

1265.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1266.  This Count is brought on behalf of the Kentucky State Class against FCA.

1267.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under § 355.2-103(1)(d).

1336321.4

1268.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

1269.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

1270.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1271.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

1272.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1273.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail

1336321.4

to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1274.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

1275.  FCA's warranties formed a basis of the bargain that was reached when Kentucky State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1276.  Despite the existence of warranties, FCA failed to inform Kentucky State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1277.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1278.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1279.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Kentucky State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1280.  Accordingly, recovery by the Kentucky State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1281.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not

1    conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts

2    regarding the Defective Vehicles.   Kentucky State Class members were therefore induced to

3    purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

4        1282.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be

5    resolved through the limited remedy of "replacements or adjustments," as many incidental and

6    consequential damages have already been suffered because of FCA's fraudulent conduct as alleged

7    herein, and because of its failure and/or continued failure to provide such limited remedy within a

8    reasonable time, and any limitation on the Kentucky State Class members' remedies would be

9    insufficient to make them whole.

10       1283.  Finally, because of FCA's breach of warranty as set forth herein, Kentucky State

11   Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the

12   goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or

13   leased, and for such other incidental and consequential damages as allowed.

14       1284.  FCA was provided notice of these issues by numerous complaints filed against them,

15   including the instant Complaint, within a reasonable amount of time.

16       1285.  As a direct and proximate result of FCA's breach of express warranties, Kentucky

17   State Class members have been damaged in an amount to be determined at trial.

18                          **KENTUCKY COUNT IV**
                   **Breach of Implied Warranty of Merchantability,**
19                  **Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212**
                      **(On Behalf of the Kentucky State Class)**
20

21       1286.  Plaintiffs reallege and incorporate by reference all allegations of the preceding

22   paragraphs as though fully set forth herein.

23       1287.  This Count is brought on behalf of the Kentucky State Class, against FCA.

24       1288.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles

25   under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under

26   § 355.2-103(1)(d).

27

28

1336321.4

1289.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

1290.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

1291.  A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212.

1292.  These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1293.  FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1294.  As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Kentucky State Class members have been damaged in an amount to be proven at trial.

## XVIII. LOUISIANA COUNTS

### LOUISIANA COUNT I
**Violations of the Louisiana Unfair Trade Practices and Consumer Protection Law,
La. Stat. Ann. § 51:1401 *et seq*.
(On Behalf of the Louisiana State Class)**

1295.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1296.  This claim is brought only on behalf of members of the Louisiana State Class against FCA.

1336321.4

1297.   FCA, Plaintiffs, and Louisiana State Class members are "persons" within the meaning of the La. Stat. Ann. § 51:1402(8).

1298.   Plaintiffs and Louisiana State Class members are "consumers" within the meaning of La. Stat. Ann. § 51:1402(1).

1299.   FCA engaged in "trade" or "commerce" within the meaning of La. Stat. Ann. § 51:1402(9).

1300.   The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce."  La. Stat. Ann. § 51:1405(A).

1301.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.   Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1302.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Louisiana State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions

controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1303.  Plaintiffs and Louisiana State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Louisiana State Class members did not, and could not, unravel FCA's deception on their own.

1304.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

1305.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1306.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Louisiana State Class.

1307.  FCA knew or should have known that its conduct violated the Louisiana CPL.

1308.  FCA owed Plaintiffs and the Louisiana State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

1309.  Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

1310.  Intentionally concealed the foregoing from Plaintiffs and the Louisiana State Class; and/or

1311.  Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Louisiana State Class that contradicted these representations.

1312.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and

1336321.4

were non-EPA-compliant and unreliable, because Plaintiffs and the other Louisiana State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1313.   As a direct and proximate result of FCA's violations of the Louisiana CPL, Plaintiffs and the Louisiana State Class have suffered injury in fact and/or actual damage.

1314.   Pursuant to La. Stat. Ann. § 51:1409, Plaintiffs and the Louisiana State Class seek to recover actual damages in an amount to be determined at trial; treble damages for FCA's knowing violations of the Louisiana CPL; an order enjoining FCA's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Stat. Ann. § 51:1409.

### LOUISIANA COUNT II
### Fraud
### (Based on Louisiana Law)
### (On Behalf of the Louisiana State Class)

1315.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1316.   This claim is brought on behalf of the Louisiana State Class against FCA.

1317.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Louisiana State Class members information that is highly relevant to their purchasing decision.

1318.   FCA further affirmatively misrepresented to Plaintiffs and Louisiana State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were

1336321.4

low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1319.  FCA knew these representations were false when made.

1320.  The Defective Vehicles purchased or leased by Plaintiffs and the other Louisiana State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Louisiana State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1321.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Louisiana State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1322.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

CLASS ACATION COMPLAINT

1336321.4

1323.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Louisiana State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Louisiana State Class members.

1324.  Plaintiffs and Louisiana State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and Louisiana State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Louisiana State Class members by concealing the true facts about the Defective Vehicles' emissions.

1325.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Louisiana State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

1326.  FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Louisiana State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1327.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

1336321.4

pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Louisiana State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Louisiana State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Louisiana State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Louisiana State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1328.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Louisiana State Class members.

CLASS ACATION COMPLAINT

1329.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Louisiana State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1330.  Plaintiffs and Louisiana State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Louisiana State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Louisiana State Class members, did not generally know such facts.

1331.  Because of the concealment and/or suppression of the facts, Plaintiffs and Louisiana State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Louisiana State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Louisiana State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1332.  The value of Plaintiffs' and Louisiana State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Louisiana State Class members' vehicles, and made any reasonable

CLASS ACACTION COMPLAINT

1336321.4

consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1333.  Accordingly, FCA is liable to Plaintiffs and Louisiana State Class members for damages in an amount to be proven at trial.

1334.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Louisiana State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### LOUISIANA COUNT III
**Breach of Implied Warranty of Merchantability/Warranty Against Redhibitory Defects,**
**La. Civ. Code Art. 2520, 2524**
**(On Behalf of the Louisiana State Class)**

1335.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1336.  This Count is brought on behalf of the Louisiana State Class, against FCA.

1337.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles.

1338.  A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.  These Defective Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the clean diesel engine system was not adequately designed, manufactured, and tested.

1339.  FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1336321.4

1340.  As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Louisiana State Class members have been damaged in an amount to be proven at trial.

## XIX.  MAINE COUNTS

### MAINE COUNT I
**Violations of the Maine Unfair Trade Practices Act,**
**Me. Rev. Stat. Ann. Tit. 5, § 205-A** *et seq.*
**(On Behalf of the Maine State Class)**

1341.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1342.  This claim is brought on behalf of the Maine State Class against FCA.

1343.  Plaintiffs intends to assert a claim under the Maine Unfair Trade Practices Act ("Maine UTPA") which makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Me. Rev. Stat. Ann. tit. 5, § 207.

1344.  Plaintiffs will make a demand in satisfaction of Me. Rev. Stat. Ann. tit. 5, § 213(A), and may amend this Complaint to assert claims under the Maine UTPA once the required 30 days have elapsed.  This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Maine UTPA.

### MAINE COUNT II
**Fraud**
**(Based on Maine Law)**
**(On Behalf of the Maine State Class)**

1345.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1346.  This claim is brought on behalf of the Maine State Class against FCA.

1347.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA

272

1336321.4

1    emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and

2    the other Maine State Class members information that is highly relevant to their purchasing decision.

3        1348.  FCA further affirmatively misrepresented to Plaintiffs and Maine State Class

4    members in advertising and other forms of communication, including standard and uniform material

5    provided with each car, that the Defective Vehicles it was selling had no significant defects, were

6    low-emission vehicles, complied with EPA regulations, and would perform and operate properly

7    when driven in normal usage.

8        1349.  FCA knew these representations were false when made.

9        1350.  The Defective Vehicles purchased or leased by Plaintiffs and the other Maine State

10   Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-

11   powered vehicles and at a much higher rate than a reasonable consumer would expect in light of

12   FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Maine State

13   Class members had to pay more for fuel than they reasonably expected, and unreliable because the

14   NOx reduction system in the Defective Vehicles turns off or is limited during normal driving

15   conditions.

16       1351.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

17   turns off or is limited during normal driving conditions and that the Defective Vehicles were

18   defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

19   pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

20   those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

21   Plaintiffs and the other Maine State Class members relied on FCA's material representations that the

22   Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from

23   defects.

24       1352.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective

25   Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its

26   EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx

27   reduction system in the Defective Vehicles turns off or is limited during normal driving conditions,

28

CLASS ACACTION COMPLAINT

1  and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted

2  higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels

3  of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures

4  about the emission system deceptive.

5      1353.  The truth about the defective emissions controls and FCA's manipulations of those

6  controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the

7  "defeat device," and non-compliance with EPA emissions requirements was known only to FCA;

8  Plaintiffs and the Maine State Class members did not know of these facts and FCA actively

9  concealed these facts from Plaintiffs and Maine State Class members.

10      1354.  Plaintiffs and Maine State Class members reasonably relied upon FCA's deception.

11  They had no way of knowing that FCA's representations were false and/or misleading.  As

12  consumers, Plaintiffs and Maine State Class members did not, and could not, unravel FCA's

13  deception on their own.  Rather, FCA intended to deceive Plaintiffs and Maine State Class members

14  by concealing the true facts about the Defective Vehicles' emissions.

15      1355.  FCA also concealed and suppressed material facts concerning what is evidently the

16  true culture of FCA—one characterized by an emphasis on profits and sales above compliance with

17  federal and state clean air laws and emissions regulations that are meant to protect the public and

18  consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Maine State

19  Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel

20  they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And

21  yet, that is precisely what the Defective Vehicles are doing.

22      1356.  FCA's false representations were material to consumers because they concerned the

23  quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with

24  applicable federal and state laws and regulations regarding clean air and emissions, and also because

25  the representations played a significant role in the value of the vehicles.  As FCA well knew, its

26  customers, including Plaintiffs and Maine State Class members, highly valued that the vehicles they

27

28

CLASS ACATION COMPLAINT

1336321.4

1   were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they

2   paid accordingly.

3       1357.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

4   turns off or is limited during normal driving conditions and that the Defective Vehicles were

5   defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

6   pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

7   those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

8   details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

9   knowledge as to such facts, and because FCA knew these facts were not known to or reasonably

10  discoverable by Plaintiffs or Maine State Class members.  FCA also had a duty to disclose because it

11  made general affirmative representations about the qualities of the vehicles with respect to

12  emissions, starting with references to them as reduced-emissions diesel cars and as compliant with

13  all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of

14  the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual

15  philosophy with respect to compliance with federal and state clean air laws and emissions

16  regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to

17  provide information to Plaintiffs and Maine State Class members, FCA had the duty to disclose not

18  just the partial truth, but also the entire truth.  These omitted and concealed facts were material

19  because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs

20  and Maine State Class members.  Whether a manufacturer's products pollute, comply with federal

21  and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with

22  respect to such compliance or non-compliance, are material concerns to a consumer, including with

23  respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs

24  and Maine State Class members that they were purchasing or leasing reduced-emission diesel

25  vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with

26  unlawfully high emissions.

27

28

1336321.4

1358.   FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Maine State Class members.

1359.   FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Maine State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1360.   Plaintiffs and Maine State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'   and Maine State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Maine State Class members, did not generally know such facts.

1361.   Because of the concealment and/or suppression of the facts, Plaintiffs and Maine State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Maine State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Maine State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1362. The value of Plaintiffs' and Maine State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Maine State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1363. Accordingly, FCA is liable to Plaintiffs and Maine State Class members for damages in an amount to be proven at trial.

1364. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' Maine State Class members' rights and the representations that FCA made to them, in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**MAINE COUNT III**
**Breach of Express Warranty,**
**Me. Rev. Stat. Tit. 11 §§ 2-313 and 2-1210**
**(On Behalf of the Maine State Class)**

1365. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1366. This Count is brought on behalf of the Maine State Class against FCA.

1367. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

1368. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§ 2-1103(1)(p)..

1369. The Defective Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11,§§ 2-105(1), and 2-1103(1)(h).

277

1370.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1371.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

1372.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1373.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

CLASS ACATION COMPLAINT

1374.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

1375.  FCA's warranties formed a basis of the bargain that was reached when Maine State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1376.  Despite the existence of warranties, FCA failed to inform Maine State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1377.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1378.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1379.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Maine State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1380.  Accordingly, recovery by the Maine State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1381.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Maine State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

CLASS ACATION COMPLAINT

1336321.4

1382.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Maine State Class members' remedies would be insufficient to make them whole.

1383.   Finally, because of FCA's breach of warranty as set forth herein, Maine State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1384.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1385.   As a direct and proximate result of FCA's breach of express warranties, Maine State Class members have been damaged in an amount to be determined at trial.

### MAINE COUNT IV
### Breach of Implied Warranty of Merchantability,
### Me. Rev. Stat. Tit. 11 §§ 2-314 and 2-1212
### (On Behalf of the Maine State Class)

1386.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1387.   This Count is brought on behalf of the Maine State Class, against FCA.

1388.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

1389.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§ 2-1103(1)(p)..

1390.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11,§§ 2-105(1), and 2-1103(1)(h).

1336321.4

1391.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Me. Rev. Stat. Ann. Tit. 11,§§ 2-314, and 2-1212.

1392.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1393.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1394.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Maine State Class members have been damaged in an amount to be proven at trial.

## XX.   MARYLAND COUNTS

### MARYLAND COUNT I
**Violations of the Maryland Consumer Protection Act,
Md. Code Ann., Com. Law § 13-101 *et seq*.
(On Behalf of the Maryland State Class)**

1395.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1396.   This claim is brought only on behalf of members of the Maryland State Class against FCA.

1397.   FCA, Plaintiffs, and the Maryland State Class members are "persons" within the meaning of Md. Code Ann., Com. Law § 13-101(h).

1398.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good. Md. Code Ann., Com. Law Code § 13-303 . In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is

281

limited during normal driving conditions, that the emissions controls were defective, that the vehicles have a "defeat device," and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair and deceptive trade practices.  FCA's acts and practices offend public policy; were immoral, unethical, oppressive, or unscrupulous; caused substantial injury to consumers; had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1399.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1400.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Maryland State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions

1336321.4

controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1401.   Plaintiffs and Maryland State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Maryland State Class members did not, and could not, unravel FCA's deception on their own.

1402.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

1403.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1404.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Maryland State Class.

1405.   FCA knew or should have known that its conduct violated the Maryland CPA

1406.   FCA owed Plaintiffs and the Maryland State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

1407.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

1408.   Intentionally concealed the foregoing from Plaintiffs and the Maryland State Class; and/or

1409.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Maryland State Class that contradicted these representations.

1410.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and

were non-EPA-compliant and unreliable, because Plaintiffs and the other Maryland State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1411.  FCA's conduct proximately caused injuries to Plaintiffs and the other Maryland State Class members.

1412.  Plaintiffs and the other Maryland State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Maryland State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1413.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1414.  Pursuant to Md. Code Ann., Com. Law § 13-408, Plaintiffs and the Maryland State Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

### MARYLAND COUNT II
### Fraud
### (Based on Maryland Law)
### (On Behalf of the Maryland State Class)

1415.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1416.  This claim is brought on behalf of the Maryland State Class against FCA.

1417.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and

1336321.4

the other Maryland State Class members information that is highly relevant to their purchasing decision.

1418.  FCA further affirmatively misrepresented to Plaintiffs and Maryland State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1419.  FCA knew these representations were false when made.

1420.  The Defective Vehicles purchased or leased by Plaintiffs and the other Maryland State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Maryland State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1421.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Maryland State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1422.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions,

1336321.4

and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1423.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Maryland State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Maryland State Class members.

1424.  Plaintiffs and Maryland State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and Maryland State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Maryland State Class members by concealing the true facts about the Defective Vehicles' emissions.

1425.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Maryland State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

1426.  FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Maryland State Class members, highly valued that the vehicles

1336321.4

CLASS ACATION COMPLAINT

1  they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and

2  they paid accordingly.

3      1427.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

4  turns off or is limited during normal driving conditions and that the Defective Vehicles were

5  defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

6  pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

7  those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

8  details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

9  knowledge as to such facts, and because FCA knew these facts were not known to or reasonably

10  discoverable by Plaintiffs or Maryland State Class members.   FCA also had a duty to disclose

11  because it made general affirmative representations about the qualities of the vehicles with respect to

12  emissions, starting with references to them as reduced-emissions diesel cars and as compliant with

13  all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of

14  the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual

15  philosophy with respect to compliance with federal and state clean air laws and emissions

16  regulations, and FCA's actual practices with respect to the vehicles at issue.   Having volunteered to

17  provide information to Plaintiffs and Maryland State Class members, FCA had the duty to disclose

18  not just the partial truth, but also the entire truth.   These omitted and concealed facts were material

19  because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs

20  and Maryland State Class members.   Whether a manufacturer's products pollute, comply with

21  federal and state clean air laws and emissions regulations, and whether that manufacturer tells the

22  truth with respect to such compliance or non-compliance, are material concerns to a consumer,

23  including with respect to the emissions certifications testing their vehicles must pass.   FCA

24  represented to Plaintiffs and Maryland State Class members that they were purchasing or leasing

25  reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-

26  emission vehicles with unlawfully high emissions.

27

28

1336321.4

1428.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Maryland State Class members.

1429.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Maryland State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1430.  Plaintiffs and Maryland State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Maryland State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Maryland State Class members, did not generally know such facts.

1431.  Because of the concealment and/or suppression of the facts, Plaintiffs and Maryland State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Maryland State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Maryland State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

CLASS ACATION COMPLAINT

1336321.4

1432.   The value of Plaintiffs' and Maryland State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Maryland State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1433.   Accordingly, FCA is liable to Plaintiffs and Maryland State Class members for damages in an amount to be proven at trial.

1434.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Maryland State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**MARYLAND COUNT III**
**Breach of Express Warranty,**
**Md. Code Com. Law §§ 2-313 and 2a-210**
**(On Behalf of the Maryland State Class)**

1435.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1436.   This Count is brought on behalf of the Maryland State Class against FCA.

1437.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1438.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

1439.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

289

1440.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1441.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

1442.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1443.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1336321.4

1444.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

1445.  FCA's warranties formed a basis of the bargain that was reached when Maryland State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1446.  Despite the existence of warranties, FCA failed to inform Maryland State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1447.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1448.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1449.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Maryland State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1450.  Accordingly, recovery by the Maryland State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1451.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Maryland State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

CLASS ACACION COMPLAINT

1336321.4

1452.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Maryland State Class members' remedies would be insufficient to make them whole.

1453.   Finally, because of FCA's breach of warranty as set forth herein, Maryland State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1454.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1455.   As a direct and proximate result of FCA's breach of express warranties, Maryland State Class members have been damaged in an amount to be determined at trial.

**MARYLAND COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Md. Code Com. Law §§ 2-314 and 2a-212**
**(On Behalf of the Maryland State Class)**

1456.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1457.   This Count is brought on behalf of the Maryland State Class, against FCA.

1458.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1459.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

1460.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

1336321.4

1461.    A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Com. Law §§ 2-314, and 2a-212.

1462.    These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1463.    FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1464.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Maryland State Class members have been damaged in an amount to be proven at trial.

## XXI.    MASSACHUSETTS COUNTS

### MASSACHUSETTS COUNT I
Violations of the Massachusetts Consumer Protection Act,
Mass. Gen. Laws Ch. 93A
(On Behalf of the Massachusetts State Class)

1465.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1466.    This claim is brought on behalf of the Massachusetts State Class against FCA.

1467.    Plaintiffs intend to assert a claim under the Massachusetts Consumer Protection Act ("MCPA"), which makes it unlawful to engage in any "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(1).

1468.    Plaintiffs will make a demand in satisfaction of Mass. Gen. Laws ch. 93A, § 9(3), and may amend this Complaint to assert claims under the MCPA once the required 30 days have elapsed.

293

1336321.4

This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the MCPA.

### MASSACHUSETTS COUNT II
### Fraud
### (Based on Massachusetts Law)
### (On Behalf of the Massachusetts State Class)

1469.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1470.   This claim is brought on behalf of the Massachusetts State Class against FCA.

1471.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Massachusetts State Class members information that is highly relevant to their purchasing decision.

1472.   FCA further affirmatively misrepresented to Plaintiffs and Massachusetts State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1473.   FCA knew these representations were false when made.

1474.   The Defective Vehicles purchased or leased by Plaintiffs and the other Massachusetts State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Massachusetts State Class members had to pay more for fuel than they reasonably expected, and unreliable because

1336321.4

1   the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving

2   conditions.

3       1475.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

4   turns off or is limited during normal driving conditions and that the Defective Vehicles were

5   defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

6   pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

7   those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

8   Plaintiffs and the other Massachusetts State Class members relied on FCA's material representations

9   that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free

10  from defects.

11      1476.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective

12  Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its

13  EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx

14  reduction system in the Defective Vehicles turns off or is limited during normal driving conditions,

15  and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted

16  higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels

17  of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures

18  about the emission system deceptive.

19      1477.  The truth about the defective emissions controls and FCA's manipulations of those

20  controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the

21  "defeat device," and non-compliance with EPA emissions requirements was known only to FCA;

22  Plaintiffs and the Massachusetts State Class members did not know of these facts and FCA actively

23  concealed these facts from Plaintiffs and Massachusetts State Class members.

24      1478.  Plaintiffs and Massachusetts State Class members reasonably relied upon FCA's

25  deception.  They had no way of knowing that FCA's representations were false and/or misleading.

26  As consumers, Plaintiffs and Massachusetts State Class members did not, and could not, unravel

27

28

1336321.4

FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and Massachusetts State Class members by concealing the true facts about the Defective Vehicles' emissions.

1479. FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. FCA also emphasized profits and sales above the trust that Plaintiffs and Massachusetts State Class members placed in its representations. Consumers buy diesel cars from FCA because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Defective Vehicles are doing.

1480. FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and Massachusetts State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1481. FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Massachusetts State Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of

296

the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Massachusetts State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Massachusetts State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Massachusetts State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1482.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Massachusetts State Class members.

1483.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Massachusetts State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1484.  Plaintiffs and Massachusetts State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'   and Massachusetts State Class members' actions were justified.  FCA was

in exclusive control of the material facts, and the public, Plaintiffs, or Massachusetts State Class members, did not generally know such facts.

1485. Because of the concealment and/or suppression of the facts, Plaintiffs and Massachusetts State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies. Had Plaintiffs and Massachusetts State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Massachusetts State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1486. The value of Plaintiffs' and Massachusetts State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Massachusetts State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1487. Accordingly, FCA is liable to Plaintiffs and Massachusetts State Class members for damages in an amount to be proven at trial.

1488. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Massachusetts State Class members' rights and the representations that FCA made to them, in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

1336321.4

**MASSACHUSETTS COUNT III**
**Breach of Express Warranty,**
**Mass. Gen. Laws c. 106 §§ 2-313 and 2A-210**
**(On Behalf of the Massachusetts State Class)**

1489.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1490.    This Count is brought on behalf of the Massachusetts State Class against FCA.

1491.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under M.G.L. c. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1) (d).

1492.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under M.G.L. c. 106 § 2A-103(1)(p).

1493.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

1494.    In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1495.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

1496.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.

1336321.4

These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1497.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1498.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

1499.  FCA's warranties formed a basis of the bargain that was reached when Massachusetts State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1500.  Despite the existence of warranties, FCA failed to inform Massachusetts State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1501.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1502.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1503.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make

1336321.4

Massachusetts State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1504.   Accordingly, recovery by the Massachusetts State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1505.   Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Massachusetts State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1506.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Massachusetts State Class members' remedies would be insufficient to make them whole.

1507.   Finally, because of FCA's breach of warranty as set forth herein, Massachusetts State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1508.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1509.   As a direct and proximate result of FCA's breach of express warranties, Massachusetts State Class members have been damaged in an amount to be determined at trial.

1336321.4

**MASSACHUSETTS COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Mass. Gen. Laws c. 106 §§ 2-314 and 2A-212**
**(On Behalf of the Massachusetts State Class)**

1510.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1511.    This Count is brought on behalf of the Massachusetts State Class, against FCA.

1512.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under M.G.L. c. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1) (d).

1513.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under M.G.L. c. 106 § 2A-103(1)(p).

1514.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

1515.    A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to M.G.L. c. 106 §§ 2-314 and 2A-212.

1516.    These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1517.    FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1518.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Massachusetts State Class members have been damaged in an amount to be proven at trial.

1336321.4

# XXII.  MICHIGAN COUNTS

### MICHIGAN COUNT I
**Violations of the Michigan Consumer Protection Act,**
**Mich. Comp. Laws § 445.903** *et seq.*
**(On Behalf of the Michigan State Class)**

1519.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1520.  This claim is brought on behalf of the Michigan State Class against FCA.

1521.  Plaintiffs and the Michigan State Class members were "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

1522.  The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including:  "(c) Representing that goods or services have … characteristics … that they do not have;" "(e) Representing that goods or services are of a particular standard … if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  Mich. Comp. Laws § 445.903(1).

1523.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when

303

they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1524.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Michigan State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unexpectedly high levels of pollutants, including NOx, as described above.

1525.  Plaintiffs and Michigan State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Michigan State Class members did not, and could not, unravel FCA's deception on their own.

1526.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

1527.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1528.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Michigan State Class.

1529.  FCA knew or should have known that its conduct violated the Michigan CPA.

1530.  FCA owed Plaintiffs and the Michigan State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

1531.  Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

1532.  Intentionally concealed the foregoing from Plaintiffs and the Michigan State Class; and/or

1336321.4

1533.  Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Michigan State Class that contradicted these representations.

1534.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, and had emissions that far exceeded those expected by a reasonable consumer.

1535.  FCA's conduct proximately caused injuries to Plaintiffs and the other Michigan State Class members.

1536.  Plaintiffs and the other Michigan State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Michigan State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.   These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1537.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1538.  Plaintiffs seeks monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs and each Michigan State Class member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.  Plaintiffs also seek punitive damages against FCA because it carried out despicable conduct with willful and conscious disregard of the rights of others.  FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

1336321.4

**MICHIGAN COUNT II**
**Fraud**
**(Based on Michigan Law)**
**(On Behalf of the Michigan State Class)**

1539.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1540.   This claim is brought on behalf of the Michigan State Class against FCA.

1541.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Michigan State Class members information that is highly relevant to their purchasing decision.

1542.   FCA further affirmatively misrepresented to Plaintiffs and Michigan State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1543.   FCA knew these representations were false when made.

1544.   The Defective Vehicles purchased or leased by Plaintiffs and the other Michigan State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Michigan State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1545.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were

1336321.4

defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Michigan State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1546.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1547.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Michigan State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Michigan State Class members.

1548.  Plaintiffs and Michigan State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Michigan State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Michigan State Class members by concealing the true facts about the Defective Vehicles' emissions.

1549.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and

1336321.4

1  consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Michigan State

2  Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel

3  they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And

4  yet, that is precisely what the Defective Vehicles are doing.

5      1550.  FCA's false representations were material to consumers because they concerned the

6  quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with

7  applicable federal and state laws and regulations regarding clean air and emissions, and also because

8  the representations played a significant role in the value of the vehicles.  As FCA well knew, its

9  customers, including Plaintiffs and Michigan State Class members, highly valued that the vehicles

10  they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and

11  they paid accordingly.

12      1551.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

13  turns off or is limited during normal driving conditions and that the Defective Vehicles were

14  defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

15  pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

16  those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

17  details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

18  knowledge as to such facts, and because FCA knew these facts were not known to or reasonably

19  discoverable by Plaintiffs or Michigan State Class members.  FCA also had a duty to disclose

20  because it made general affirmative representations about the qualities of the vehicles with respect to

21  emissions, starting with references to them as reduced-emissions diesel cars and as compliant with

22  all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of

23  the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual

24  philosophy with respect to compliance with federal and state clean air laws and emissions

25  regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to

26  provide information to Plaintiffs and Michigan State Class members, FCA had the duty to disclose

27  not just the partial truth, but also the entire truth.  These omitted and concealed facts were material

28

1336321.4

because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Michigan State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and Michigan State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1552. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Michigan State Class members.

1553. FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Michigan State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1554. Plaintiffs and Michigan State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Michigan State Class members' actions were justified. FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Michigan State Class members, did not generally know such facts.

1555. Because of the concealment and/or suppression of the facts, Plaintiffs and Michigan State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and

1336321.4

fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies. Had Plaintiffs and Michigan State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Michigan State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1556. The value of Plaintiffs' and Michigan State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Michigan State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1557. Accordingly, FCA is liable to Plaintiffs and Michigan State Class members for damages in an amount to be proven at trial.

1558. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Michigan State Class members' rights and the representations that FCA made to them, in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**MICHIGAN COUNT III**
**Breach of Express Warranty,**
**Mich. Comp. Laws §§ 440.2313 and 440.2860**
**(On Behalf of the Michigan State Class)**

1559. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1560.   This Count is brought on behalf of the Michigan State Class against FCA.

1561.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under MICH. COMP. LAWS § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(d).

1562.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under MICH. COMP. LAWS § 440.2803(1)(p).

1563.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

1564.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1565.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:   a "Performance Warranty" and a "Design and Defect Warranty."

1566.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1336321.4

1567.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1568.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

1569.  FCA's warranties formed a basis of the bargain that was reached when Michigan State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1570.  Despite the existence of warranties, FCA failed to inform Michigan State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1571.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1572.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1573.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Michigan State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

CLASS ACATION COMPLAINT

1336321.4

1574.   Accordingly, recovery by the Michigan State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1575.   Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.   Michigan State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1576.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Michigan State Class members' remedies would be insufficient to make them whole.

1577.   Finally, because of FCA's breach of warranty as set forth herein, Michigan State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1578.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1579.   As a direct and proximate result of FCA's breach of express warranties, Michigan State Class members have been damaged in an amount to be determined at trial.

**MICHIGAN COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Mich. Comp. Laws §§ 440.2314 and 440.2860**
**(On Behalf of the Michigan State Class)**

1580.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1336321.4

1581.   This Count is brought on behalf of the Michigan State Class, against FCA.

1582.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under MICH. COMP. LAWS § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(d).

1583.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under MICH. COMP. LAWS § 440.2803(1)(p).

1584.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

1585.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to MICH. COMP. LAWS §§ 440.2314 and 440.2862.

1586.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1587.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1588.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Michigan State Class members have been damaged in an amount to be proven at trial.

## XXIII. MINNESOTA COUNTS

### MINNESOTA COUNT I
**Violations of the Minnesota Prevention of Consumer Fraud Act,
Minn. Stat. § 325F.68 *et seq*.
(On Behalf of the Minnesota State Class)**

1589.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1590.   This claim is brought on behalf of the Minnesota State Class against FCA.

1336321.4

1591.  The Defective Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

1592.  The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."  Minn. Stat. § 325F.69(1).  The Minnesota CFA also prohibits the dissemination, directly or indirectly, of an advertisement "of any sort regarding merchandise," where that advertisement contains "any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading."  Minn. Stat. § 325F.67. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA used or employed a fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby and disseminated advertisements containing material assertions, representations, or statements of fact which were untrue, deceptive, or misleading, all in violation of the Minnesota CFA.

1593.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA

315

1336321.4

engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1594.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Minnesota State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1595.   Plaintiffs and Minnesota State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Minnesota State Class members did not, and could not, unravel FCA's deception on their own.

1596.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

1597.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1598.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Minnesota State Class.

1599.   FCA knew or should have known that its conduct violated the Minnesota CFA.

1600.   FCA owed Plaintiffs and the Minnesota State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

1336321.4

1601.  Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

1602.  Intentionally concealed the foregoing from Plaintiffs and the Minnesota State Class; and/or

1603.  Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Minnesota State Class that contradicted these representations.

1604.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Minnesota State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1605.  FCA's conduct proximately caused injuries to Plaintiffs and the other Minnesota State Class members.

1606.  Plaintiffs and the other Minnesota State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Minnesota State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1607.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1336321.4

1608.  Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs and the Minnesota State Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

1609.  Plaintiffs also seeks punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that FCA's acts show deliberate disregard for the rights of others.

**MINNESOTA COUNT II**
**Fraud**
**(Based on Minnesota Law)**
**(On Behalf of the Minnesota State Class)**

1610.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1611.  This claim is brought on behalf of the Minnesota State Class against FCA.

1612.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Minnesota State Class members information that is highly relevant to their purchasing decision.

1613.  FCA further affirmatively misrepresented to Plaintiffs and Minnesota State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1614.  FCA knew these representations were false when made.

1615.  The Defective Vehicles purchased or leased by Plaintiffs and the other Minnesota State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of

1336321.4

FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Minnesota State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1616.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Minnesota State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1617.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1618.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Minnesota State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Minnesota State Class members.

1619.  Plaintiffs and Minnesota State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading.

1336321.4

As consumers, Plaintiffs and Minnesota State Class members did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and Minnesota State Class members by concealing the true facts about the Defective Vehicles' emissions.

1620. FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. FCA also emphasized profits and sales above the trust that Plaintiffs and Minnesota State Class members placed in its representations. Consumers buy diesel cars from FCA because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Defective Vehicles are doing.

1621. FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and Minnesota State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1622. FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Minnesota State Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with

1336321.4

all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Minnesota State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Minnesota State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and Minnesota State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1623. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Minnesota State Class members.

1624. FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Minnesota State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1625. Plaintiffs and Minnesota State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed

from them.  Plaintiffs'   and Minnesota State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Minnesota State Class members, did not generally know such facts.

1626.   Because of the concealment and/or suppression of the facts, Plaintiffs and Minnesota State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Minnesota State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Minnesota State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1627.   The value of Plaintiffs' and Minnesota State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Minnesota State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1628.   Accordingly, FCA is liable to Plaintiffs and Minnesota State Class members for damages in an amount to be proven at trial.

1629.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Minnesota State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's  conduct warrants an

CLASS ACACION COMPLAINT

1336321.4

assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**MINNESOTA COUNT III**
**Breach of Express Warranty,**
**Minn. Stat. §§ 336.2-313 and 336.2A-210**
**(On Behalf of the Minnesota State Class)**

1630.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1631.  This Count is brought on behalf of the Minnesota State Class against FCA.

1632.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

1633.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1634.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105(1) and 336.2A-103(1)(h).

1635.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1636.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

1637.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required

1336321.4

by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1638.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1639.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

1640.  FCA's warranties formed a basis of the bargain that was reached when Minnesota State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1641.  Despite the existence of warranties, FCA failed to inform Minnesota State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1642.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1336321.4

1643.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1644.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Minnesota State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1645.  Accordingly, recovery by the Minnesota State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1646.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Minnesota State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1647.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Minnesota State Class members' remedies would be insufficient to make them whole.

1648.  Finally, because of FCA's breach of warranty as set forth herein, Minnesota State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1649.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1336321.4

1650.   As a direct and proximate result of FCA's breach of express warranties, Minnesota State Class members have been damaged in an amount to be determined at trial.

**MINNESOTA COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Minn. Stat. §§ 336.2-314 and 336.2A-212**
**(On Behalf of the Minnesota State Class)**

1651.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1652.   This Count is brought on behalf of the Minnesota State Class, against FCA.

1653.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

1654.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1655.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105(1) and 336.2A-103(1)(h).

1656.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Minn. Stat. §§ 336.2-314 and 336.2A-212.

1657.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1658.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1336321.4

1659.  As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Minnesota State Class members have been damaged in an amount to be proven at trial.

## XXIV. MISSISSIPPI COUNTS

### MISSISSIPPI COUNT I
**Violations of Mississippi Consumer Protection Act,
Miss. Code. Ann. § 75-24-1, *et seq*.
(On Behalf of the Mississippi State Class)**

1660.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1661.  This claim is brought on behalf of the Mississippi State Class against FCA.

1662.  The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce."  Miss. Code. Ann. § 75-24-5(1).  Unfair or deceptive practices include, but are not limited to, "(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;" "(g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(i) Advertising goods or services with intent not to sell them as advertised."  Miss. Code. Ann. § 75-24-5. FCA participated in deceptive trade practices that violated the Mississippi CPA as described herein, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; and advertising Class Vehicles with the intent not to sell them as advertised.

1663.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted

327

1336321.4

unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.  In purchasing or leasing the Defective Vehicles, Mississippi State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Mississippi State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception.  Mississippi State Class members did not, and could not, unravel FCA's deception on their own.

1664.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

1665.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1666.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead the Mississippi State Class.

1667.   FCA knew or should have known that its conduct violated the Mississippi Consumer Protection Act.

1668.   FCA owed the Mississippi State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

1336321.4

1669.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

1670.   Intentionally concealed the foregoing from the Mississippi State Class; and/or

1671.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from the Mississippi State Class that contradicted these representations.

1672.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Mississippi State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1673.   FCA's conduct proximately caused injuries to the Mississippi State Class members.

1674.   Mississippi State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Mississippi State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1675.   FCA's violations present a continuing risk to the Mississippi State Class as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1676.   The Mississippi State Class seeks actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

CLASS ACACTION COMPLAINT

**MISSISSIPPI COUNT II**
**Fraud**
**(Based on Mississippi Law)**
**(On Behalf of the Mississippi State Class)**

1677.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1678.   This claim is brought on behalf of Plaintiffs and the Mississippi State Class against FCA.

1679.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were noncompliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Mississippi State Class members information that is highly relevant to their purchasing decision.

1680.   FCA further affirmatively misrepresented to Plaintiffs and Mississippi State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1681.   FCA knew these representations were false when made.

1682.   The Defective Vehicles purchased or leased by Plaintiffs and the other Mississippi State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1683.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

330

pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Mississippi State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1684.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1685.  The truth about the defective emissions controls and FCA's manipulations of those controls, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Mississippi State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Mississippi State Class members.

1686.  Plaintiffs and Mississippi State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and Mississippi State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Mississippi State Class members by concealing the true facts about the Defective Vehicles' emissions.

1687.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and

1336321.4

Mississippi State Class members placed in its representations. Consumers buy diesel cars from FCA because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Defective Vehicles are doing.

1688. FCA's false representations were material to consumers because they concerned the quality of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and Mississippi State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1689. FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Mississippi State Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Mississippi State Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Mississippi State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that

1336321.4

manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Mississippi State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1690.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Mississippi State Class members.

1691.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Mississippi State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1692.  Plaintiffs and Mississippi State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Mississippi State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Mississippi State Class members, did not generally know such facts.

1693.  Because of the concealment and/or suppression of the facts, Plaintiffs and Mississippi State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Mississippi State Class members been aware of the true

1336321.4

emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, Plaintiffs and Mississippi State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1694.  The value of Plaintiffs' and Mississippi State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Mississippi State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1695.  Accordingly, FCA is liable to Plaintiffs and Mississippi State Class members for damages in an amount to be proven at trial.

1696.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Mississippi State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**MISSISSIPPI COUNT III**
**Breach of Express Warranty,**
**Miss. Code §§ 75-2-313 and 75-2A-210**
**(On Behalf of the Mississippi State Class)**

1697.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1698.  This Count is brought on behalf of the Mississippi State Class against FCA.

1699.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

334

1336321.4

1700.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Miss. Code § 75-2A-103(1)(p).

1701.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

1702.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1703.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

1704.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1705.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail

to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1706.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

1707.  FCA's warranties formed a basis of the bargain that was reached when Mississippi State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1708.  Despite the existence of warranties, FCA failed to inform Mississippi State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1709.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1710.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1711.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Mississippi State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1712.  Accordingly, recovery by the Mississippi State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1713.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not

CLASS ACACION COMPLAINT

conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Mississippi State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1714.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Mississippi State Class members' remedies would be insufficient to make them whole.

1715.  Finally, because of FCA's breach of warranty as set forth herein, Mississippi State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1716.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1717.  As a direct and proximate result of FCA's breach of express warranties, Mississippi State Class members have been damaged in an amount to be determined at trial.

**MISSISSIPPI COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Miss. Code §§ 75-2-314 and 75-2A-212**
**(On Behalf of the Mississippi State Class)**

1718.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1719.  This Count is brought on behalf of the Mississippi State Class, against FCA.

1720.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

1721.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Miss. Code § 75-2A-103(1)(p).

1336321.4

1722.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

1723.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Miss. Code §§ 75-2-314 and 75-2A-212.

1724.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1725.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Mississippi State Class members have been damaged in an amount to be proven at trial.

## XXV.  **MISSOURI COUNTS**

### MISSOURI COUNT I
**Violations of the Missouri Merchandising Practices Act,**
**Mo. Rev. Stat. § 407.010 *et seq.***
**(On Behalf of the Missouri State Class)**

1726.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1727.   Plaintiffs bring this Count on behalf of the Missouri State Class against FCA.

1728.   FCA, Plaintiffs, and the Missouri State Class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

1729.   FCA engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

1730.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation,

338

CLASS ACTION COMPLAINT

1336321.4

unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, FCA used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, in violation of the Missouri MPA. FCA's conduct offends public policy; is unethical, oppressive, or unscrupulous; and presents a risk of, or causes, substantial injury to consumers.

1731. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

CLASS ACACION COMPLAINT

1336321.4

1732.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Missouri State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1733.   Plaintiffs and Missouri State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Missouri State Class members did not, and could not, unravel FCA's deception on their own.

1734.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

1735.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1736.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Missouri State Class.

1737.   FCA knew or should have known that its conduct violated the Missouri MPA.

1738.   FCA owed Plaintiffs and the Missouri State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

1739.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

1740.   Intentionally concealed the foregoing from Plaintiffs and the Missouri State Class; and/or

1741.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Missouri State Class that contradicted these representations.

1336321.4

1742.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Missouri State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1743.  FCA's conduct proximately caused injuries to Plaintiffs and the other Missouri State Class members.

1744.  Plaintiffs and the other Missouri State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Missouri State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1745.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1746.  FCA is liable to Plaintiffs and the Missouri State Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

**MISSOURI COUNT II**
**Fraud**
**(Based on Missouri Law)**
**(On Behalf of the Missouri State Class)**

1747.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1748.  This claim is brought on behalf of the Missouri State Class against FCA.

1749.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective

1336321.4

emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Missouri State Class members information that is highly relevant to their purchasing decision.

1750.   FCA further affirmatively misrepresented to Plaintiffs and Missouri State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1751.   FCA knew these representations were false when made.

1752.   The Defective Vehicles purchased or leased by Plaintiffs and the other Missouri State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Missouri State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1753.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Missouri State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1336321.4

1754.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1755.   The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Missouri State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Missouri State Class members.

1756.   Plaintiffs and Missouri State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Missouri State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Missouri State Class members by concealing the true facts about the Defective Vehicles' emissions.

1757.   FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Missouri State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

1758.   FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with

1336321.4

applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Missouri State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1759.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Missouri State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Missouri State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Missouri State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Missouri State Class members that they were purchasing or leasing reduced-emission diesel

1336321.4

1  vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with

2  unlawfully high emissions.

3       1760.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to

4  pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles

5  and did not or could not comply with federal and state laws governing clean air and emissions,

6  which perception would hurt the brand's image and cost FCA money, and it did so at the expense of

7  Plaintiffs and Missouri State Class members.

8       1761. FCA still has not made full and adequate disclosures, and continues to defraud

9  Plaintiffs and Missouri State Class members by concealing material information regarding the

10  emissions qualities of the Defective Vehicles.

11       1762.  Plaintiffs and Missouri State Class members were unaware of the omitted material

12  facts referenced herein, and they would not have acted as they did if they had known of the

13  concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-

14  emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily

15  polluting vehicles, or would have taken other affirmative steps in light of the information concealed

16  from them.  Plaintiffs'  and Missouri State Class members' actions were justified.  FCA was in

17  exclusive control of the material facts, and the public, Plaintiffs, or Missouri State Class members,

18  did not generally know such facts.

19       1763.  Because of the concealment and/or suppression of the facts, Plaintiffs and Missouri

20  State Class members have sustained damage because they own vehicles that are diminished in value

21  as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and

22  fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel

23  engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues

24  engendered by FCA's corporate policies.  Had Plaintiffs and Missouri State Class members been

25  aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the

26  truth and compliance with applicable federal and state laws and regulations, and its failure to meet

27  and maintain the advertised MPG rate, Plaintiffs and Missouri State Class members who purchased

28

1336321.4

or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1764.  The value of Plaintiffs' and Missouri State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Missouri State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1765.  Accordingly, FCA is liable to Plaintiffs and Missouri State Class members for damages in an amount to be proven at trial.

1766.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Missouri State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**MISSOURI COUNT III**
**Breach of Express Warranty,**
**Mo. Stat. §§ 400.2-313 and 400.2A-210**
**(On Behalf of the Missouri State Class)**

1767.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1768.  This Count is brought on behalf of the Missouri State Class against FCA.

1769.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

1770.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

1336321.4

1771.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).5.

1772.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1773.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

1774.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1775.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty

1336321.4

provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1776.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

1777.  FCA's warranties formed a basis of the bargain that was reached when Missouri State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1778.  Despite the existence of warranties, FCA failed to inform Missouri State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1779.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1780.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1781.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Missouri State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1782.  Accordingly, recovery by the Missouri State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1783.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts

1336321.4

regarding the Defective Vehicles.  Missouri State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1784.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Missouri State Class members' remedies would be insufficient to make them whole.

1785.  Finally, because of FCA's breach of warranty as set forth herein, Missouri State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1786.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1787.  As a direct and proximate result of FCA's breach of express warranties, Missouri State Class members have been damaged in an amount to be determined at trial.

**MISSOURI COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Mo. Stat. §§ 400.2-314 and 400.2A-212**
**(On Behalf of the Missouri State Class)**

1788.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1789.  This Count is brought on behalf of the Missouri State Class, against FCA.

1790.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

1791.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

349

1336321.4

1792.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).5.

1793.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mo. Stat. § 400.2-314 and Mo. Stat. § 400.2A-212.

1794.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1795.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1796.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Missouri State Class members have been damaged in an amount to be proven at trial.

## XXVI. <u>MONTANA COUNTS</u>

### MONTANA COUNT I
**Violations of the Montana Unfair Trade Practices and Consumer Protection Act of 1973,
Mont. Code Ann. § 30-14-101 *et seq*.
(On Behalf of the Montana State Class)**

1797.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1798.   This claim is brought only on behalf of the Montana State Class against FCA.

1799.   FCA, Plaintiffs, and the Montana State Class members are "persons" within the meaning of Mont. Code Ann. § 30-14-102(6).

1800.   Montana State Class members are "consumer[s]" under Mont. Code Ann. § 30-14-102(1).

1336321.4

1801.    The sale or lease of the Defective Vehicles to Montana State Class members occurred within "trade and commerce" within the meaning of Mont. Code Ann. § 30-14-102(8), and FCA committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

1802.    The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."    Mont. Code Ann. § 30-14-103. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.    Accordingly, FCA engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of the Montana CPA.

1803.    In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.    Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such

that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1804.    In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Montana State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1805.    Plaintiffs and Montana State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel FCA's deception on their own.

1806.    FCA's actions as set forth above occurred in the conduct of trade or commerce.

1807.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1808.    FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Montana State Class.

1809.    FCA knew or should have known that its conduct violated the Montana CPA.

1810.    FCA owed Plaintiffs and the Montana State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

1811.    Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

1812.    Intentionally concealed the foregoing from Plaintiffs and the Montana State Class; and/or

1813.    Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully

352

1336321.4

withholding material facts from Plaintiffs and the Montana State Class that contradicted these representations.

1814. FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1815. FCA's conduct proximately caused injuries to Plaintiffs and the other Montana State Class members.

1816. Plaintiffs and the other Montana State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Montana State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1817. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1818. Because FCA's unlawful methods, acts, and practices have caused Plaintiffs and Montana State Class members to suffer an ascertainable loss of money and property, Plaintiffs and the Montana State Class seek from FCA actual damages or $500, whichever is greater, discretionary treble damages, reasonable attorneys' fees, and any other relief the Court considers necessary or proper, under Mont. Code Ann. § 30-14-133.

1336321.4

## MONTANA COUNT II
### Fraud
### (Based on Montana Law)
### (On Behalf of the Montana State Class)

1819.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1820.   This claim is brought on behalf of the Montana State Class against FCA.

1821.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Montana State Class members information that is highly relevant to their purchasing decision.

1822.   FCA further affirmatively misrepresented to Plaintiffs and Montana State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1823.   FCA knew these representations were false when made.

1824.   The Defective Vehicles purchased or leased by Plaintiffs and the other Montana State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Montana State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1825.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were

1336321.4

defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Montana State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1826.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1827.   The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Montana State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Montana State Class members.

1828.   Plaintiffs and Montana State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.   As consumers, Plaintiffs and Montana State Class members did not, and could not, unravel FCA's deception on their own.   Rather, FCA intended to deceive Plaintiffs and Montana State Class members by concealing the true facts about the Defective Vehicles' emissions.

1829.   FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and

1336321.4

consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Montana State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

1830.  FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Montana State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1831.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Montana State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Montana State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material

1336321.4

because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Montana State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Montana State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1832.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Montana State Class members.

1833.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Montana State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1834.  Plaintiffs and Montana State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Montana State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Montana State Class members, did not generally know such facts.

1835.  Because of the concealment and/or suppression of the facts, Plaintiffs and Montana State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and

1336321.4

fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies. Had Plaintiffs and Montana State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Montana State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1836. The value of Plaintiffs' and Montana State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Montana State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1837. Accordingly, FCA is liable to Plaintiffs and Montana State Class members for damages in an amount to be proven at trial.

1838. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Montana State Class members' rights and the representations that FCA made to them, in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### MONTANA COUNT III
### Breach of Express Warranty,
### Mont. Code §§ 30-2-313 and 30-2A-210
### (On Behalf of the Montana State Class)

1839. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1336321.4

1840.   This Count is brought on behalf of the Montana State Class against FCA.

1841.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Mont. Code § 30-2-104(1) and "sellers" of motor vehicles under § 30-2-103(1)(d).

1842.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Mont. Code § 30-2A-103(1)(p).

1843.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).5.

1844.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1845.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:   a "Performance Warranty" and a "Design and Defect Warranty."

1846.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1336321.4

1847.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.    Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.    The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.    This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1848.    As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

1849.    FCA's warranties formed a basis of the bargain that was reached when Montana State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1850.    Despite the existence of warranties, FCA failed to inform Montana State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1851.    FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.    FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1852.    Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1853.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Montana State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

CLASS ACACION COMPLAINT

1336321.4

1854.  Accordingly, recovery by the Montana State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1855.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Montana State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1856.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Montana State Class members' remedies would be insufficient to make them whole.

1857.  Finally, because of FCA's breach of warranty as set forth herein, Montana State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1858.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1859.  As a direct and proximate result of FCA's breach of express warranties, Montana State Class members have been damaged in an amount to be determined at trial.

**MONTANA COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Mont. Code §§ 30-2-314 and 30-2A-212**
**(On Behalf of the Montana State Class)**

1860.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1336321.4

1     1861.   This Count is brought on behalf of the Montana State Class, against FCA.

2     1862.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles

3   under Mont. Code § 30-2-104(1) and "sellers" of motor vehicles under § 30-2-103(1)(d).

4     1863.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor

5   vehicles under Mont. Code § 30-2A-103(1)(p).

6     1864.   The Defective Vehicles are and were at all relevant times "goods" within the meaning

7   of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).5.

8     1865.   A warranty that the Defective Vehicles were in merchantable condition and fit for the

9   ordinary purpose for which vehicles are used is implied by law pursuant to Mont. Code §§ 30-2-314

10  and 30-2A-212.

11    1866.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in

12  merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

13  Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal

14  and state emissions standards, rendering certain emissions functions inoperative; and the "clean"

15  diesel engine system was not adequately designed, manufactured, and tested.

16    1867.   FCA was provided notice of these issues by the investigations of the EPA and

17  California state regulators, and numerous complaints filed against it including the instant complaint,

18  within a reasonable amount of time.

19    1868.   As a direct and proximate result of FCA's breach of the implied warranty of

20  merchantability, Montana State Class members have been damaged in an amount to be proven at

21  trial.

22              **XXVII.        NEBRASKA COUNTS**

23                        **NEBRASKA COUNT I**
24        **Violations of the Nebraska Consumer Protection Act,**
                    **Neb. Rev. Stat. § 59-1601 *et seq*.**
25                 **(On Behalf of the Nebraska State Class)**

26    1869.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth

27  herein.

28

1336321.4

1870.  This claim is brought on behalf of the Nebraska State Class against FCA.

1871.  FCA, Plaintiffs and Nebraska State Class members are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), Neb. Rev. Stat. § 59-1601(1).

1872.  FCA's actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

1873.  The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Neb. Rev. Stat. § 59-1602. FCA's conduct as set forth herein constitutes unfair or deceptive acts or practices.

1874.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1875.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Nebraska State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions

1336321.4

controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1876.  Plaintiffs and Nebraska State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Nebraska State Class members did not, and could not, unravel FCA's deception on their own.

1877.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

1878.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1879.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Nebraska State Class.

1880.  FCA knew or should have known that its conduct violated the Nebraska CPA.

1881.  FCA owed Plaintiffs and the Nebraska State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

1882.  Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

1883.  Intentionally concealed the foregoing from Plaintiffs and the Nebraska State Class; and/or

1884.  Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Nebraska State Class that contradicted these representations.

1885.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and

1336321.4

were non-EPA-compliant and unreliable, because Plaintiffs and the other Nebraska State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1886.   FCA's conduct proximately caused injuries to Plaintiffs and the other Nebraska State Class members.

1887.   Because FCA's conduct caused injury to Nebraska State Class members' property through violations of the Nebraska CPA, Plaintiffs and the Nebraska State Class seek recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining FCA's unfair or deceptive acts and practices, court costs, reasonable attorneys' fees, and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

**NEBRASKA COUNT II**
**Fraud**
**(Based on Nebraska Law)**
**(On Behalf of the Nebraska State Class)**

1888.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1889.   This claim is brought on behalf of the Nebraska State Class against FCA.

1890.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Nebraska State Class members information that is highly relevant to their purchasing decision.

1891.   FCA further affirmatively misrepresented to Plaintiffs and Nebraska State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were

1336321.4

low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1892.  FCA knew these representations were false when made.

1893.  The Defective Vehicles purchased or leased by Plaintiffs and the other Nebraska State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Nebraska State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1894.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Nebraska State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1895.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1336321.4

1896.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Nebraska State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Nebraska State Class members.

1897.  Plaintiffs and Nebraska State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and Nebraska State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Nebraska State Class members by concealing the true facts about the Defective Vehicles' emissions.

1898.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Nebraska State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

1899.  FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Nebraska State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1900.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

1336321.4

pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Nebraska State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Nebraska State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Nebraska State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Nebraska State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1901.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Nebraska State Class members.

1336321.4

1902.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Nebraska State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1903.  Plaintiffs and Nebraska State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Nebraska State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Nebraska State Class members, did not generally know such facts.

1904.  Because of the concealment and/or suppression of the facts, Plaintiffs and Nebraska State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Nebraska State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Nebraska State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1905.  The value of Plaintiffs' and Nebraska State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Nebraska State Class members' vehicles, and made any reasonable

1336321.4

consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1906.  Accordingly, FCA is liable to Plaintiffs and Nebraska State Class members for damages in an amount to be proven at trial.

1907.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Nebraska State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**NEBRASKA COUNT III**
**Breach of Express Warranty,**
**Neb. Rev. St. U.C.C. §§ 2-313 and 2A-210**
**(On Behalf of the Nebraska State Class)**

1908.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1909.  This Count is brought on behalf of the Nebraska State Class against FCA.

1910.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1911.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

1912.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

1913.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3

CLASS ACATION COMPLAINT

1336321.4

1    years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever

2    occurs first).

3        1914.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two

4    federal emission control warranties:  a "Performance Warranty" and a "Design and Defect

5    Warranty."

6        1915.  The EPA requires vehicle manufacturers to provide a Performance Warranty with

7    respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its

8    vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required

9    by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever

10   occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission

11   control components are covered for the first eight years or 80,000 miles, whichever comes first.

12   These major emission control components subject to the longer warranty include the catalytic

13   converters, the electronic emission control unit, and the onboard emission diagnostic device or

14   computer.

15       1916.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with

16   respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their

17   vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect

18   Warranty required by the EPA covers repair of emission control or emission related parts which fail

19   to function or function improperly because of a defect in materials or workmanship.  This warranty

20   provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission

21   control components, for eight years or 80,000 miles, whichever comes first.

22       1917.  As manufacturers of light-duty vehicles, FCA were required to provide these

23   warranties to purchasers or lessees of Defective Vehicles.

24       1918.  FCA's warranties formed a basis of the bargain that was reached when Nebraska

25   State Class members purchased or leased their Defective Vehicles equipped with the non-compliant

26   "clean" diesel engine and emission systems.

27

28

1336321.4

1919.  Despite the existence of warranties, FCA failed to inform Nebraska State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1920.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1921.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1922.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Nebraska State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1923.  Accordingly, recovery by the Nebraska State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1924.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Nebraska State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1925.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a

1336321.4

reasonable time, and any limitation on the Nebraska State Class members' remedies would be insufficient to make them whole.

1926.  Finally, because of FCA's breach of warranty as set forth herein, Nebraska State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1927.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1928.  As a direct and proximate result of FCA's breach of express warranties, Nebraska State Class members have been damaged in an amount to be determined at trial.

**NEBRASKA COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Neb. Rev. St. U.C.C. §§ 2-314 and 2A-212**
**(On Behalf of the Nebraska State Class)**

1929.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1930.  This Count is brought on behalf of the Nebraska State Class, against FCA.

1931.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1932.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

1933.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

1934.  A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Neb. Rev. St. U.C.C.§§ 2-314 and 2A-212.

1935.  These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1936.  FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1937.  As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Nebraska State Class members have been damaged in an amount to be proven at trial.

**XXVIII.**    **NEVADA COUNTS**

**NEVADA COUNT I**
**Violations of the Nevada Deceptive Trade Practices Act,**
**Nev. Rev. Stat. § 598.0903 *et seq.***
**(On Behalf of the Nevada State Class)**

1938.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1939.  Plaintiffs bring this Count on behalf of the Nevada State Class against FCA.

1940.  The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903 *et seq.*, prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction."

1941.  Accordingly, FCA has violated the Nevada DTPA by knowingly representing that the Defective Vehicles have uses and benefits, which they do not have; representing that the Defective

374

Vehicles are of a particular standard, quality, and grade when they are not; advertising Defective Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

1942.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1943.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Nevada State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1944.  Plaintiffs and Nevada State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception.

1336321.4

Plaintiffs and Nevada State Class members did not, and could not, unravel FCA's deception on their own.

1945.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

1946.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1947.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Nevada State Class.

1948.  FCA knew or should have known that its conduct violated the Nevada DTPA.

1949.  FCA owed Plaintiffs and the Nevada State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

1950.  Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

1951.  Intentionally concealed the foregoing from Plaintiffs and the Nevada State Class; and/or

1952.  Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Nevada State Class that contradicted these representations.

1953.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Nevada State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1954.  FCA's conduct proximately caused injuries to Plaintiffs and the other Nevada State Class members.

1955.  Plaintiffs and the other Nevada State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Nevada State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.   These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1956.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1957.  Accordingly, Plaintiffs and the Nevada State Class seek their actual damages, punitive damages, court costs, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA. Nev. Rev. Stat. § 41.600.

**NEVADA COUNT II**
**Fraud**
**(Based on Nevada Law)**
**(On Behalf of the Nevada State Class)**

1958.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1959.  This claim is brought on behalf of the Nevada State Class against FCA.

1960.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Nevada State Class members information that is highly relevant to their purchasing decision.

1961.  FCA further affirmatively misrepresented to Plaintiffs and Nevada State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were

377

1336321.4

low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1962.   FCA knew these representations were false when made.

1963.   The Defective Vehicles purchased or leased by Plaintiffs and the other Nevada State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Nevada State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1964.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Nevada State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1965.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1336321.4

1966. The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Nevada State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Nevada State Class members.

1967. Plaintiffs and Nevada State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and Nevada State Class members did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and Nevada State Class members by concealing the true facts about the Defective Vehicles' emissions.

1968. FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. FCA also emphasized profits and sales above the trust that Plaintiffs and Nevada State Class members placed in its representations. Consumers buy diesel cars from FCA because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Defective Vehicles are doing.

1969. FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and Nevada State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1970. FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

CLASS ACATION COMPLAINT

1336321.4

pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Nevada State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Nevada State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Nevada State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Nevada State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1971.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Nevada State Class members.

1336321.4

1972.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Nevada State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1973.  Plaintiffs and Nevada State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Nevada State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Nevada State Class members, did not generally know such facts.

1974.  Because of the concealment and/or suppression of the facts, Plaintiffs and Nevada State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Nevada State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Nevada State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1975.  The value of Plaintiffs' and Nevada State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Nevada State Class members' vehicles, and made any reasonable

consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1976.  Accordingly, FCA is liable to Plaintiffs and Nevada State Class members for damages in an amount to be proven at trial.

1977.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Nevada State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**NEVADA COUNT III**
**Breach of Express Warranty,**
**N.R.S. §§ 104.2313 and 104A.2210**
**(On Behalf of the Nevada State Class)**

1978.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1979.  This Count is brought on behalf of the Nevada State Class against FCA.

1980.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.R.S. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

1981.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.R.S. § 104A.2103(1)(p).

1982.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

1983.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3

years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1984.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

1985.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1986.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1987.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

1988.  FCA's warranties formed a basis of the bargain that was reached when Nevada State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

CLASS ACATION COMPLAINT

1989.   Despite the existence of warranties, FCA failed to inform Nevada State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1990.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

1991.   Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1992.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Nevada State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1993.   Accordingly, recovery by the Nevada State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

1994.   Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Nevada State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1995.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a

CLASS ACACION COMPLAINT

1336321.4

reasonable time, and any limitation on the Nevada State Class members' remedies would be insufficient to make them whole.

1996.   Finally, because of FCA's breach of warranty as set forth herein, Nevada State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1997.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1998.   As a direct and proximate result of FCA's breach of express warranties, Nevada State Class members have been damaged in an amount to be determined at trial.

### NEVADA COUNT IV
### Breach of Implied Warranty of Merchantability,
### N.R.S. §§ 104.2314 and 104A.2212
### (On Behalf of the Nevada State Class)

1999.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2000.   This Count is brought on behalf of the Nevada State Class, against FCA.

2001.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.R.S. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

2002.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.R.S. § 104A.2103(1)(p).

2003.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

2004.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.R.S. §§ 104.2314 and 104A.2212.

2005.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

1336321.4

Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2006.  FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2007.  As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Nevada State Class members have been damaged in an amount to be proven at trial.

## XXIX. NEW HAMPSHIRE COUNTS

**NEW HAMPSHIRE COUNT I**
**Violations of the New Hampshire Consumer Protection Act,**
**N.H. Rev. Stat. § 358-A:1 *et seq*.**
**(On Behalf of the New Hampshire State Class)**

2008.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2009.  Plaintiffs bring this claim on behalf of the New Hampshire State Class against FCA.

2010.  Plaintiffs, New Hampshire State Class members, and FCA are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. Rev. Stat. § 358-A:1.

2011.  FCA's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

2012.  The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised."  N.H. Rev. Stat. § 358-A:2.

2013.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during

1336321.4

normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.   Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2014.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other New Hampshire State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2015.   Plaintiffs and New Hampshire State Class members reasonably relied upon FCA's false misrepresentations.   They had no way of knowing that FCA's representations were false and gravely misleading.   As alleged herein, FCA engaged in extremely sophisticated methods of deception.   Plaintiffs and New Hampshire State Class members did not, and could not, unravel FCA's deception on their own.

2016.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

2017.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1336321.4

2018.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the New Hampshire State Class.

2019.   FCA knew or should have known that its conduct violated the New Hampshire CPA.

2020.   FCA owed Plaintiffs and the New Hampshire State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

2021.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2022.   Intentionally concealed the foregoing from Plaintiffs and the New Hampshire State Class; and/or

2023.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the New Hampshire State Class that contradicted these representations.

2024.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other New Hampshire State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2025.   FCA's conduct proximately caused injuries to Plaintiffs and the other New Hampshire State Class members.

2026.   Because FCA's willful conduct caused injury to New Hampshire State Class members' property through violations of the New Hampshire CPA, Plaintiffs and the New Hampshire State Class seek recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, an order enjoining FCA's unfair and/or deceptive acts and practices, and any other just and proper relief under N.H. Rev. Stat. § 358-A:10.

1336321.4

**NEW HAMPSHIRE COUNT II**
**Fraud**
**(Based on New Hampshire Law)**
**(On Behalf of the New Hampshire State Class)**

2027.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2028.   This claim is brought on behalf of the New Hampshire State Class against FCA.

2029.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other New Hampshire State Class members information that is highly relevant to their purchasing decision.

2030.   FCA further affirmatively misrepresented to Plaintiffs and New Hampshire State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2031.   FCA knew these representations were false when made.

2032.   The Defective Vehicles purchased or leased by Plaintiffs and the other New Hampshire State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other New Hampshire State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

2033.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were

389

1336321.4

defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other New Hampshire State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2034.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2035.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the New Hampshire State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and New Hampshire State Class members.

2036.  Plaintiffs and New Hampshire State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and New Hampshire State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and New Hampshire State Class members by concealing the true facts about the Defective Vehicles' emissions.

2037.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and

1336321.4

1    consumers. FCA also emphasized profits and sales above the trust that Plaintiffs and New

2    Hampshire State Class members placed in its representations. Consumers buy diesel cars from FCA

3    because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the

4    environment. And yet, that is precisely what the Defective Vehicles are doing.

5        2038. FCA's false representations were material to consumers because they concerned the

6    quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with

7    applicable federal and state laws and regulations regarding clean air and emissions, and also because

8    the representations played a significant role in the value of the vehicles. As FCA well knew, its

9    customers, including Plaintiffs and New Hampshire State Class members, highly valued that the

10   vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced

11   emissions, and they paid accordingly.

12       2039. FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

13   turns off or is limited during normal driving conditions and that the Defective Vehicles were

14   defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

15   pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

16   those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

17   details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

18   knowledge as to such facts, and because FCA knew these facts were not known to or reasonably

19   discoverable by Plaintiffs or New Hampshire State Class members. FCA also had a duty to disclose

20   because it made general affirmative representations about the qualities of the vehicles with respect to

21   emissions, starting with references to them as reduced-emissions diesel cars and as compliant with

22   all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of

23   the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual

24   philosophy with respect to compliance with federal and state clean air laws and emissions

25   regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to

26   provide information to Plaintiffs and New Hampshire State Class members, FCA had the duty to

27   disclose not just the partial truth, but also the entire truth. These omitted and concealed facts were

28

391

1336321.4

material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and New Hampshire State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and New Hampshire State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2040.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and New Hampshire State Class members.

2041. FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and New Hampshire State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

2042.  Plaintiffs and New Hampshire State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and New Hampshire State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or New Hampshire State Class members, did not generally know such facts.

2043.  Because of the concealment and/or suppression of the facts, Plaintiffs and New Hampshire State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those

vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies. Had Plaintiffs and New Hampshire State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and New Hampshire State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2044. The value of Plaintiffs' and New Hampshire State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and New Hampshire State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2045. Accordingly, FCA is liable to Plaintiffs and New Hampshire State Class members for damages in an amount to be proven at trial.

2046. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and New Hampshire State Class members' rights and the representations that FCA made to them, in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### NEW HAMPSHIRE COUNT III
### Breach of Express Warranty,
### N.H. Rev. Stat. §§ 382-A:2-313 and 382-A:2A-210
### (On Behalf of the New Hampshire State Class)

2047. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1336321.4

2048.   This Count is brought on behalf of the New Hampshire State Class against FCA.

2049.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382-A:2-103(1)(d).

2050.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

2051.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 382-A:2A-103(1)(h).

2052.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

2053.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:   a "Performance Warranty" and a "Design and Defect Warranty."

2054.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1336321.4

2055.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.   Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.   The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.   This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2056.   As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

2057.   FCA's warranties formed a basis of the bargain that was reached when New Hampshire State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2058.   Despite the existence of warranties, FCA failed to inform New Hampshire State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2059.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.   FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

2060.   Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2061.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make New Hampshire State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1336321.4

2062.  Accordingly, recovery by the New Hampshire State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

2063.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  New Hampshire State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

2064.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the New Hampshire State Class members' remedies would be insufficient to make them whole.

2065.  Finally, because of FCA's breach of warranty as set forth herein, New Hampshire State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2066.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2067.  As a direct and proximate result of FCA's breach of express warranties, New Hampshire State Class members have been damaged in an amount to be determined at trial.

**NEW HAMPSHIRE COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212**
**(On Behalf of the New Hampshire State Class)**

2068.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2069.   This Count is brought on behalf of the New Hampshire State Class, against FCA.

2070.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382-A:2-103(1)(d).

2071.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

2072.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 382-A:2A-103(1)(h).

2073.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212.

2074.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2075.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2076.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, New Hampshire State Class members have been damaged in an amount to be proven at trial.

## XXX.  NEW JERSEY COUNTS

### NEW JERSEY COUNT I
### Violations of the New Jersey Consumer Fraud Act,
### N.J. Stat. Ann. § 56:8-1 *et seq*.
### (On Behalf of the New Jersey State Class)

2077.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1336321.4

2078.  Plaintiffs bring this Count on behalf of the New Jersey State Class against FCA.

2079.  The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq.* ("N.J. CFA"), prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

2080.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2081.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other New Jersey State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2082.  Plaintiffs and New Jersey State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception.

1336321.4

Plaintiffs and New Jersey State Class members did not, and could not, unravel FCA's deception on their own.

2083.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

2084.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2085.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the New Jersey State Class.

2086.  FCA knew or should have known that its conduct violated the N.J. CFA.

2087.  FCA owed Plaintiffs and the New Jersey State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

2088.  Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2089.  Intentionally concealed the foregoing from Plaintiffs and the New Jersey State Class; and/or

2090.  Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the New Jersey State Class that contradicted these representations.

2091.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2092.  FCA's conduct proximately caused injuries to Plaintiffs and the other New Jersey State Class members.

1336321.4

2093.  FCA's conduct proximately caused injuries to Plaintiffs and the other New Jersey State Class.

2094.  Plaintiffs and the other New Jersey State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Subclass members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2095.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

2096.  Pursuant to N.J. Stat. Ann. § 56:8-20, Plaintiffs will serve the New Jersey Attorney General with a copy of this Complaint within 10 days of filing.

**NEW JERSEY COUNT II**
**Fraud**
**(Based on New Jersey Law)**
**(On Behalf of the New Jersey State Class)**

2097.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2098.  This claim is brought on behalf of the New Jersey State Class against FCA.

2099.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other New Jersey State Class members information that is highly relevant to their purchasing decision.

2100.  FCA further affirmatively misrepresented to Plaintiffs and New Jersey State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were

1336321.4

low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2101.   FCA knew these representations were false when made.

2102.   The Defective Vehicles purchased or leased by Plaintiffs and the other New Jersey State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other New Jersey State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

2103.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other New Jersey State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2104.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1336321.4

2105.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the New Jersey State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and New Jersey State Class members.

2106.  Plaintiffs and New Jersey State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and New Jersey State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and New Jersey State Class members by concealing the true facts about the Defective Vehicles' emissions.

2107.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and New Jersey State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

2108.  FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and New Jersey State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2109.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or New Jersey State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and New Jersey State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and New Jersey State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and New Jersey State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2110.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and New Jersey State Class members.

CLASS ACTION COMPLAINT

1336321.4

2111.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and New Jersey State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

2112.  Plaintiffs and New Jersey State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and New Jersey State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or New Jersey State Class members, did not generally know such facts.

2113.  Because of the concealment and/or suppression of the facts, Plaintiffs and New Jersey State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and New Jersey State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and New Jersey State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2114.  The value of Plaintiffs' and New Jersey State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and New Jersey State Class members' vehicles, and made any

1336321.4

reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2115.  Accordingly, FCA is liable to Plaintiffs and New Jersey State Class members for damages in an amount to be proven at trial.

2116.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and New Jersey State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**NEW JERSEY COUNT III**
**Breach of Express Warranty,**
**N.J.S. 12A:2-313 and 2A-210**
**(On Behalf of the New Jersey State Class)**

2117.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2118.  This Count is brought on behalf of the New Jersey State Class against FCA.

2119.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

2120.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.J.S. 12A:2A-103(1)(p).

2121.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

2122.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3

1336321.4

1   years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever

2   occurs first).

3       2123.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two

4   federal emission control warranties:   a "Performance Warranty" and a "Design and Defect

5   Warranty."

6       2124.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

7   respect to the vehicles' emission systems.   Thus, FCA also provides an express warranty for its

8   vehicles through a Federal Emissions Performance Warranty.   The Performance Warranty required

9   by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever

10  occurs first, when a vehicle fails an emissions test.   Under this warranty, certain major emission

11  control components are covered for the first eight years or 80,000 miles, whichever comes first.

12  These major emission control components subject to the longer warranty include the catalytic

13  converters, the electronic emission control unit, and the onboard emission diagnostic device or

14  computer.

15      2125.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with

16  respect to their vehicles' emission systems.   Thus, FCA also provides an express warranty for their

17  vehicles through a Federal Emission Control System Defect Warranty.   The Design and Defect

18  Warranty required by the EPA covers repair of emission control or emission related parts which fail

19  to function or function improperly because of a defect in materials or workmanship.   This warranty

20  provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission

21  control components, for eight years or 80,000 miles, whichever comes first.

22      2126.  As manufacturers of light-duty vehicles, FCA were required to provide these

23  warranties to purchasers or lessees of Defective Vehicles.

24      2127.  FCA's warranties formed a basis of the bargain that was reached when New Jersey

25  State Class members purchased or leased their Defective Vehicles equipped with the non-compliant

26  "clean" diesel engine and emission systems.

27

28

CLASS ACACTION COMPLAINT

1336321.4

2128.  Despite the existence of warranties, FCA failed to inform New Jersey State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2129.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

2130.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2131.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make New Jersey State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2132.  Accordingly, recovery by the New Jersey State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

2133.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  New Jersey State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

2134.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a

CLASS ACACION COMPLAINT

1336321.4

reasonable time, and any limitation on the New Jersey State Class members' remedies would be insufficient to make them whole.

2135.  Finally, because of FCA's breach of warranty as set forth herein, New Jersey State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2136.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2137.  As a direct and proximate result of FCA's breach of express warranties, New Jersey State Class members have been damaged in an amount to be determined at trial.

**NEW JERSEY COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**N.J.S. 12A:2-314 and 2A-212**
**(On Behalf of the New Jersey State Class)**

2138.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2139.  This Count is brought on behalf of the New Jersey State Class, against FCA.

2140.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

2141.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.J.S. 12A:2A-103(1)(p).

2142.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

2143.  A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.J.S. 12A:2-314 and 2A-212.

2144.  These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

1336321.4

Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2145.  FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2146.  As a direct and proximate result of FCA's breach of the implied warranty of merchantability, New Jersey State Class members have been damaged in an amount to be proven at trial.

## XXXI. NEW MEXICO COUNTS

### NEW MEXICO COUNT I
**Violations of the New Mexico Unfair Trade Practices Act,
N.M. Stat. Ann. § 57-12-1 *et seq.*
(On Behalf of the New Mexico State Class)**

2147.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2148.  This claim is brought on behalf of the New Mexico State Class against FCA.

2149.  FCA, Plaintiffs, and New Mexico State Class members are or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. Stat. Ann. § 57-12-2.

2150.  FCA's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. Ann. § 57-12-2.

2151.  The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive."  N.M. Stat. Ann. § 57-12-2(D).  FCA's acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. Stat. Ann. § 57-12-2(D).  In addition, FCA's actions constitute unconscionable

1    actions under N.M. Stat. Ann. § 57-12-2(E), since they took advantage of the lack of knowledge,

2    ability, experience, and capacity of the New Mexico State Class members to a grossly unfair degree.

3        2152.  In the course of FCA's business, FCA willfully failed to disclose and actively

4    concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during

5    normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-

6    powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer

7    would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted

8    unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA

9    engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive

10   acts or practices, including representing that the Defective Vehicles have characteristics, uses,

11   benefits, and qualities which they do not have; representing that the Defective Vehicles are of a

12   particular standard and quality when they are not; failing to reveal a material fact, the omission of

13   which tends to mislead or deceive the consumer, and which fact could not reasonably be known by

14   the consumer; making a representation of fact or statement of fact material to the transaction such

15   that a person reasonably believes the represented or suggested state of affairs to be other than it

16   actually is; and failing to reveal facts that are material to the transaction in light of representations of

17   fact made in a positive manner.

18       2153.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other New Mexico

19   State Class members were deceived by FCA's failure to disclose that the NOx reduction system in

20   the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions

21   controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants,

22   including NOx, as described above.

23       2154.  Plaintiffs and New Mexico State Class members reasonably relied upon FCA's false

24   misrepresentations.  They had no way of knowing that FCA's representations were false and gravely

25   misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception.

26   Plaintiffs and New Mexico State Class members did not, and could not, unravel FCA's deception on

27   their own.

28

CLASS ACACTION COMPLAINT

1336321.4

2155.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

2156.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2157.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the New Mexico State Class.

2158.   FCA knew or should have known that its conduct violated the New Mexico UTPA.

2159.   FCA owed Plaintiffs and the New Mexico State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

2160.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2161.   Intentionally concealed the foregoing from Plaintiffs and the New Mexico State Class; and/or

2162.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the New Mexico State Class that contradicted these representations.

2163.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other New Mexico State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2164.   FCA's conduct proximately caused injuries to Plaintiffs and the other New Mexico State Class members.

2165.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1336321.4

2166.  As a direct and proximate result of FCA's violations of the New Mexico UTPA, Plaintiffs and the New Mexico State Class have suffered injury in fact and/or actual damage.

2167.  New Mexico State Class members seek punitive damages against FCA because FCA's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

2168.  Because FCA's unconscionable, willful conduct caused actual harm to New Mexico State Class members, Plaintiffs and the New Mexico State Class seek recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. Stat. Ann. § 57-12-10.

### NEW MEXICO COUNT II
### Fraud
### (Based on New Mexico Law)
### (On Behalf of the New Mexico State Class)

2169.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2170.  This claim is brought on behalf of the New Mexico State Class against FCA.

2171.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other New Mexico State Class members information that is highly relevant to their purchasing decision.

2172.  FCA further affirmatively misrepresented to Plaintiffs and New Mexico State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1336321.4

1    2173.   FCA knew these representations were false when made.

2    2174.   The Defective Vehicles purchased or leased by Plaintiffs and the other New Mexico

3    State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-

4    powered vehicles and at a much higher rate than a reasonable consumer would expect in light of

5    FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other New Mexico

6    State Class members had to pay more for fuel than they reasonably expected, and unreliable because

7    the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving

8    conditions.

9    2175.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

10   turns off or is limited during normal driving conditions and that the Defective Vehicles were

11   defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

12   pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

13   those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

14   Plaintiffs and the other New Mexico State Class members relied on FCA's material representations

15   that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free

16   from defects.

17   2176.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective

18   Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its

19   EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx

20   reduction system in the Defective Vehicles turns off or is limited during normal driving conditions,

21   and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted

22   higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels

23   of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures

24   about the emission system deceptive.

25   2177.   The truth about the defective emissions controls and FCA's manipulations of those

26   controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the

27   "defeat device," and non-compliance with EPA emissions requirements was known only to FCA;

28

1336321.4

1  Plaintiffs and the New Mexico State Class members did not know of these facts and FCA actively

2  concealed these facts from Plaintiffs and New Mexico State Class members.

3      2178.  Plaintiffs and New Mexico State Class members reasonably relied upon FCA's

4  deception.  They had no way of knowing that FCA's representations were false and/or misleading.

5  As consumers, Plaintiffs and New Mexico State Class members did not, and could not, unravel

6  FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and New Mexico State

7  Class members by concealing the true facts about the Defective Vehicles' emissions.

8      2179.  FCA also concealed and suppressed material facts concerning what is evidently the

9  true culture of FCA—one characterized by an emphasis on profits and sales above compliance with

10 federal and state clean air laws and emissions regulations that are meant to protect the public and

11 consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and New Mexico

12 State Class members placed in its representations.  Consumers buy diesel cars from FCA because

13 they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the

14 environment.  And yet, that is precisely what the Defective Vehicles are doing.

15     2180.  FCA's false representations were material to consumers because they concerned the

16 quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with

17 applicable federal and state laws and regulations regarding clean air and emissions, and also because

18 the representations played a significant role in the value of the vehicles.  As FCA well knew, its

19 customers, including Plaintiffs and New Mexico State Class members, highly valued that the

20 vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced

21 emissions, and they paid accordingly.

22     2181.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

23 turns off or is limited during normal driving conditions and that the Defective Vehicles were

24 defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

25 pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

26 those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

27 details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

28

1336321.4

knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or New Mexico State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and New Mexico State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and New Mexico State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and New Mexico State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2182.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and New Mexico State Class members.

2183.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and New Mexico State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

CLASS ACATION COMPLAINT

1336321.4

2184.  Plaintiffs and New Mexico State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and New Mexico State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or New Mexico State Class members, did not generally know such facts.

2185.  Because of the concealment and/or suppression of the facts, Plaintiffs and New Mexico State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and New Mexico State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and New Mexico State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2186.  The value of Plaintiffs' and New Mexico State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and New Mexico State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1336321.4

2187.   Accordingly, FCA is liable to Plaintiffs and New Mexico State Class members for damages in an amount to be proven at trial.

2188.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and New Mexico State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**NEW MEXICO COUNT III**
**Breach of Express Warranty,**
**N.M. Stat. §§ 55-2-313 and 55-2A-210**
**(On Behalf of the New Mexico State Class)**

2189.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2190.   This Count is brought on behalf of the New Mexico State Class against FCA.

2191.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

2192.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

2193.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

2194.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1336321.4

2195.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

2196.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2197.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2198.   As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

2199.   FCA's warranties formed a basis of the bargain that was reached when New Mexico State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2200.   Despite the existence of warranties, FCA failed to inform New Mexico State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of

compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2201.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

2202.   Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2203.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make New Mexico State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2204.   Accordingly, recovery by the New Mexico State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

2205.   Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  New Mexico State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

2206.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the New Mexico State Class members' remedies would be insufficient to make them whole.

1336321.4

2207.  Finally, because of FCA's breach of warranty as set forth herein, New Mexico State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2208.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2209.  As a direct and proximate result of FCA's breach of express warranties, New Mexico State Class members have been damaged in an amount to be determined at trial.

**NEW MEXICO COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**N.M. Stat. §§ 55-2-314 and 55-2A-212**
**(On Behalf of the New Mexico State Class)**

2210.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2211.  This Count is brought on behalf of the New Mexico State Class, against FCA.

2212.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

2213.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

2214.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

2215.  A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.M. Stat. §§ 55-2-314 and 55-2A-212.

2216.  These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal

1336321.4

and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2217.  FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2218.  As a direct and proximate result of FCA's breach of the implied warranty of merchantability, New Mexico State Class members have been damaged in an amount to be proven at trial.

### XXXII.     NEW YORK COUNTS

**NEW YORK COUNT I**
**Violations of the New York General Business Law § 350,**
**N.Y. Gen. Bus. Law § 350**
**(On Behalf of the New York State Class)**

2219.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2220.  This claim is brought on behalf of the New York State Class against FCA.

2221.  New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  The challenged act or practice was "consumer-oriented;" (2) that the act or practice was misleading in a material way; and (3) Plaintiffs suffered injury as a result of the deceptive act or practice.  Accordingly, FCA has violated General Business Law § 349.

2222.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during

1336321.4

normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.   Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2223.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other New York State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2224.   Plaintiffs and New York State Class members reasonably relied upon FCA's false misrepresentations.   They had no way of knowing that FCA's representations were false and gravely misleading.   As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and New York State Class members did not, and could not, unravel FCA's deception on their own.

2225.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

2226.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1336321.4

2227.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the New York State Class.

2228.  FCA knew or should have known that its conduct violated New York's General Business Law § 349.

2229.  FCA owed Plaintiffs and the New York State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

2230.  Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2231.  Intentionally concealed the foregoing from Plaintiffs and the New York State Class; and/or

2232.  Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the New York State Class that contradicted these representations.

2233.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other New York State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2234.  FCA's conduct proximately caused injuries to Plaintiffs and the other New York State Class members.

2235.  Plaintiffs and the other New York State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other New York State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution

in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2236.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

2237.  Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiffs and each New York State Class member may recover actual damages, in addition to three times actual damages up to $1,000 for FCA's willful and knowing violation of N.Y. Gen. Bus. Law § 349.

**NEW YORK COUNT II**
**Violations of the New York General Business Law § 349,**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of the New York State Class)**

2238.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2239.  This claim is brought on behalf of the New York New York State Class against FCA.

2240.  New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

2241.  FCA caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to FCA, to be untrue and misleading to consumers, including Plaintiffs and the other New York State Class members.

2242.  FCA has violated N.Y. Gen. Bus. Law § 350 because of the misrepresentations and omissions alleged herein, including, but not limited to, FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

2243.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other New York State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions

controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2244.  Plaintiffs and New York State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and New York State Class members did not, and could not, unravel FCA's deception on their own.

2245.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

2246.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2247.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the New York State Class.

2248.  FCA knew or should have known that its conduct violated General Business Law § 350.

2249.  FCA owed Plaintiffs and the New York State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

2250.  Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2251.  Intentionally concealed the foregoing from Plaintiffs and the New York State Class; and/or

2252.  Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the New York State Class that contradicted these representations.

2253.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-

1336321.4

powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other New York State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2254.  FCA's conduct proximately caused injuries to Plaintiffs and the other New York State Class members.

2255.  Plaintiffs and the other New York State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other New York State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2256.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

2257.  Plaintiffs and the other New York State Class members are entitled to recover their actual damages or $500, whichever is greater.  Because FCA acted willfully or knowingly, Plaintiffs and the other New York State Class members are entitled to recover three times actual damages, up to $10,000.

### NEW YORK COUNT III
### Fraud
### (Based on New York Law)
### (On Behalf of the New York State Class)

2258.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2259.  This claim is brought on behalf of the New York State Class against FCA.

2260.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign,

emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other New York State Class members information that is highly relevant to their purchasing decision.

2261.   FCA further affirmatively misrepresented to Plaintiffs and New York State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2262.   FCA knew these representations were false when made.

2263.   The Defective Vehicles purchased or leased by Plaintiffs and the other New York State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other New York State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

2264.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other New York State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2265.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its

1336321.4

EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2266.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the New York State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and New York State Class members.

2267.  Plaintiffs and New York State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and New York State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and New York State Class members by concealing the true facts about the Defective Vehicles' emissions.

2268.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and New York State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

2269.  FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its

1   customers, including Plaintiffs and New York State Class members, highly valued that the vehicles

2   they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and

3   they paid accordingly.

4        2270.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

5   turns off or is limited during normal driving conditions and that the Defective Vehicles were

6   defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

7   pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

8   those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

9   details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

10   knowledge as to such facts, and because FCA knew these facts were not known to or reasonably

11   discoverable by Plaintiffs or New York State Class members.   FCA also had a duty to disclose

12   because it made general affirmative representations about the qualities of the vehicles with respect to

13   emissions, starting with references to them as reduced-emissions diesel cars and as compliant with

14   all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of

15   the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual

16   philosophy with respect to compliance with federal and state clean air laws and emissions

17   regulations, and FCA's actual practices with respect to the vehicles at issue.   Having volunteered to

18   provide information to Plaintiffs and New York State Class members, FCA had the duty to disclose

19   not just the partial truth, but also the entire truth.   These omitted and concealed facts were material

20   because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs

21   and New York State Class members.   Whether a manufacturer's products pollute, comply with

22   federal and state clean air laws and emissions regulations, and whether that manufacturer tells the

23   truth with respect to such compliance or non-compliance, are material concerns to a consumer,

24   including with respect to the emissions certifications testing their vehicles must pass.   FCA

25   represented to Plaintiffs and New York State Class members that they were purchasing or leasing

26   reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-

27   emission vehicles with unlawfully high emissions.

28

CLASS ACATION COMPLAINT

2271.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and New York State Class members.

2272.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and New York State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

2273.  Plaintiffs and New York State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'    and New York State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or New York State Class members, did not generally know such facts.

2274.  Because of the concealment and/or suppression of the facts, Plaintiffs and New York State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and New York State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and New York State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

CLASS ACATION COMPLAINT

2275.   The value of Plaintiffs' and New York State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and New York State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2276.   Accordingly, FCA is liable to Plaintiffs and New York State Class members for damages in an amount to be proven at trial.

2277.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and New York State Class members' rights and the representations that FCA made to them, in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**NEW YORK COUNT IV**
**Breach of Express Warranty,**
**N.Y. U.C.C. Law §§ 2-313 and 2A-210**
**(On Behalf of the New York State Class)**

2278.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2279.   This Count is brought on behalf of the New York State Class against FCA.

2280.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

2281.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

2282.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

431

1336321.4

2283. In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first. This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation" FCA also provided two express California Emissions Standard Warranties. One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

2284. The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2285. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2286. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

CLASS ACATION COMPLAINT

1336321.4

2287.   As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

2288.   FCA's warranties formed a basis of the bargain that was reached when New York State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2289.   Despite the existence of warranties, FCA failed to inform New York State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2290.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

2291.   Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2292.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make New York State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2293.   Accordingly, recovery by the New York State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

2294.   Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  New York State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1336321.4

2295.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the New York State Class members' remedies would be insufficient to make them whole.

2296.   Finally, because of FCA's breach of warranty as set forth herein, New York State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2297.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2298.   As a direct and proximate result of FCA's breach of express warranties, New York State Class members have been damaged in an amount to be determined at trial.

**NEW YORK COUNT V**
**Breach of Implied Warranty of Merchantability,**
**N.Y. U.C.C. Law §§ 2-314 and 2A-212**
**(On Behalf of the New York State Class)**

2299.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2300.   This Count is brought on behalf of the New York State Class, against FCA.

2301.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

2302.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

2303.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

CLASS ACACTION COMPLAINT

1336321.4

2304.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law §§ 2-314 and 2A-212.

2305.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2306.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2307.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, New York State Class members have been damaged in an amount to be proven at trial.

## XXXIII.     NORTH CAROLINA COUNTS

### NORTH CAROLINA COUNT I
### Violations of the North Carolina Unfair and Deceptive Acts and Practices Act,
### N.C. Gen. Stat. § 75-1.1 *et seq.*
### (On Behalf of the North Carolina State Class)

2308.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2309.   Plaintiffs bring this Count on behalf of the North Carolina State Class against FCA.

2310.   FCA engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

2311.   The North Carolina UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."   N.C. Gen. Stat. § 75-1.1(a).   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that

435

the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair and deceptive trade practices because it (1) had the capacity or tendency to deceive, (2) offend public policy, (3) are immoral, unethical, oppressive, or unscrupulous, or (4) cause substantial injury to consumers.

2312.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2313.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other North Carolina State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2314.  Plaintiffs and North Carolina State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of

436

1336321.4

deception.  Plaintiffs and North Carolina State Class members did not, and could not, unravel FCA's deception on their own.

2315.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

2316.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2317.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the North Carolina State Class.

2318.   FCA knew or should have known that its conduct violated the North Carolina UDTPA.

2319.   FCA owed Plaintiffs and the North Carolina State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

2320.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2321.   Intentionally concealed the foregoing from Plaintiffs and the North Carolina State Class; and/or

2322.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the North Carolina State Class that contradicted these representations.

2323.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other North Carolina State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1336321.4

2324.   FCA's conduct proximately caused injuries to Plaintiffs and the other North Carolina State Class members.  Plaintiffs and the other North Carolina State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other North Carolina State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2325.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

2326.   Plaintiffs seek an order for treble his actual damages, court costs, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. § 75-16.

2327.   Plaintiffs also seeks punitive damages against FCA because FCA's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

**NORTH CAROLINA COUNT II**
**Fraud**
**(Based on North Carolina Law)**
**(On Behalf of the North Carolina State Class)**

2328.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2329.   This claim is brought on behalf of the North Carolina State Class against FCA.

2330.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other North Carolina State Class members information that is highly relevant to their purchasing decision.

1336321.4

2331.   FCA further affirmatively misrepresented to Plaintiffs and North Carolina State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2332.   FCA knew these representations were false when made.

2333.   The Defective Vehicles purchased or leased by Plaintiffs and the other North Carolina State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other North Carolina State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

2334.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other North Carolina State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2335.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels

1336321.4

of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2336. The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the North Carolina State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and North Carolina State Class members.

2337. Plaintiffs and North Carolina State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and North Carolina State Class members did not, and could not, unravel FCA's deception on their own. Rather, FCA intended to deceive Plaintiffs and North Carolina State Class members by concealing the true facts about the Defective Vehicles' emissions.

2338. FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. FCA also emphasized profits and sales above the trust that Plaintiffs and North Carolina State Class members placed in its representations. Consumers buy diesel cars from FCA because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Defective Vehicles are doing.

2339. FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and North Carolina State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1336321.4

2340.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or North Carolina State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and North Carolina State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and North Carolina State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and North Carolina State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2341.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions,

CLASS ACATION COMPLAINT

which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and North Carolina State Class members.

2342. FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and North Carolina State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

2343. Plaintiffs and North Carolina State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs'   and North Carolina State Class members' actions were justified. FCA was in exclusive control of the material facts, and the public, Plaintiffs, or North Carolina State Class members, did not generally know such facts.

2344. Because of the concealment and/or suppression of the facts, Plaintiffs and North Carolina State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies. Had Plaintiffs and North Carolina State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and North Carolina State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2345. The value of Plaintiffs' and North Carolina State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-

1336321.4

compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and North Carolina State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2346.   Accordingly, FCA is liable to Plaintiffs and North Carolina State Class members for damages in an amount to be proven at trial.

2347.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and North Carolina State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**NORTH CAROLINA COUNT III**
**Breach of Express Warranty,**
**N.C.G.S.A. §§ 25-2-313 and 252A-210**
**(On Behalf of the North Carolina State Class)**

2348.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2349.   This Count is brought on behalf of the North Carolina State Class against FCA.

2350.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.C.G.S.A. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

2351.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.C.G.S.A. § 25-2A-103(1)(p).

2352.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.C.G.S.A. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).

2353.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory

1    preparation" FCA also provided two express California Emissions Standard Warranties. One for 3

2    years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever

3    occurs first).

4        2354.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two

5    federal emission control warranties:   a "Performance Warranty" and a "Design and Defect

6    Warranty."

7        2355.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

8    respect to the vehicles' emission systems.   Thus, FCA also provides an express warranty for its

9    vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required

10   by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever

11   occurs first, when a vehicle fails an emissions test.   Under this warranty, certain major emission

12   control components are covered for the first eight years or 80,000 miles, whichever comes first.

13   These major emission control components subject to the longer warranty include the catalytic

14   converters, the electronic emission control unit, and the onboard emission diagnostic device or

15   computer.

16       2356.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with

17   respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their

18   vehicles through a Federal Emission Control System Defect Warranty.   The Design and Defect

19   Warranty required by the EPA covers repair of emission control or emission related parts which fail

20   to function or function improperly because of a defect in materials or workmanship.   This warranty

21   provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission

22   control components, for eight years or 80,000 miles, whichever comes first.

23       2357.   As manufacturers of light-duty vehicles, FCA were required to provide these

24   warranties to purchasers or lessees of Defective Vehicles.

25       2358.   FCA's warranties formed a basis of the bargain that was reached when North

26   Carolina State Class members purchased or leased their Defective Vehicles equipped with the non-

27   compliant "clean" diesel engine and emission systems.

28

1336321.4

2359.  Despite the existence of warranties, FCA failed to inform North Carolina State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2360.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

2361.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2362.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make North Carolina State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2363.  Accordingly, recovery by the North Carolina State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

2364.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  North Carolina State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

2365.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a

1336321.4

reasonable time, and any limitation on the North Carolina State Class members' remedies would be insufficient to make them whole.

2366.  Finally, because of FCA's breach of warranty as set forth herein, North Carolina State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2367.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2368.  As a direct and proximate result of FCA's breach of express warranties, North Carolina State Class members have been damaged in an amount to be determined at trial.

**NORTH CAROLINA COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**N.C.G.S.A. §§ 25-2-314 and 252A-212**
**(On Behalf of the North Carolina State Class)**

2369.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2370.  This Count is brought on behalf of the North Carolina State Class, against FCA.

2371.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.C.G.S.A. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

2372.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.C.G.S.A. § 25-2A-103(1)(p).

2373.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.C.G.S.A. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).

2374.  A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.C.G.S.A. § 25-2-314 and N.C.G.S.A. § 25-2A-212.

2375.  These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

1336321.4

Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2376. FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2377. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, North Carolina State Class members have been damaged in an amount to be proven at trial.

## XXXIV. NORTH DAKOTA COUNTS

### NORTH DAKOTA COUNT I
### Violations of the North Dakota Consumer Fraud Act,
### N.D. Cent. Code § 51-15-02
### (On Behalf of the North Dakota State Class)

2378. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2379. This claim is brought on behalf of the North Dakota State Class against FCA.

2380. Plaintiffs, North Dakota State Class members, and FCA are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

2381. FCA engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. Code § 51-15-02(3), (5).

2382. The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise." N.D. Cent. Code § 51-15-02. As set forth above and below, FCA committed deceptive acts or practices, with the intent that North Dakota State Class members rely thereon in connection with their purchase or lease of the Defective Vehicles.

1336321.4

2383.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.   Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2384.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other North Dakota State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2385.   Plaintiffs and North Dakota State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.   As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and North Dakota State Class members did not, and could not, unravel FCA's deception on their own.

2386.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

1336321.4

2387.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2388.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the North Dakota State Class.

2389.  FCA knew or should have known that its conduct violated the North Dakota CFA.

2390.  FCA owed Plaintiffs and the North Dakota State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

2391.  Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2392.  Intentionally concealed the foregoing from Plaintiffs and the North Dakota State Class; and/or

2393.  Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the North Dakota State Class that contradicted these representations.

2394.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other North Dakota State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2395.  FCA's conduct proximately caused injuries to Plaintiffs and the other North Dakota State Class members.

2396.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1336321.4

2397.  As a direct and proximate result of FCA's violations of the North Dakota CFA, Plaintiffs and the North Dakota State Class have suffered injury in fact and/or actual damage.

2398.  North Dakota State Class members seek punitive damages against FCA because FCA's conduct was egregious.  FCA's egregious conduct warrants punitive damages.

2399.  Further, FCA knowingly committed the conduct described above, and thus, under N.D. Cent. Code § 51-15-09, FCA is liable to Plaintiffs and the North Dakota North Dakota State Class for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements.  Plaintiffs further seek an order enjoining FCA's unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

**NORTH DAKOTA COUNT II**
**Fraud**
**(Based on North Dakota Law)**
**(On Behalf of the North Dakota State Class)**

2400.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2401.  This claim is brought on behalf of the North Dakota State Class against FCA.

2402.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other North Dakota State Class members information that is highly relevant to their purchasing decision.

2403.  FCA further affirmatively misrepresented to Plaintiffs and North Dakota State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2404.   FCA knew these representations were false when made.

2405.   The Defective Vehicles purchased or leased by Plaintiffs and the other North Dakota State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other North Dakota State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

2406.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other North Dakota State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2407.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2408.   The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA;

451

1336321.4

1    Plaintiffs and the North Dakota State Class members did not know of these facts and FCA actively

2    concealed these facts from Plaintiffs and North Dakota State Class members.

3        2409.  Plaintiffs and North Dakota State Class members reasonably relied upon FCA's

4    deception.  They had no way of knowing that FCA's representations were false and/or misleading.

5    As consumers, Plaintiffs and North Dakota State Class members did not, and could not, unravel

6    FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and North Dakota State

7    Class members by concealing the true facts about the Defective Vehicles' emissions.

8        2410.  FCA also concealed and suppressed material facts concerning what is evidently the

9    true culture of FCA—one characterized by an emphasis on profits and sales above compliance with

10    federal and state clean air laws and emissions regulations that are meant to protect the public and

11    consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and North Dakota

12    State Class members placed in its representations.  Consumers buy diesel cars from FCA because

13    they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the

14    environment.  And yet, that is precisely what the Defective Vehicles are doing.

15        2411.  FCA's false representations were material to consumers because they concerned the

16    quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with

17    applicable federal and state laws and regulations regarding clean air and emissions, and also because

18    the representations played a significant role in the value of the vehicles.  As FCA well knew, its

19    customers, including Plaintiffs and North Dakota State Class members, highly valued that the

20    vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced

21    emissions, and they paid accordingly.

22        2412.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

23    turns off or is limited during normal driving conditions and that the Defective Vehicles were

24    defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

25    pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

26    those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

27    details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

28

1336321.4

knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or North Dakota State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and North Dakota State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and North Dakota State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and North Dakota State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2413.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and North Dakota State Class members.

2414.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and North Dakota State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

CLASS ACATION COMPLAINT

2415.  Plaintiffs and North Dakota State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'   and North Dakota State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or North Dakota State Class members, did not generally know such facts.

2416.  Because of the concealment and/or suppression of the facts, Plaintiffs and North Dakota State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and North Dakota State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and North Dakota State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2417.  The value of Plaintiffs' and North Dakota State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and North Dakota State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1336321.4

2418.   Accordingly, FCA is liable to Plaintiffs and North Dakota State Class members for damages in an amount to be proven at trial.

2419.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and North Dakota State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## NORTH DAKOTA COUNT III
### Breach of Express Warranty,
### N.D. Cent. Code §§ 41-02-30 and 41-02.1-19
### (On Behalf of the North Dakota State Class)

2420.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2421.   This Count is brought on behalf of the North Dakota State Class against FCA.

2422.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.D. Cent. Code § 41-02.04(3) and "sellers" of motor vehicles under § 41-02-03(1)(d).

2423.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.D. Cent. Code § 41-02.1-03(1)(p).

2424.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.D. Cent. Code § 41-02-05(2) and N.D. Cent. Code § 41-02.1-03(1)(h).

2425.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1336321.4

2426.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

2427.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2428.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2429.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

2430.  FCA's warranties formed a basis of the bargain that was reached when North Dakota State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2431.  Despite the existence of warranties, FCA failed to inform North Dakota State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of

1336321.4

compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2432.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

2433.   Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2434.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make North Dakota State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2435.   Accordingly, recovery by the North Dakota State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

2436.   Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  North Dakota State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

2437.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the North Dakota State Class members' remedies would be insufficient to make them whole.

1336321.4

2438.   Finally, because of FCA's breach of warranty as set forth herein, North Dakota State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2439.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2440.   As a direct and proximate result of FCA's breach of express warranties, North Dakota State Class members have been damaged in an amount to be determined at trial.

**NORTH DAKOTA COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**N.D. Cent. Code §§ 41-02-31 and 41-02.1-21**
**(On Behalf of the North Dakota State Class)**

2441.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2442.   This Count is brought on behalf of the North Dakota State Class, against FCA.

2443.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.D. Cent. Code § 41-02.04(3) and "sellers" of motor vehicles under § 41-02-03(1)(d).

2444.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.D. Cent. Code § 41-02.1-03(1)(p).

2445.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.D. Cent. Code § 41-02-05(2) and N.D. Cent. Code § 41-02.1-03(1)(h).

2446.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.D. Cent. Code § 41-02-31 and N.D. Cent. Code § 41-02.1-21.

2447.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal

1336321.4

and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2448.  FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2449.  As a direct and proximate result of FCA's breach of the implied warranty of merchantability, North Dakota State Class members have been damaged in an amount to be proven at trial.

## XXXV.    OHIO COUNTS

**OHIO COUNT I**
**Violations of the Ohio Consumer Sales Practices Act,**
**Ohio Rev. Code § 1345.01 *et seq*.**
**(On Behalf of the Ohio State Class)**

2450.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2451.  This claim is brought on behalf of the Ohio State Class against FCA.

2452.  Plaintiffs and the other Ohio State Class members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 ("Ohio CSPA").  FCA is a "supplier" as defined by the Ohio CSPA. Plaintiffs' and the other Ohio State Class members' purchases or leases of Defective Vehicles were "consumer transactions" as defined by the Ohio CSPA.

2453.  The Ohio CSPA, Ohio Rev. Code § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction.  Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.  *Id.*  FCA's conduct as alleged above and

1336321.4

below constitutes unfair and/or deceptive consumer sales practices in violation of Ohio Rev. Code § 1345.02.

2454.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing the that Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2455.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Ohio State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2456.  Plaintiffs and Ohio State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception.  Plaintiffs and Ohio State Class members did not, and could not, unravel FCA's deception on their own.

1336321.4

2457.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

2458.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2459.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Ohio State Class.

2460.   FCA knew or should have known that its conduct violated the Ohio CSPA.

2461.   The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of FCA in this Complaint, including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a substantial defect, constitute deceptive sales practices in violation of the CSPA. These cases include, but are not limited to, the following:

> a.  *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);
>
> b.  *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);
>
> c.  *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);
>
> d.  *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);
>
> e.  *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);
>
> f.  *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);
>
> g.  *Cranford v. Joseph Airport Toyota, Inc.* (OPIF #10001586);
>
> h.  *Brown v. Spears* (OPIF #10000403);
>
> i.  *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);
>
> j.  *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326); and
>
> k.  *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524).

1336321.4

2462. FCA owed Plaintiffs and the Ohio State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

2463. Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2464. Intentionally concealed the foregoing from Plaintiffs and the Ohio State Class; and/or

2465. Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Ohio State Class that contradicted these representations.

2466. FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Ohio State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2467. FCA's conduct proximately caused injuries to Plaintiffs and the other Ohio State Class members.

2468. Plaintiffs and the other Ohio State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Ohio State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2469. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

2470. Plaintiffs and the Ohio State Class sustained damages as a result of FCA's unlawful acts and are, therefore, entitled to damages and other relief as provided under the Ohio CSPA.

1336321.4

2471.  Plaintiffs also seek court costs and attorneys' fees as a result of FCA's violations of the OCSPA as provided in Ohio Rev. Code § 1345.09.

**OHIO COUNT II**
**Fraud**
**(Based on Ohio Law)**
**(On Behalf of the Ohio State Class)**

2472.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2473.  This claim is brought on behalf of the Ohio State Class against FCA.

2474.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Ohio State Class members information that is highly relevant to their purchasing decision.

2475.  FCA further affirmatively misrepresented to Plaintiffs and Ohio State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2476.  FCA knew these representations were false when made.

2477.  The Defective Vehicles purchased or leased by Plaintiffs and the other Ohio State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Ohio State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1336321.4

2478.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Ohio State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2479.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2480.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Ohio State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Ohio State Class members.

2481.  Plaintiffs and Ohio State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Ohio State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Ohio State Class members by concealing the true facts about the Defective Vehicles' emissions.

1336321.4

2482.   FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.   FCA also emphasized profits and sales above the trust that Plaintiffs and Ohio State Class members placed in its representations.   Consumers buy diesel cars from FCA because they feel they are clean diesel cars.   They do not want to be spewing noxious gases into the environment.   And yet, that is precisely what the Defective Vehicles are doing.

2483.   FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.   As FCA well knew, its customers, including Plaintiffs and Ohio State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2484.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Ohio State Class members.   FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions

regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Ohio State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Ohio State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Ohio State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2485.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Ohio State Class members.

2486.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Ohio State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

2487.  Plaintiffs and Ohio State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Ohio State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Ohio State Class members, did not generally know such facts.

1336321.4

2488.    Because of the concealment and/or suppression of the facts, Plaintiffs and Ohio State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Ohio State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Ohio State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2489.    The value of Plaintiffs' and Ohio State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Ohio State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2490.    Accordingly, FCA is liable to Plaintiffs and Ohio State Class members for damages in an amount to be proven at trial.

2491.    FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Ohio State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

1336321.4

**OHIO COUNT III**
**Breach of Express Warranty,**
**Ohio. Rev. Code § 1302.26, *et seq*. / U.C.C. § 2-313**
**(On Behalf of the Ohio State Class)**

2492.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2493.   This Count is brought on behalf of the Ohio State Class against FCA.

2494.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under § 1302.01(4).

2495.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

2496.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8), and 1310.01(A)(8).

2497.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

2498.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:   a "Performance Warranty" and a "Design and Defect Warranty."

2499.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission

468

control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2500.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2501.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

2502.  FCA's warranties formed a basis of the bargain that was reached when Ohio State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2503.  Despite the existence of warranties, FCA failed to inform Ohio State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2504.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

2505.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1336321.4

CLASS ACATION COMPLAINT

2506.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Ohio State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2507.  Accordingly, recovery by the Ohio State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

2508.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Ohio State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

2509.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Ohio State Class members' remedies would be insufficient to make them whole.

2510.  Finally, because of FCA's breach of warranty as set forth herein, Ohio State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2511.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2512.  As a direct and proximate result of FCA's breach of express warranties, Ohio State Class members have been damaged in an amount to be determined at trial.

1336321.4

**OHIO COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Ohio Rev. Code Ann. §§ 1302.27 and 1310.19**
**(On Behalf of the Ohio State Class)**

2513.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2514.   This Count is brought on behalf of the Ohio State Class, against FCA.

2515.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under § 1302.01(4).

2516.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

2517.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8), and 1310.01(A)(8).

2518.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ohio Rev. Code §§ 1302.27 and 1310.19.

2519.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2520.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2521.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Ohio State Class members have been damaged in an amount to be proven at trial.

1336321.4

## XXXVI.    OKLAHOMA COUNTS

### OKLAHOMA COUNT I
#### Violations of the Oklahoma Consumer Protection Act,
#### Okla. Stat. Tit. 15 § 751 *et seq*.
#### (On Behalf of the Oklahoma State Class)

2522.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2523.    Plaintiffs bring this Count on behalf of the Oklahoma State Class against FCA.

2524.    Plaintiffs and the Oklahoma Subclass members are "persons" under the Oklahoma Consumer Protection Act ("Oklahoma CPA"), Okla. Stat. tit. 15 § 752.

2525.    FCA is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15 § 15-751(1).

2526.    The sale or lease of the Defective Vehicles to the Oklahoma Subclass members was a "consumer transaction" within the meaning of Okla. Stat. tit. 15 § 752, and FCA's actions as set forth herein occurred in the conduct of trade or commerce.

2527.    The Oklahoma CPA declares unlawful, *inter alia*, the following acts or practices when committed in the course of business:  "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics, … uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." *See* Okla. Stat. tit. 15, § 753.

2528.    In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA

472

1336321.4

engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2529.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Oklahoma State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2530.  Plaintiffs and Subclass members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Oklahoma State Class members did not, and could not, unravel FCA's deception on their own.

2531.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

2532.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2533.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Oklahoma State Class.

2534.  FCA knew or should have known that its conduct violated the Oklahoma CPA.

2535.  FCA owed Plaintiffs and the Subclass a duty to disclose the truth about its emissions systems manipulation because FCA:

1336321.4

2536.    Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2537.    Intentionally concealed the foregoing from Plaintiffs and the Oklahoma State Class; and/or

2538.    Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

2539.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2540.    FCA's conduct proximately caused injuries to Plaintiffs and the other Oklahoma State Class members.

2541.    Plaintiffs and the Oklahoma State Class suffered ascertainable loss caused by FCA's misrepresentations and concealment of and failure to disclose material information.

2542.    FCA's unlawful acts and practices complained of herein affect the public interest.

2543.    As a direct and proximate result of FCA's violations of the Oklahoma CPA, Plaintiffs and the Oklahoma State Class have suffered injury in fact and/or actual damage.

2544.    FCA's conduct as alleged herein was unconscionable because (1) FCA, knowingly or with reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) at the time the consumer transaction was entered into, FCA knew or had reason to know that price grossly exceeded the price at which similar vehicles were readily

1336321.4

obtainable in similar transactions by like consumers; and (3) FCA knew or had reason to know that the transaction FCA induced the consumer to enter into was excessively one-sided in favor of FCA.

2545.  Because FCA's unconscionable conduct caused injury to Oklahoma State Class members, Plaintiffs and the Oklahoma Subclass seek recovery of actual damages, discretionary penalties up to $2,000 per violation, punitive damages, and reasonable attorneys' fees, under Okla. Stat. tit. 15 § 761.1.  Plaintiffs and the Oklahoma State Class further seek an order enjoining FCA's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

**OKLAHOMA COUNT II**
**Fraud**
**(Based on Oklahoma Law)**
**(On Behalf of the Oklahoma State Class)**

2546.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2547.  This claim is brought on behalf of the Oklahoma State Class against FCA.

2548.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Oklahoma State Class members information that is highly relevant to their purchasing decision.

2549.  FCA further affirmatively misrepresented to Plaintiffs and Oklahoma State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2550.  FCA knew these representations were false when made.

1336321.4

2551.  The Defective Vehicles purchased or leased by Plaintiffs and the other Oklahoma State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Oklahoma State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

2552.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Oklahoma State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2553.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2554.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA;

1336321.4

1  Plaintiffs and the Oklahoma State Class members did not know of these facts and FCA actively

2  concealed these facts from Plaintiffs and Oklahoma State Class members.

3    2555.  Plaintiffs and Oklahoma State Class members reasonably relied upon FCA's

4  deception.  They had no way of knowing that FCA's representations were false and/or misleading.

5  As consumers, Plaintiffs and Oklahoma State Class members did not, and could not, unravel FCA's

6  deception on their own.  Rather, FCA intended to deceive Plaintiffs and Oklahoma State Class

7  members by concealing the true facts about the Defective Vehicles' emissions.

8    2556.  FCA also concealed and suppressed material facts concerning what is evidently the

9  true culture of FCA—one characterized by an emphasis on profits and sales above compliance with

10  federal and state clean air laws and emissions regulations that are meant to protect the public and

11  consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Oklahoma

12  State Class members placed in its representations.  Consumers buy diesel cars from FCA because

13  they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the

14  environment.  And yet, that is precisely what the Defective Vehicles are doing.

15    2557.  FCA's false representations were material to consumers because they concerned the

16  quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with

17  applicable federal and state laws and regulations regarding clean air and emissions, and also because

18  the representations played a significant role in the value of the vehicles.  As FCA well knew, its

19  customers, including Plaintiffs and Oklahoma State Class members, highly valued that the vehicles

20  they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and

21  they paid accordingly.

22    2558.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

23  turns off or is limited during normal driving conditions and that the Defective Vehicles were

24  defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

25  pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

26  those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

27  details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

28

1336321.4

knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Oklahoma State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Oklahoma State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Oklahoma State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Oklahoma State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2559.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Oklahoma State Class members.

2560.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Oklahoma State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1336321.4

2561.   Plaintiffs and Oklahoma State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Oklahoma State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Oklahoma State Class members, did not generally know such facts.

2562.   Because of the concealment and/or suppression of the facts, Plaintiffs and Oklahoma State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Oklahoma State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Oklahoma State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2563.   The value of Plaintiffs' and Oklahoma State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Oklahoma State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2564.  Accordingly, FCA is liable to Plaintiffs and Oklahoma State Class members for damages in an amount to be proven at trial.

2565.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Oklahoma State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**OKLAHOMA COUNT III**
**Breach of Express Warranty,**
**Okla. Stat. Tit. 12 §§ 2-313 and 2A-210**
**(On Behalf of the Oklahoma State Class)**

2566.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2567.  This Count is brought on behalf of the Oklahoma State Class against FCA.

2568.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

2569.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

2570.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

2571.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1336321.4

2572.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

2573.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2574.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2575.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

2576.  FCA's warranties formed a basis of the bargain that was reached when Oklahoma State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2577.  Despite the existence of warranties, FCA failed to inform Oklahoma State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of

compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2578.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

2579.   Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2580.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Oklahoma State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2581.   Accordingly, recovery by the Oklahoma State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

2582.   Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Oklahoma State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

2583.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Oklahoma State Class members' remedies would be insufficient to make them whole.

CLASS ACATION COMPLAINT

1336321.4

2584.   Finally, because of FCA's breach of warranty as set forth herein, Oklahoma State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2585.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2586.   As a direct and proximate result of FCA's breach of express warranties, Oklahoma State Class members have been damaged in an amount to be determined at trial.

**OKLAHOMA COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Okla. Stat. Tit. 12A §§ 2-314 and 2A-212**
**(On Behalf of the Oklahoma State Class)**

2587.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2588.   This Count is brought on behalf of the Oklahoma State Class, against FCA.

2589.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

2590.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

2591.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

2592.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Okla. Stat. Tit. 12A §§ 2-314 and 2A-212.

2593.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal

483

1336321.4

and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2594.  FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2595.  As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Oklahoma State Class members have been damaged in an amount to be proven at trial.

### XXXVII.    OREGON COUNTS

### OREGON COUNT I
**Violations of the Oregon Unlawful Trade Practices Act,
Or. Rev. Stat. §§ 646.605, *et seq*.
(On Behalf of the Oregon State Class)**

2596.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2597.  This claim is brought on behalf of the Oregon State Class against FCA.

2598.  FCA and the Oregon State Class are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

2599.  FCA engaged in "trade" or "commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

2600.  The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits "unfair or deceptive acts conduct in trade or commerce …." Or. Rev. Stat. § 646.608(1).

2601.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA

484

1336321.4

engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.  In purchasing or leasing the Defective Vehicles, Mississippi State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Mississippi State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception.  Mississippi State Class members did not, and could not, unravel FCA's deception on their own.

2602.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

2603.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2604.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead the Mississippi State Class.

2605.  FCA knew or should have known that its conduct violated the Oregon Unfair Trade Practices Act.

2606.  FCA owed the Mississippi State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

1336321.4

2607.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2608.   Intentionally concealed the foregoing from the Mississippi State Class; and/or

2609.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from the Mississippi State Class that contradicted these representations.

2610.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Mississippi State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2611.   FCA's conduct proximately caused injuries to the Mississippi State Class members.

2612.   Mississippi State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Mississippi State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.   These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2613.   FCA's violations present a continuing risk to the Oregon State Class as well as to the general public.   FCA's unlawful acts and practices complained of herein affect the public interest.

2614.   Pursuant to Or. Rev. Stat. § 646.638, the Oregon State Class seek an order enjoining FCA's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Oregon UTPA.

1336321.4

**OREGON COUNT II**
**Fraud**
**(Based on Oregon Law)**
**(On Behalf of the Oregon State Class)**

2615.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2616.   This claim is brought on behalf of Plaintiffs and the Oregon State Class against FCA.

2617.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were noncompliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Oregon State Class members information that is highly relevant to their purchasing decision.

2618.   FCA further affirmatively misrepresented to Plaintiffs and Oregon State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2619.   FCA knew these representations were false when made.

2620.   The Defective Vehicles purchased or leased by Plaintiffs and the other Oregon State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

2621.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

487

1336321.4

those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Oregon State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2622.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2623.   The truth about the defective emissions controls and FCA's manipulations of those controls, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Oregon State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Oregon State Class members.

2624.   Plaintiffs and Oregon State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Oregon State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Oregon State Class members by concealing the true facts about the Defective Vehicles' emissions.

2625.   FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Oregon State Class members placed in its representations.  Consumers buy diesel cars from FCA because

1336321.4

they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Defective Vehicles are doing.

2626. FCA's false representations were material to consumers because they concerned the quality of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As FCA well knew, its customers, including Plaintiffs and Oregon State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2627. FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Oregon State Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Oregon State Class members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Oregon State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer,

including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Oregon State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2628.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Oregon State Class members.

2629.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Oregon State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

2630.  Plaintiffs and Oregon State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Oregon State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Oregon State Class members, did not generally know such facts.

2631.  Because of the concealment and/or suppression of the facts, Plaintiffs and Oregon State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Oregon State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with

1336321.4

applicable federal and state laws and regulations, Plaintiffs and Oregon State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2632.  The value of Plaintiffs' and Oregon State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Oregon State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2633.  Accordingly, FCA is liable to Plaintiffs and Oregon State Class members for damages in an amount to be proven at trial.

2634.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Oregon State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**OREGON COUNT III**
**Breach of Express Warranty,**
**Or. Rev. Stat. §§ 72.3130 and 72A.2100**
**(On Behalf of the Oregon State Class)**

2635.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2636.  This Count is brought on behalf of the Oregon State Class against FCA.

2637.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

1336321.4

2638.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

2639.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

2640.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

2641.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

2642.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2643.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail

1336321.4

1   to function or function improperly because of a defect in materials or workmanship.  This warranty

2   provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission

3   control components, for eight years or 80,000 miles, whichever comes first.

4       2644.  As manufacturers of light-duty vehicles, FCA were required to provide these

5   warranties to purchasers or lessees of Defective Vehicles.

6       2645.  FCA's warranties formed a basis of the bargain that was reached when Oregon State

7   Class members purchased or leased their Defective Vehicles equipped with the non-compliant

8   "clean" diesel engine and emission systems.

9       2646.  Despite the existence of warranties, FCA failed to inform Oregon State Class

10  members that the Defective Vehicles were intentionally designed and manufactured to be out of

11  compliance with applicable state and federal emissions laws, and failed to fix the defective emission

12  components free of charge.

13      2647.  FCA breached the express warranty promising to repair and correct a manufacturing

14  defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted,

15  and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship

16  defects.

17      2648.  Affording FCA a reasonable opportunity to cure their breach of written warranties

18  would be unnecessary and futile here.

19      2649.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing

20  defect fails in its essential purpose because the contractual remedy is insufficient to make Oregon

21  State Class members whole and because FCA has failed and/or have refused to adequately provide

22  the promised remedies within a reasonable time.

23      2650.  Accordingly, recovery by the Oregon State Class members is not restricted to the

24  limited warranty promising to repair and/or correct a manufacturing defect, and they seek all

25  remedies as allowed by law.

26      2651.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased

27  the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not

28

CLASS ACATION COMPLAINT

1336321.4

conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles. Oregon State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

2652. Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Oregon State Class members' remedies would be insufficient to make them whole.

2653. Finally, because of FCA's breach of warranty as set forth herein, Oregon State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2654. FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2655. As a direct and proximate result of FCA's breach of express warranties, Oregon State Class members have been damaged in an amount to be determined at trial.

**OREGON COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Or. Rev. Stat. §§ 72.3140 and 72A.2120**
**(On Behalf of the Oregon State Class)**

2656. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2657. This Count is brought on behalf of the Oregon State Class, against FCA.

2658. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

1336321.4

2659.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

2660.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

2661.  A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Or. Rev. Stat. §§ 72.3140 and 72A-2120.

2662.  These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2663.  FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2664.  As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Oregon State Class members have been damaged in an amount to be proven at trial.

### XXXVIII.    PENNSYLVANIA COUNTS

**PENNSYLVANIA COUNT I**
**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law,**
**73 P.S. § 201-1 *et seq.***
**(On Behalf of the Pennsylvania State Class)**

2665.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2666.  Plaintiffs bring this Count on behalf of the Pennsylvania State Class against FCA.

2667.  Plaintiffs purchased the Defective Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

2668.  FCA perpetrated the acts complained of herein in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

495

2669.  The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including:  (i) "Representing that goods or services have … characteristics, … [b]enefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."  73 P.S. § 201-2(4).

2670.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2671.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Pennsylvania State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

CLASS ACACION COMPLAINT

2672.  Plaintiffs and Subclass members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel FCA's deception on their own.

2673.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

2674.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2675.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Pennsylvania State Class.

2676.  FCA knew or should have known that its conduct violated the Pennsylvania CPL.

2677.  FCA owed Plaintiffs and the Pennsylvania State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

2678.  Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2679.  Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

2680.  Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Pennsylvania State Class that contradicted these representations.

2681.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1336321.4

2682.  FCA's conduct proximately caused injuries to Plaintiffs and the other Pennsylvania State Class members.

2683.  Plaintiffs and the other Pennsylvania State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Subclass members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2684.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

2685.  FCA is liable to Plaintiffs and the Pennsylvania State Class for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a).  Plaintiffs and the Pennsylvania State Class members are also entitled to an award of punitive damages given that FCA's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

### PENNSYLVANIA COUNT II
### Fraud
### (Based on Pennsylvania Law)
### (On Behalf of the Pennsylvania State Class)

2686.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2687.  This claim is brought on behalf of the Pennsylvania State Class against FCA.

2688.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Pennsylvania State Class members information that is highly relevant to their purchasing decision.

1336321.4

2689.   FCA further affirmatively misrepresented to Plaintiffs and Pennsylvania State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2690.   FCA knew these representations were false when made.

2691.   The Defective Vehicles purchased or leased by Plaintiffs and the other Pennsylvania State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Pennsylvania State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

2692.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Pennsylvania State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2693.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels

1336321.4

of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2694.   The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Pennsylvania State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Pennsylvania State Class members.

2695.   Plaintiffs and Pennsylvania State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and Pennsylvania State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Pennsylvania State Class members by concealing the true facts about the Defective Vehicles' emissions.

2696.   FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Pennsylvania State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

2697.   FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Pennsylvania State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

CLASS ACATION COMPLAINT

2698.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Pennsylvania State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Pennsylvania State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Pennsylvania State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Pennsylvania State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2699.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions,

1336321.4

which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Pennsylvania State Class members.

2700.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Pennsylvania State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

2701.  Plaintiffs and Pennsylvania State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'   and Pennsylvania State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Pennsylvania State Class members, did not generally know such facts.

2702.  Because of the concealment and/or suppression of the facts, Plaintiffs and Pennsylvania State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Pennsylvania State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Pennsylvania State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2703.  The value of Plaintiffs' and Pennsylvania State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-

502

1336321.4

compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Pennsylvania State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2704.   Accordingly, FCA is liable to Plaintiffs and Pennsylvania State Class members for damages in an amount to be proven at trial.

2705.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Pennsylvania State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### PENNSYLVANIA COUNT III
### Breach of Express Warranty,
### 13. Pa. Cons. Stat. §§ 2313 and 2A210
### (On Behalf of the Pennsylvania State Class)

2706.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2707.   This Count is brought on behalf of the Pennsylvania State Class against FCA.

2708.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

2709.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

2710.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

2711.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory

preparation" FCA also provided two express California Emissions Standard Warranties. One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

2712.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

2713.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2714.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2715.   As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

2716.   FCA's warranties formed a basis of the bargain that was reached when Pennsylvania State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2717.  Despite the existence of warranties, FCA failed to inform Pennsylvania State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2718.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

2719.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2720.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Pennsylvania State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2721.  Accordingly, recovery by the Pennsylvania State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

2722.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Pennsylvania State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

2723.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a

1336321.4

reasonable time, and any limitation on the Pennsylvania State Class members' remedies would be insufficient to make them whole.

2724.   Finally, because of FCA's breach of warranty as set forth herein, Pennsylvania State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2725.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2726.   As a direct and proximate result of FCA's breach of express warranties, Pennsylvania State Class members have been damaged in an amount to be determined at trial.

### PENNSYLVANIA COUNT IV
### Breach of Implied Warranty of Merchantability,
### 13. Pa. Cons. Stat. §§ 2314 and 2A212
### (On Behalf of the Pennsylvania State Class)

2727.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2728.   This Count is brought on behalf of the Pennsylvania State Class, against FCA.

2729.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

2730.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

2731.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

2732.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 3 Pa. Cons. Stat. §§ 2314 and 2A212.

2733.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

1336321.4

Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2734. FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2735. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Pennsylvania State Class members have been damaged in an amount to be proven at trial.

## XXXIX.    RHODE ISLAND COUNTS

### RHODE ISLAND COUNT I
**Violations of the Rhode Island Unfair Trade Practices and Consumer Protection Law,**
**R.I. Gen. Laws § 6-13.1 *et seq*.**
**(On Behalf of the Rhode Island State Class)**

2736. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2737. Plaintiffs bring this Count on behalf of the Rhode Island State Class against FCA.

2738. Plaintiffs are persons who purchased a Defective Vehicle primarily for personal, family, or household purposes within the meaning of R.I. Gen. Laws § 6-13.1-5.2(a).

2739. Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(vii) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another"; "(ix) Advertising goods or services with intent not to sell them as advertised"; "(xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding"; "(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer"; and "(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect."  R.I. Gen. Laws § 6- 13.1-1(6).

507

1336321.4

2740. FCA engaged in unlawful trade practices, including:  (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective Vehicles are of a particular standard and quality when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging in conduct that is unfair or deceptive and likely to deceive.

2741.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

2742.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2743.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Rhode Island State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

CLASS ACATION COMPLAINT

1336321.4

2744.   Plaintiffs and Rhode Island State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Rhode Island State Class members did not, and could not, unravel FCA's deception on their own.

2745.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

2746.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2747.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Rhode Island State Class.

2748.   FCA knew or should have known that its conduct violated the Rhode Island CPA.

2749.   FCA owed Plaintiffs and the Rhode Island State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

2750.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2751.   Intentionally concealed the foregoing from Plaintiffs and the Rhode Island State Class; and/or

2752.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Rhode Island State Class that contradicted these representations.

2753.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Rhode Island State Class

1336321.4

members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2754.  FCA's conduct proximately caused injuries to Plaintiffs and the other Rhode Island State Class members.

2755.  Plaintiffs and the Rhode Island State Class suffered ascertainable loss caused by FCA's misrepresentations and concealment of and failure to disclose material information to Plaintiffs who purchased the Defective Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all.

2756.  FCA's unlawful acts and practices complained of herein affect the public interest.

2757.  As a direct and proximate result of FCA's violations of the Rhode Island CPA, Plaintiffs and the Rhode Island Rhode Island State Class have suffered injury in fact and/or actual damage.

2758.  Plaintiffs and Rhode Island State class members are entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen. Laws § 6-13.1-5.2(a).  Plaintiffs also seek punitive damages in the discretion of the Court because of FCA's egregious disregard of consumer and public safety and their long-running concealment of the serious safety defects and their tragic consequences.

### RHODE ISLAND COUNT II
### Fraud
### (Based on Rhode Island Law)
### (On Behalf of the Rhode Island State Class)

2759.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2760.  This claim is brought on behalf of the Rhode Island State Class against FCA.

2761.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA

1336321.4

1  emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and
2  the other Rhode Island State Class members information that is highly relevant to their purchasing
3  decision.

4    2762.  FCA further affirmatively misrepresented to Plaintiffs and Rhode Island State Class
5  members in advertising and other forms of communication, including standard and uniform material
6  provided with each car, that the Defective Vehicles it was selling had no significant defects, were
7  low-emission vehicles, complied with EPA regulations, and would perform and operate properly
8  when driven in normal usage.

9    2763.  FCA knew these representations were false when made.

10    2764.  The Defective Vehicles purchased or leased by Plaintiffs and the other Rhode Island
11  State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-
12  powered vehicles and at a much higher rate than a reasonable consumer would expect in light of
13  FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Rhode Island
14  State Class members had to pay more for fuel than they reasonably expected, and unreliable because
15  the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving
16  conditions.

17    2765.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles
18  turns off or is limited during normal driving conditions and that the Defective Vehicles were
19  defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted
20  pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded
21  those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because
22  Plaintiffs and the other Rhode Island State Class members relied on FCA's material representations
23  that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free
24  from defects.

25    2766.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective
26  Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its
27  EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx

28

reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2767.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Rhode Island State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Rhode Island State Class members.

2768.  Plaintiffs and Rhode Island State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and Rhode Island State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Rhode Island State Class members by concealing the true facts about the Defective Vehicles' emissions.

2769.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Rhode Island State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

2770.  FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Rhode Island State Class members, highly valued that the

1    vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced

2    emissions, and they paid accordingly.

3        2771.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

4    turns off or is limited during normal driving conditions and that the Defective Vehicles were

5    defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

6    pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

7    those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

8    details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

9    knowledge as to such facts, and because FCA knew these facts were not known to or reasonably

10   discoverable by Plaintiffs or Rhode Island State Class members.   FCA also had a duty to disclose

11   because it made general affirmative representations about the qualities of the vehicles with respect to

12   emissions, starting with references to them as reduced-emissions diesel cars and as compliant with

13   all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of

14   the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual

15   philosophy with respect to compliance with federal and state clean air laws and emissions

16   regulations, and FCA's actual practices with respect to the vehicles at issue.   Having volunteered to

17   provide information to Plaintiffs and Rhode Island State Class members, FCA had the duty to

18   disclose not just the partial truth, but also the entire truth.   These omitted and concealed facts were

19   material because they directly impact the value of the Defective Vehicles purchased or leased by

20   Plaintiffs and Rhode Island State Class members.   Whether a manufacturer's products pollute,

21   comply with federal and state clean air laws and emissions regulations, and whether that

22   manufacturer tells the truth with respect to such compliance or non-compliance, are material

23   concerns to a consumer, including with respect to the emissions certifications testing their vehicles

24   must pass.   FCA represented to Plaintiffs and Rhode Island State Class members that they were

25   purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or

26   leasing defective, high-emission vehicles with unlawfully high emissions.

27

28

1336321.4

2772.   FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Rhode Island State Class members.

2773.   FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Rhode Island State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

2774.   Plaintiffs and Rhode Island State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'   and Rhode Island State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Rhode Island State Class members, did not generally know such facts.

2775.   Because of the concealment and/or suppression of the facts, Plaintiffs and Rhode Island State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Rhode Island State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Rhode Island State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2776. The value of Plaintiffs' and Rhode Island State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Rhode Island State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2777. Accordingly, FCA is liable to Plaintiffs and Rhode Island State Class members for damages in an amount to be proven at trial.

2778. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Rhode Island State Class members' rights and the representations that FCA made to them, in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**RHODE ISLAND COUNT III**
**Breach of Express Warranty,**
**6A R.I. Gen. Laws §§ 6A-2-313 and 6A-2.1-210**
**(On Behalf of the Rhode Island State Class)**

2779. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2780. This Count is brought on behalf of the Rhode Island State Class against FCA.

2781. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 6A R.I. Gen. Laws §§ 6A-2-104(1) and 6A-2.1-103(1)(t), and "sellers" of motor vehicles under § 6A-2-103(a)(4).

2782. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under 6A R.I. Gen. Laws § 6A-2.1-103(1)(p).

2783. The Defective Vehicles are and were at all relevant times "goods" within the meaning of 6A R.I. Gen. Laws §§ 6A-2-105(1) and 6A-2.1-103(1)(h).

1336321.4

2784.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

2785.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

2786.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2787.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1336321.4

2788.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

2789.  FCA's warranties formed a basis of the bargain that was reached when Rhode Island State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2790.  Despite the existence of warranties, FCA failed to inform Rhode Island State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2791.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

2792.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2793.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Rhode Island State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2794.  Accordingly, recovery by the Rhode Island State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

2795.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Rhode Island State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

1336321.4

2796.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Rhode Island State Class members' remedies would be insufficient to make them whole.

2797.  Finally, because of FCA's breach of warranty as set forth herein, Rhode Island State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2798.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2799.  As a direct and proximate result of FCA's breach of express warranties, Rhode Island State Class members have been damaged in an amount to be determined at trial.

**RHODE ISLAND COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**6A R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212**
**(On Behalf of the Rhode Island State Class)**

2800.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2801.  This Count is brought on behalf of the Rhode Island State Class, against FCA.

2802.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 6A R.I. Gen. Laws §§ 6A-2-104(1) and 6A-2.1-103(1)(t), and "sellers" of motor vehicles under § 6A-2-103(a)(4).

2803.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under 6A R.I. Gen. Laws § 6A-2.1-103(1)(p).

2804.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of 6A R.I. Gen. Laws §§ 6A-2-105(1) and 6A-2.1-103(1)(h).

518

1336321.4

2805.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 6A R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212.

2806.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2807.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2808.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Rhode Island State Class members have been damaged in an amount to be proven at trial.

## XL.    SOUTH CAROLINA COUNTS

### SOUTH CAROLINA COUNT I
### Violations of the South Carolina Unfair Trade Practices Act,
### S.C. Code Ann. § 39-5-10 *et seq.*
### (On Behalf of the South Carolina State Class)

2809.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2810.   This claim is brought on behalf of the South Carolina State Class against FCA.

2811.   FCA is a "person" under S.C. Code Ann. § 39-5-10.

2812.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  S.C. Code Ann. § 39-5-20(a).

2813.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during

1336321.4

normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.   Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2814.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other South Carolina State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2815.   Plaintiffs and South Carolina State Class members reasonably relied upon FCA's false misrepresentations.   They had no way of knowing that FCA's representations were false and gravely misleading.   As alleged herein, FCA engaged in extremely sophisticated methods of deception.   Plaintiffs and Subclass members did not, and could not, unravel FCA's deception on their own.

2816.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

2817.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1336321.4

2818.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the South Carolina State Class.  FCA knew or should have known that its conduct violated the South Carolina UTPA.

2819.   FCA owed Plaintiffs and the South Carolina State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

2820.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2821.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

2822.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the South Carolina State Class that contradicted these representations.

2823.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2824.   FCA's conduct proximately caused injuries to Plaintiffs and the other South Carolina State Class members.

2825.   Plaintiffs and the South Carolina State Class suffered ascertainable loss caused by FCA's misrepresentations and concealment of and failure to disclose material information.  Plaintiffs who purchased the Defective Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all.

2826.   FCA's unlawful acts and practices complained of herein affect the public interest.

1336321.4

2827. As a direct and proximate result of FCA's violations of the South Carolina UTPA, Plaintiffs and the South Carolina State Class have suffered injury in fact and/or actual damage.

2828. Pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiffs seeks monetary relief against FCA to recover for economic losses. Because FCA's actions were willful and knowing, Plaintiffs' damages should be trebled. *Id.*

2829. Plaintiffs further alleges that FCA's malicious and deliberate conduct warrants an assessment of punitive damages because FCA carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the South Carolina State Class to cruel and unjust hardship as a result.

**SOUTH CAROLINA COUNT II**
**Violations of the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act,**
**S.C. Code Ann. § 56-15-10 *et seq*.**
**(On Behalf of the South Carolina State Class)**

2830. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2831. This claim is brought only on behalf of the South Carolina State Class against FCA.

2832. FCA was a "manufacturer" as set forth in S.C. Code Ann. § 56-15-10, as each was engaged in the business of manufacturing or assembling new and unused motor vehicles.

2833. FCA committed unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. Code Ann. § 56-15-30.

2834. FCA engaged in actions which were arbitrary, in bad faith, unconscionable, and which caused damage to Plaintiffs, the South Carolina State Class, and to the public.

2835. FCA's bad faith and unconscionable actions include, but are not limited to: (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that the Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising the Defective Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving the Defective Vehicles confers or involves

rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving the Defective Vehicles has been supplied in accordance with a previous representation when it has not.

## SOUTH CAROLINA COUNT III
### Fraud
### (Based on South Carolina Law)
### (On Behalf of the South Carolina State Class)

2836.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2837.   This claim is brought on behalf of the South Carolina State Class against FCA.

2838.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other South Carolina State Class members information that is highly relevant to their purchasing decision.

2839.   FCA further affirmatively misrepresented to Plaintiffs and South Carolina State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2840.   FCA knew these representations were false when made.

2841.   The Defective Vehicles purchased or leased by Plaintiffs and the other South Carolina State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other South Carolina State Class members had to pay more for fuel than they reasonably expected, and unreliable because

1336321.4

the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

2842.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other South Carolina State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2843.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2844.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the South Carolina State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and South Carolina State Class members.

2845.  Plaintiffs and South Carolina State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and South Carolina State Class members did not, and could not, unravel

CLASS ACATION COMPLAINT

1336321.4

1   FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and South Carolina State

2   Class members by concealing the true facts about the Defective Vehicles' emissions.

3        2846.  FCA also concealed and suppressed material facts concerning what is evidently the

4   true culture of FCA—one characterized by an emphasis on profits and sales above compliance with

5   federal and state clean air laws and emissions regulations that are meant to protect the public and

6   consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and South Carolina

7   State Class members placed in its representations.  Consumers buy diesel cars from FCA because

8   they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the

9   environment.  And yet, that is precisely what the Defective Vehicles are doing.

10       2847.  FCA's false representations were material to consumers because they concerned the

11  quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with

12  applicable federal and state laws and regulations regarding clean air and emissions, and also because

13  the representations played a significant role in the value of the vehicles.  As FCA well knew, its

14  customers, including Plaintiffs and South Carolina State Class members, highly valued that the

15  vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced

16  emissions, and they paid accordingly.

17       2848.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

18  turns off or is limited during normal driving conditions and that the Defective Vehicles were

19  defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

20  pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

21  those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

22  details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

23  knowledge as to such facts, and because FCA knew these facts were not known to or reasonably

24  discoverable by Plaintiffs or South Carolina State Class members.  FCA also had a duty to disclose

25  because it made general affirmative representations about the qualities of the vehicles with respect to

26  emissions, starting with references to them as reduced-emissions diesel cars and as compliant with

27  all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of

28

1336321.4

the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and South Carolina State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and South Carolina State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and South Carolina State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2849. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and South Carolina State Class members.

2850. FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and South Carolina State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

2851. Plaintiffs and South Carolina State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and South Carolina State Class members' actions were justified. FCA was

in exclusive control of the material facts, and the public, Plaintiffs, or South Carolina State Class members, did not generally know such facts.

2852.   Because of the concealment and/or suppression of the facts, Plaintiffs and South Carolina State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.   Had Plaintiffs and South Carolina State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and South Carolina State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2853.   The value of Plaintiffs' and South Carolina State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and South Carolina State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2854.   Accordingly, FCA is liable to Plaintiffs and South Carolina State Class members for damages in an amount to be proven at trial.

2855.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and South Carolina State Class members' rights and the representations that FCA made to them, in order to enrich FCA.   FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

CLASS ACATION COMPLAINT

1336321.4

**SOUTH CAROLINA COUNT IV**
**Breach of Express Warranty,**
**S.C. Code §§ 36-2-313 and 36-2A-210**
**(On Behalf of the South Carolina State Class)**

2856.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2857.   This Count is brought on behalf of the South Carolina State Class against FCA.

2858.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

2859.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under S.C. Code § 36-2A-103(1)(p).

2860.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

2861.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

2862.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:   a "Performance Warranty" and a "Design and Defect Warranty."

2863.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission

1336321.4

control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2864.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2865.   As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

2866.   FCA's warranties formed a basis of the bargain that was reached when South Carolina State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2867.   Despite the existence of warranties, FCA failed to inform South Carolina State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2868.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

2869.   Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

CLASS ACACTION COMPLAINT

1336321.4

2870.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make South Carolina State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2871.   Accordingly, recovery by the South Carolina State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

2872.   Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  South Carolina State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

2873.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the South Carolina State Class members' remedies would be insufficient to make them whole.

2874.   Finally, because of FCA's breach of warranty as set forth herein, South Carolina State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2875.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2876.   As a direct and proximate result of FCA's breach of express warranties, South Carolina State Class members have been damaged in an amount to be determined at trial.

1336321.4

**SOUTH CAROLINA COUNT V**
**Breach of Implied Warranty of Merchantability,**
**S.C. Code §§ 36-2-314 and 36-2A-212**
**(On Behalf of the South Carolina State Class)**

2877.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2878.   This Count is brought on behalf of the South Carolina State Class, against FCA.

2879.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

2880.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under S.C. Code § 36-2A-103(1)(p).

2881.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

2882.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.C. Code §§ 36-2-314 and 36-2A-212.

2883.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2884.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2885.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, South Carolina State Class members have been damaged in an amount to be proven at trial.

1336321.4

# XLI.   SOUTH DAKOTA COUNTS

### SOUTH DAKOTA COUNT I
### Violations of the South Dakota Deceptive Trade Practices and Consumer Protection Law,
### S.D. Codified Laws § 37-24-6
### (On Behalf of the South Dakota State Class)

2886.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2887.  This claim is brought on behalf of the South Dakota State Class against FCA.

2888.  FCA and the South Dakota State Class are "persons" within the meaning of S.D. Codified Laws § 37-24-1(8).

2889.  FCA is engaged in "trade" or "commerce" within the meaning of S.D. Codified Laws § 37-24-1(13).

2890.  The South Dakota Deceptive Trade Practices and Consumer Protection ("South Dakota CPA") prohibits "deceptive acts or practices, which are defined to include "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby."  S.D. Codified Laws § 37-24-6(1).

2891.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of

1336321.4

which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.  In purchasing or leasing the Defective Vehicles, South Dakota State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  South Dakota State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception.  South Dakota State Class members did not, and could not, unravel FCA's deception on their own.

2892.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

2893.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2894.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead the South Dakota State Class.

2895.   FCA knew or should have known that its conduct violated the Oregon Unfair Trade Practices Act.

2896.   FCA owed the South Dakota State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

2897.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2898.   Intentionally concealed the foregoing from the South Dakota State Class; and/or

1336321.4

2899.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from the South Dakota State Class that contradicted these representations.

2900.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because South Dakota State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2901.   FCA's conduct proximately caused injuries to the South Dakota State Class members.

2902.   South Dakota State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that South Dakota State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2903.   FCA's violations present a continuing risk to the South Dakota State Class as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

**SOUTH DAKOTA COUNT II**
**Fraud**
**(Based on South Dakota Law)**
**(On Behalf of the South Dakota State Class)**

2904.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2905.   This claim is brought on behalf of Plaintiffs and the South Dakota State Class against FCA.

2906.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective

534

1336321.4

emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were noncompliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other South Dakota State Class members information that is highly relevant to their purchasing decision.

2907.   FCA further affirmatively misrepresented to Plaintiffs and South Dakota State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2908.   FCA knew these representations were false when made.

2909.   The Defective Vehicles purchased or leased by Plaintiffs and the other South Dakota State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

2910.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other South Dakota State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2911.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its

1336321.4

EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2912.  The truth about the defective emissions controls and FCA's manipulations of those controls, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the South Dakota State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and South Dakota State Class members.

2913.  Plaintiffs and South Dakota State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and South Dakota State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and South Dakota State Class members by concealing the true facts about the Defective Vehicles' emissions.

2914.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and South Dakota State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

2915.  FCA's false representations were material to consumers because they concerned the quality of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including

Plaintiffs and South Dakota State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2916.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or South Dakota State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and South Dakota State Class members, FCA had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and South Dakota State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and South Dakota State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1336321.4

2917.   FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and South Dakota State Class members.

2918.   FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and South Dakota State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

2919.   Plaintiffs and South Dakota State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'   and South Dakota State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or South Dakota State Class members, did not generally know such facts.

2920.   Because of the concealment and/or suppression of the facts, Plaintiffs and South Dakota State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and South Dakota State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, Plaintiffs and South Dakota State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

CLASS ACACION COMPLAINT

2921.  The value of Plaintiffs' and South Dakota State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and South Dakota State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2922.  Accordingly, FCA is liable to Plaintiffs and South Dakota State Class members for damages in an amount to be proven at trial.

2923.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and South Dakota State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**SOUTH DAKOTA COUNT III**
**Breach of Express Warranty,**
**S.D. Codified Laws §§ 57A-2-313 and 57-2A-210**
**(On Behalf of the South Dakota State Class)**

2924.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2925.  This Count is brought on behalf of the South Dakota State Class against FCA.

2926.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor vehicles under § 57A-104(1)(d).

2927.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

2928.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

539

1336321.4

2929. In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first. This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation" FCA also provided two express California Emissions Standard Warranties. One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

2930. The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2931. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2932. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1336321.4

2933.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

2934.  FCA's warranties formed a basis of the bargain that was reached when South Dakota State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2935.  Despite the existence of warranties, FCA failed to inform South Dakota State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2936.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

2937.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2938.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make South Dakota State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2939.  Accordingly, recovery by the South Dakota State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

2940.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  South Dakota State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

2941.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the South Dakota State Class members' remedies would be insufficient to make them whole.

2942.  Finally, because of FCA's breach of warranty as set forth herein, South Dakota State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2943.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2944.  As a direct and proximate result of FCA's breach of express warranties, South Dakota State Class members have been damaged in an amount to be determined at trial.

**SOUTH DAKOTA COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**S.D. Codified Laws §§ 57-2-314 and 57-2A-212**
**(On Behalf of the South Dakota State Class)**

2945.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2946.  This Count is brought on behalf of the South Dakota State Class, against FCA.

2947.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor vehicles under § 57A-104(1)(d).

2948.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

2949.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

1336321.4

2950.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212.

2951.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2952.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2953.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, South Dakota State Class members have been damaged in an amount to be proven at trial.

## XLII.  TENNESSEE COUNTS

### TENNESSEE COUNT I
**Violations of the Tennessee Consumer Protection Act,
Tenn. Code Ann. § 47-18-101 *et seq*.
(On Behalf of the Tennessee State Class)**

2954.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2955.   Plaintiffs bring this Count on behalf of the Tennessee State Class against FCA.

2956.   Plaintiffs and Tennessee State Class members are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

2957.   FCA is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

2958.   FCA's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

2959.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not

1336321.4

limited to: "Representing that goods or services have … characteristics, [or] … benefits … that they do not have…;" "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" "Advertising goods or services with intent not to sell them as advertised;" and "Engaging in any other act or practice which is deceptive to the consumer or any other person." Tenn. Code Ann. § 47-18-104. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, FCA violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that the Defective Vehicles have characteristics or benefits that they did not have; representing that the Defective Vehicles are of a particular standard, quality, or grade when they are of another; advertising the Defective Vehicles with intent not to sell them as advertised; and engaging in acts or practices that are deceptive to consumers.

2960. In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limite during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such

CLASS ACACTION COMPLAINT

that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2961.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Tennessee State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2962.  Plaintiffs and Subclass members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel FCA's deception on their own.

2963.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

2964.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2965.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Subclass.

2966.  FCA knew or should have known that its conduct violated the Tennessee CPA.

2967.  FCA owed Plaintiffs and the Subclass a duty to disclose the truth about its emissions systems manipulation because FCA:

2968.  Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

2969.  Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

2970.  Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1336321.4

CLASS ACACTION COMPLAINT

2971.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2972.  FCA's conduct proximately caused injuries to Plaintiffs and the other Tennessee State Class members.

2973.  Plaintiffs and the other Tennessee State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Tennessee State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

2974.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

2975.  Pursuant to Tenn. Code § 47-18-109(a), Plaintiffs and the Tennessee State Class seek monetary relief against FCA measured as actual damages in an amount to be determined at trial, treble damages as a result of FCA's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## TENNESSEE COUNT II
### Fraud
### (Based on Tennessee Law)
### (On Behalf of the Tennessee State Class)

2976.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2977.  This claim is brought on behalf of the Tennessee State Class against FCA.

2978.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Tennessee State Class members information that is highly relevant to their purchasing decision.

2979.   FCA further affirmatively misrepresented to Plaintiffs and Tennessee State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2980.   FCA knew these representations were false when made.

2981.   The Defective Vehicles purchased or leased by Plaintiffs and the other Tennessee State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Tennessee State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

2982.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defect device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Tennessee State Class members relied on FCA's material representations that

1336321.4

the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2983.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2984.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Tennessee State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Tennessee State Class members.

2985.  Plaintiffs and Tennessee State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Tennessee State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Tennessee State Class members by concealing the true facts about the Defective Vehicles' emissions.

2986.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Tennessee State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

1336321.4

2987.  FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Tennessee State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2988.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Tennessee State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Tennessee State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Tennessee State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer,

including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and Tennessee State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2989. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Tennessee State Class members.

2990. FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Tennessee State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

2991. Plaintiffs and Tennessee State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Tennessee State Class members' actions were justified. FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Tennessee State Class members, did not generally know such facts.

2992. Because of the concealment and/or suppression of the facts, Plaintiffs and Tennessee State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies. Had Plaintiffs and Tennessee State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the

1336321.4

truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Tennessee State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2993.  The value of Plaintiffs' and Tennessee State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Tennessee State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2994.  Accordingly, FCA is liable to Plaintiffs and Tennessee State Class members for damages in an amount to be proven at trial.

2995.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Tennessee State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### TENNESSEE COUNT III
**Breach of Express Warranty,**
**Tenn. Code Ann. §§ 47-2-313 and 47-2A-210**
**(On Behalf of the Tennessee State Class)**

2996.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2997.  This Count is brought on behalf of the Tennessee State Class against FCA.

2998.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles under § 47-2-103(1)(d).

551

1336321.4

2999.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

3000.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

3001.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

3002.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

3003.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

3004.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail

1336321.4

to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

3005. As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

3006. FCA's warranties formed a basis of the bargain that was reached when Tennessee State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3007. Despite the existence of warranties, FCA failed to inform Tennessee State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

3008. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

3009. Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

3010. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Tennessee State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3011. Accordingly, recovery by the Tennessee State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

3012. Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not

1336321.4

conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.   Tennessee State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

3013.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Tennessee State Class members' remedies would be insufficient to make them whole.

3014.   Finally, because of FCA's breach of warranty as set forth herein, Tennessee State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3015.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

3016.   As a direct and proximate result of FCA's breach of express warranties, Tennessee State Class members have been damaged in an amount to be determined at trial.

**TENNESSEE COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Tenn. Code Ann. §§ 47-2-314 and 47-2A-212**
**(On Behalf of the Tennessee State Class)**

3017.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3018.   This Count is brought on behalf of the Tennessee State Class, against FCA.

3019.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles under § 47-2-103(1)(d).

554

1336321.4

3020.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

3021.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

3022.  A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tenn. Code §§ 47-2-314 and 47-2A-212.

3023.  These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3024.  FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

3025.  As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Tennessee State Class members have been damaged in an amount to be proven at trial.

## XLIII. TEXAS COUNTS

### TEXAS COUNT I
**Violations of the Deceptive Trade Practices Act,**
**Tex. Bus. & Com. Code § 17.41 *et seq.***
**(On Behalf of the Texas State Class)**

3026.  The Texas Deceptive Trade Practices Act ("Texas DTPA") declares "[f]alse, misleading, or deceptive acts" to be unlawful Tex. Bus. & Com. Code § 17.46.

3027.  This claim is brought on behalf of the Texas State Class against FCA.

3028.  Plaintiffs will make a demand in satisfaction of Tex. Bus. & Com. Code § 17.505(a), and may amend this Complaint to assert claims under the Texas DTPA once the required notice

CLASS ACATION COMPLAINT

1336321.4

period has elapsed.  This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Texas DTPA.

**TEXAS COUNT II**
**Fraud**
**(Based on Texas Law)**
**(On Behalf of the Texas State Class)**

3029.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3030.  This claim is brought on behalf of the Texas State Class against FCA.

3031.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Texas State Class members information that is highly relevant to their purchasing decision.

3032.  FCA further affirmatively misrepresented to Plaintiffs and Texas State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

3033.  FCA knew these representations were false when made.

3034.  The Defective Vehicles purchased or leased by Plaintiffs and the other Texas State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Texas State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

556

3035.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Texas State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

3036.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

3037.   The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Texas State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Texas State Class members.

3038.   Plaintiffs and Texas State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Texas State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Texas State Class members by concealing the true facts about the Defective Vehicles' emissions.

3039.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Texas State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

3040.  FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Texas State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

3041.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Texas State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions

CLASS ACACTION COMPLAINT

regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Texas State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Texas State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and Texas State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

3042. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Texas State Class members.

3043. FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Texas State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

3044. Plaintiffs and Texas State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Texas State Class members' actions were justified. FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Texas State Class members, did not generally know such facts.

1336321.4

3045.   Because of the concealment and/or suppression of the facts, Plaintiffs and Texas State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Texas State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Texas State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

3046.   The value of Plaintiffs' and Texas State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Texas State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

3047.   Accordingly, FCA is liable to Plaintiffs and Texas State Class members for damages in an amount to be proven at trial.

3048.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Texas State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

CLASS ACACTION COMPLAINT

1336321.4

**TEXAS COUNT III**
**Breach of Express Warranty,**
**Tex. Bus. & Com. Code §§ 2.313 and 2A.210**
**(On Behalf of the Texas State Class)**

3049.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3050.   This Count is brought on behalf of the Texas State Class against FCA.

3051.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4).

3052.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

3053.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

3054.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

3055.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:   a "Performance Warranty" and a "Design and Defect Warranty."

3056.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission

1336321.4

control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

3057.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

3058.   As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

3059.   FCA's warranties formed a basis of the bargain that was reached when Texas State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3060.   Despite the existence of warranties, FCA failed to inform Texas State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

3061.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

3062.   Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1336321.4

3063.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Texas State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3064.   Accordingly, recovery by the Texas State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

3065.   Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.   Texas State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

3066.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Texas State Class members' remedies would be insufficient to make them whole.

3067.   Finally, because of FCA's breach of warranty as set forth herein, Texas State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3068.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

3069.   As a direct and proximate result of FCA's breach of express warranties, Texas State Class members have been damaged in an amount to be determined at trial.

CLASS ACATION COMPLAINT

**TEXAS COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Tex. Bus. & Com. Code §§ 2.314 and 2A.212**
**(On Behalf of the Texas State Class)**

3070.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3071.  This Count is brought on behalf of the Texas State Class, against FCA.

3072.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4).

3073.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

3074.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

3075.  A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

3076.  These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3077.  FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

3078.  As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Texas State Class members have been damaged in an amount to be proven at trial.

1336321.4

## XLIV. UTAH COUNTS

### UTAH COUNT I
### Violations of the Utah Consumer Sales Practices Act,
### Utah Code Ann. § 13-11-1 *et seq.*
### (On Behalf of the Utah State Class)

3079.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3080.   Plaintiffs bring this Count on behalf of the Utah State Class against FCA.

3081.   FCA qualifies as a "supplier" under the Utah Consumer Sales Practices Act ("Utah CSPA"), Utah Code Ann. § 13-11-3.

3082.   Plaintiffs and the Utah State Class members are "persons" under Utah Code Ann. § 13-11-3.

3083.   Sales of the Defective Vehicles to Plaintiffs and the Utah State Class were "consumer transactions" within the meaning of Utah Code Ann. § 13-11-3.

3084.   The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under Utah Code Ann. § 13-11-4. Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally:  (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not."  Utah Code Ann. § 13-11-4.  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA. Utah Code Ann. § 13-11-5.

3085.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive

565

acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

3086.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Utah State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

3087.   Plaintiffs and Utah State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Utah State Class members did not, and could not, unravel FCA's deception on their own.

3088.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

3089.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

3090.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Utah State Class.

3091.   FCA knew or should have known that its conduct violated the Utah CSPA.

3092.   FCA owed Plaintiffs and the Utah State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

CLASS ACATION COMPLAINT

1336321.4

3093.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

3094.   Intentionally concealed the foregoing from Plaintiffs and the Utah State Class; and/or

3095.   Made incomplete representations that it manipulated the emissions system I the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Utah State Class that contradicted these representations.

3096.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Utah State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

3097.   FCA's conduct proximately caused injuries to Plaintiffs and the other Utah State Class members.

3098.   Plaintiffs and the other Utah State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Utah State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

3099.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

3100.   Pursuant to Utah Code Ann. § 13-11-4, Plaintiffs and the Utah State Class seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for Plaintiffs and each Utah

State Class member, reasonable attorneys' fees, and any other just and proper relief available under the Utah CSPA.

**UTAH COUNT II**
**Fraud**
**(Based on Utah Law)**
**(On Behalf of the Utah State Class)**

3101.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3102.   This claim is brought on behalf of the Utah State Class against FCA.

3103.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Utah State Class members information that is highly relevant to their purchasing decision.

3104.   FCA further affirmatively misrepresented to Plaintiffs and Utah State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

3105.   FCA knew these representations were false when made.

3106.   The Defective Vehicles purchased or leased by Plaintiffs and the other Utah State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Utah State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

1336321.4

3107.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Utah State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

3108.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

3109.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Utah State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Utah State Class members.

3110.  Plaintiffs and Utah State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Utah State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Utah State Class members by concealing the true facts about the Defective Vehicles' emissions.

1336321.4

3111.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Utah State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

3112.  FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Utah State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

3113.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Utah State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions

regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Utah State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Utah State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and Utah State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

3114. FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Utah State Class members.

3115. FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Utah State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

3116. Plaintiffs and Utah State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Utah State Class members' actions were justified. FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Utah State Class members, did not generally know such facts.

1336321.4

3117.   Because of the concealment and/or suppression of the facts, Plaintiffs and Utah State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Utah State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Utah State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

3118.   The value of Plaintiffs' and Utah State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Utah State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

3119.   Accordingly, FCA is liable to Plaintiffs and Utah State Class members for damages in an amount to be proven at trial.

3120.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Utah State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

CLASS ACACION COMPLAINT

1336321.4

**UTAH COUNT III**
**Breach of Express Warranty,**
**Utah Code §§ 70A-2-313 and 70-2A-210**
**(On Behalf of the Utah State Class)**

3121.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3122.   This Count is brought on behalf of the Utah State Class against FCA.

3123.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles under § 70A-2-103(1)(d).

3124.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Utah Code § 70A-2a-103(1)(p).

3125.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

3126.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

3127.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:   a "Performance Warranty" and a "Design and Defect Warranty."

3128.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission

573

1336321.4

control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

3129.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

3130.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

3131.  FCA's warranties formed a basis of the bargain that was reached when Utah State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3132.  Despite the existence of warranties, FCA failed to inform Utah State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

3133.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

3134.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1336321.4

3135. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Utah State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3136. Accordingly, recovery by the Utah State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

3137. Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles. Utah State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

3138. Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Utah State Class members' remedies would be insufficient to make them whole.

3139. Finally, because of FCA's breach of warranty as set forth herein, Utah State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3140. FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

3141. As a direct and proximate result of FCA's breach of express warranties, Utah State Class members have been damaged in an amount to be determined at trial.

1336321.4

**UTAH COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Utah Code §§ 70A-2-314 and 70-2A-212**
**(On Behalf of the Utah State Class)**

3142.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3143.    This Count is brought on behalf of the Utah State Class, against FCA.

3144.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles under § 70A-2-103(1)(d).

3145.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Utah Code § 70A-2a-103(1)(p).

3146.    The Defective Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

3147.    A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Utah Code §§ 70A-2-314 and 70A-2a-212.

3148.    These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3149.    FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

3150.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Utah State Class members have been damaged in an amount to be proven at trial.

1336321.4

# XLV.  VERMONT COUNTS

## VERMONT COUNT I
### Violations of the Vermont Consumer Fraud Act,
### Vt. Stat. Ann. Tit. 9, § 2451 *et seq*.
### (On Behalf of the Vermont State Class)

3151.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

3152.  This claim is brought on behalf of the Vermont State Class against FCA.

3153.  FCA is a seller within the meaning of Vt. Stat. Ann. tit. 9, § 2451(a)(c).

3154.  The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce."  Vt. Stat. Ann. tit. 9, § 2453(a).

3155.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1336321.4

3156.   In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Vermont State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

3157.   Plaintiffs and Vermont State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Vermont State Class members did not, and could not, unravel FCA's deception on their own.

3158.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

3159.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

3160.   FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Vermont State Class.

3161.   FCA knew or should have known that its conduct violated the Vermont CFA.

3162.   FCA owed Plaintiffs and the Vermont State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

3163.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

3164.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

3165.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Vermont State Class that contradicted these representations.

3166.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were

1336321.4

defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Vermont State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

3167.  FCA's conduct proximately caused injuries to Plaintiffs and the other Vermont State Class members.

3168.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true cleanliness and efficiency of the EcoDiesel engine, the quality of FCA's brands, the devaluing of environmental cleanliness and integrity at FCA's company, and the true value of the Defective Vehicles.

3169.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Vermont Subclass. FCA's fraudulent use of the "defeat device" and concealment of the true characteristics of the Clean Diesel engine system were material to Plaintiffs and the Vermont Subclass. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its vehicles pollute rather than make environmentally friendly vehicles.

3170.  Plaintiffs and the Vermont Subclass suffered ascertainable loss caused by FCA's misrepresentations and concealment of and failure to disclose material information. Plaintiffs who purchased the Defective Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all.

3171.  FCA had an ongoing duty to all its customers to refrain from unfair and deceptive acts or practices under the Vermont CFA.  All owners of Defective Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices that occurred In the course of FCA's business.

1336321.4

3172.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

3173.  As a direct and proximate result of FCA's violations of the Vermont CFA, Plaintiffs and the Vermont State Class have suffered injury in fact and/or actual damage.

3174.  Plaintiffs and Vermont State Class members are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]" pursuant to Vt. Stat. Ann. tit. 9, § 2461(b).

**VERMONT COUNT II**
**Fraud**
**(Based on Vermont Law)**
**(On Behalf of the Vermont State Class)**

3175.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3176.  This claim is brought on behalf of the Vermont State Class against FCA.

3177.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Vermont State Class members information that is highly relevant to their purchasing decision.

3178.  FCA further affirmatively misrepresented to Plaintiffs and Vermont State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

3179.  FCA knew these representations were false when made.

3180.  The Defective Vehicles purchased or leased by Plaintiffs and the other Vermont State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Vermont State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

3181.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Vermont State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

3182.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

3183.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA;

1336321.4

Plaintiffs and the Vermont State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Vermont State Class members.

3184.   Plaintiffs and Vermont State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.   As consumers, Plaintiffs and Vermont State Class members did not, and could not, unravel FCA's deception on their own.   Rather, FCA intended to deceive Plaintiffs and Vermont State Class members by concealing the true facts about the Defective Vehicles' emissions.

3185.   FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Vermont State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

3186.   FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Vermont State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

3187.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

1336321.4

knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Vermont State Class members. FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Vermont State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth. These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Vermont State Class members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. FCA represented to Plaintiffs and Vermont State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

3188.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Vermont State Class members.

3189.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Vermont State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

1336321.4

CLASS ACATION COMPLAINT

3190.  Plaintiffs and Vermont State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Vermont State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Vermont State Class members, did not generally know such facts.

3191.  Because of the concealment and/or suppression of the facts, Plaintiffs and Vermont State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Vermont State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Vermont State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

3192.  The value of Plaintiffs' and Vermont State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Vermont State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

CLASS ACACTION COMPLAINT

1336321.4

3193. Accordingly, FCA is liable to Plaintiffs and Vermont State Class members for damages in an amount to be proven at trial.

3194. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Vermont State Class members' rights and the representations that FCA made to them, in order to enrich FCA. FCA' s conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**VERMONT COUNT III**
**Breach of Express Warranty,**
**Vt. Stat. Tit. 9, §§ 2-313 and 2A-210**
**(On Behalf of the Vermont State Class)**

3195. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3196. This Count is brought on behalf of the Vermont State Class against FCA.

3197. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Vt. Stat. Tit. 9A, § 2-104(1) and 2A-103(1)(t), and "sellers" of motor vehicles under § 2-103(1)(d).

3198. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Vt. Stat. Tit. 9A, § 2A-103(1)(p).

3199. The Defective Vehicles are and were at all relevant times "goods" within the meaning of Vt. Stat. Tit. 9A, §§ § 2-105(1) and 2A-103(1)(h).

3200. In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first. This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation" FCA also provided two express California Emissions Standard Warranties. One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1336321.4

3201.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

3202.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

3203.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

3204.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

3205.  FCA's warranties formed a basis of the bargain that was reached when Vermont State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3206.  Despite the existence of warranties, FCA failed to inform Vermont State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of

1336321.4

compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

3207.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

3208.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

3209.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Vermont State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3210.  Accordingly, recovery by the Vermont State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

3211.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Vermont State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

3212.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Vermont State Class members' remedies would be insufficient to make them whole.

1336321.4

3213.  Finally, because of FCA's breach of warranty as set forth herein, Vermont State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3214.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

3215.  As a direct and proximate result of FCA's breach of express warranties, Alabama State Class members have been damaged in an amount to be determined at trial.

**VERMONT COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Vt. Stat. Tit. 9, §§ 2-314 and 2A-212**
**(On Behalf of the Vermont State Class)**

3216.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3217.  This Count is brought on behalf of the Vermont State Class, against FCA.

3218.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Vt. Stat. Tit. 9A, § 2-104(1) and 2A-103(1)(t), and "sellers" of motor vehicles under § 2-103(1)(d).

3219.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Vt. Stat. Tit. 9A, § 2A-103(1)(p).

3220.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Vt. Stat. Tit. 9A, §§ § 2-105(1) and 2A-103(1)(h).

3221.  A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Vt. Stat. Tit. 9A, §§ 2-314 and 2A-212.

3222.  These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal

1336321.4

and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3223.  FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

3224.  As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Vermont State Class members have been damaged in an amount to be proven at trial.

## XLVI. VIRGINIA COUNTS

### VIRGINIA COUNT I
**Violations of the Virginia Consumer Protection Act,**
**Va. Code Ann. § 59.1-196 *et seq*.**
**(On Behalf of the Virginia State Class)**

3225.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3226.  This claim is brought on behalf of the Virginia State Class against FCA.

3227.  FCA is a "person" as defined by Va. Code Ann. § 59.1-198. The transactions between Plaintiffs and the other Virginia State Class members on the one hand and FCA on the other, leading to the purchase or lease of the Defective Vehicles by Plaintiffs and the other Virginia State Class members, are "consumer transactions" as defined by Va. Code Ann. § 59.1-198, because the Defective Vehicles were purchased or leased primarily for personal, family or household purposes.

3228.  The Virginia Consumer Protection Act ("Virginia CPA") prohibits "(5) misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; (6) misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; … (8) advertising goods or services with intent not to sell them as advertised; … [and] (14) using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction[.]" Va. Code Ann. § 59.1-200(A).

3229.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during

1336321.4

normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Virginia State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

3230. Plaintiffs and Subclass members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely misleading.  As alleged herein, FCA engaged in extremely sophisticated methods of deception.  Plaintiffs and Virginia State Class members did not, and could not, unravel FCA's deception on their own.

3231.  FCA's actions as set forth above occurred in the conduct of trade or commerce.

3232.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

3233.  FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Virginia State Class.

1336321.4

3234.   FCA knew or should have known that its conduct violated the Virginia CPA.

3235.   FCA owed Plaintiffs and the Virginia State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

3236.   Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

3237.   Intentionally concealed the foregoing from Plaintiffs and the Virginia State Class; and/or

3238.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Virginia State Class that contradicted these representations.

3239.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Virginia State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

3240.   FCA's conduct proximately caused injuries to Plaintiffs and the other Virginia State Class members.

3241.   Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Virginia State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

3242.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

591

1336321.4

3243.  Pursuant to Va. Code Ann. § 59.1-204, Plaintiffs and the Virginia State Class seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for Plaintiffs and each Virginia State Class member. Because FCA's conduct was committed willfully and knowingly, Plaintiffs is entitled to recover, for himself and each Subclass member, the greater of (a) three times actual damages or (b) $1,000.

3244.  Plaintiffs also seeks punitive damages, and attorneys' fees, and any other just and proper relief available under General Business Law § 59.1-204 *et seq.*

**VIRGINIA COUNT II**
**Fraud**
**(Based on Virginia Law)**
**(On Behalf of the Virginia State Class)**

3245.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3246.  This claim is brought on behalf of the Virginia State Class against FCA.

3247.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Virginia State Class members information that is highly relevant to their purchasing decision.

3248.  FCA further affirmatively misrepresented to Plaintiffs and Virginia State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

3249.  FCA knew these representations were false when made.

592

1336321.4

3250.   The Defective Vehicles purchased or leased by Plaintiffs and the other Virginia State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Virginia State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

3251.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Virginia State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

3252.   As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

3253.   The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA;

Plaintiffs and the Virginia State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Virginia State Class members.

3254.  Plaintiffs and Virginia State Class members reasonably relied upon FCA's deception. They had no way of knowing that FCA's representations were false and/or misleading.  As consumers, Plaintiffs and Virginia State Class members did not, and could not, unravel FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Virginia State Class members by concealing the true facts about the Defective Vehicles' emissions.

3255.  FCA also concealed and suppressed material facts concerning what is evidently the true culture of FCA—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Virginia State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

3256.  FCA's false representations were material to consumers because they concerned the quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Virginia State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

3257.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Virginia State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Virginia State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Virginia State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Virginia State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

3258.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Virginia State Class members.

3259.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Virginia State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

3260.  Plaintiffs and Virginia State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Virginia State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Virginia State Class members, did not generally know such facts.

3261.  Because of the concealment and/or suppression of the facts, Plaintiffs and Virginia State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Virginia State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Virginia State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

3262.  The value of Plaintiffs' and Virginia State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Virginia State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

3263. Accordingly, FCA is liable to Plaintiffs and Virginia State Class members for damages in an amount to be proven at trial.

3264. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Virginia State Class members' rights and the representations that FCA made to them, in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### VIRGINIA COUNT III
### Breach of Express Warranty,
### Va. Code §§ 8.2-313 and 8.2A-210
### (On Behalf of the Virginia State Class)

3265. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3266. This Count is brought on behalf of the Virginia State Class against FCA.

3267. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-103(1)(d).

3268. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Va. Code § 8.2A-103(1)(p).

3269. The Defective Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

3270. In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first. This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation" FCA also provided two express California Emissions Standard Warranties. One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

1336321.4

3271.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

3272.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

3273.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

3274.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

3275.  FCA's warranties formed a basis of the bargain that was reached when Virginia State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3276.  Despite the existence of warranties, FCA failed to inform Virginia State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of

1336321.4

compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

3277.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

3278.   Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

3279.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Virginia State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3280.   Accordingly, recovery by the Virginia State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

3281.   Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Virginia State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

3282.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Virginia State Class members' remedies would be insufficient to make them whole.

1336321.4

3283.  Finally, because of FCA's breach of warranty as set forth herein, Virginia State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3284.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

3285.  As a direct and proximate result of FCA's breach of express warranties, Virginia State Class members have been damaged in an amount to be determined at trial.

### VIRGINIA COUNT IV
### Breach of Implied Warranty of Merchantability,
### Va. Code §§ 8.2-314 and 8.2A-212
### (On Behalf of the Virginia State Class)

3286.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3287.  This Count is brought on behalf of the Virginia State Class, against FCA.

3288.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-103(1)(d).

3289.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Va. Code § 8.2A-103(1)(p).

3290.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

3291.  A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Va. Code §§ 8.2-314 and 8.2A-212.

3292.  These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal

and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3293.  FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

3294.  As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Virginia State Class members have been damaged in an amount to be proven at trial.

## XLVII.    WASHINGTON STATE COUNTS

### WASHINGTON STATE COUNT I
**Violations of the Washington Consumer Protection Act,**
**Wash. Rev. Code Ann. § 19.86.010 *et seq*.**
**(On Behalf of the Washington State Class)**

3295.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

3296.  Plaintiffs bring this Count on behalf of the Washington State Class against FCA.

3297.  FCA, Plaintiffs, and each member of the Washington State Class is a "person" under Wash. Rev. Code Ann. § 19.86.010(1) ("Washington CPA").

3298.  FCA engaged in "trade" or "commerce" under Wash. Rev. Code Ann. § 19.86.010(2).

3299.  The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code. Wash. Ann. § 19.96.010.

3300.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, FCA

601

1336321.4

engaged in unfair and deceptive business practices prohibited by the Washington CPA. FCA's conduct was unfair because it (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. FCA's conduct is deceptive because it has the capacity or tendency to deceive.

3301.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

3302.  In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Washington State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

3303.  Plaintiffs and Washington State Class members reasonably relied upon FCA's false misrepresentations.  They had no way of knowing that FCA's representations were false and gravely

1336321.4

misleading.    As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Washington State Class members did not, and could not, unravel FCA's deception on their own.

3304.    FCA's actions as set forth above occurred in the conduct of trade or commerce.

3305.    FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

3306.    FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Washington State Class.

3307.    1FCA knew or should have known that its conduct violated the Washington CPA.

3308.    FCA owed Plaintiffs and the Subclass a duty to disclose the truth about its emissions systems manipulation because FCA:

3309.    Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

3310.    Intentionally concealed the foregoing from Plaintiffs and the Washington State Class; and/or

3311.    Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Washington State Class that contradicted these representations.

3312.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Washington State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1336321.4

3313.  FCA's conduct proximately caused injuries to Plaintiffs and the other Washington State Class members.

3314.  Plaintiffs and the other Washington State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Washington State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

3315.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

3316.  FCA is liable to Plaintiffs and the Subclass for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code. Ann. § 19.86.090.

### WASHINGTON STATE COUNT II
#### Fraud
#### (Based on Washington Law)
#### (On Behalf of the Washington State Class)

3317.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3318.  This claim is brought on behalf of the Washington State Class against FCA.

3319.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Washington State Class members information that is highly relevant to their purchasing decision.

1336321.4

3320.  FCA further affirmatively misrepresented to Plaintiffs and Washington State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

3321.  FCA knew these representations were false when made.

3322.  The Defective Vehicles purchased or leased by Plaintiffs and the other Washington State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Washington State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

3323.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Washington State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

3324.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels

1    of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures

2    about the emission system deceptive.

3        3325.  The truth about the defective emissions controls and FCA's manipulations of those

4    controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the

5    "defeat device," and non-compliance with EPA emissions requirements was known only to FCA;

6    Plaintiffs and the Washington State Class members did not know of these facts and FCA actively

7    concealed these facts from Plaintiffs and Washington State Class members.

8        3326.  Plaintiffs and Washington State Class members reasonably relied upon FCA's

9    deception.  They had no way of knowing that FCA's representations were false and/or misleading.

10   As consumers, Plaintiffs and Washington State Class members did not, and could not, unravel

11   FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and Washington State

12   Class members by concealing the true facts about the Defective Vehicles' emissions.

13       3327.  FCA also concealed and suppressed material facts concerning what is evidently the

14   true culture of FCA—one characterized by an emphasis on profits and sales above compliance with

15   federal and state clean air laws and emissions regulations that are meant to protect the public and

16   consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Washington

17   State Class members placed in its representations.  Consumers buy diesel cars from FCA because

18   they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the

19   environment.  And yet, that is precisely what the Defective Vehicles are doing.

20       3328.  FCA's false representations were material to consumers because they concerned the

21   quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with

22   applicable federal and state laws and regulations regarding clean air and emissions, and also because

23   the representations played a significant role in the value of the vehicles.  As FCA well knew, its

24   customers, including Plaintiffs and Washington State Class members, highly valued that the vehicles

25   they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and

26   they paid accordingly.

27

28

1336321.4

CLASS ACATION COMPLAINT

3329.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because details of the true facts were known and/or accessible only to FCA, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Washington State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Washington State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Washington State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Washington State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

3330.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions,

1336321.4

1    which perception would hurt the brand's image and cost FCA money, and it did so at the expense of

2    Plaintiffs and Washington State Class members.

3        3331.  FCA still has not made full and adequate disclosures, and continues to defraud

4    Plaintiffs and Washington State Class members by concealing material information regarding the

5    emissions qualities of the Defective Vehicles.

6        3332.  Plaintiffs and Washington State Class members were unaware of the omitted material

7    facts referenced herein, and they would not have acted as they did if they had known of the

8    concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-

9    emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily

10   polluting vehicles, or would have taken other affirmative steps in light of the information concealed

11   from them.  Plaintiffs'   and Washington State Class members' actions were justified.  FCA was in

12   exclusive control of the material facts, and the public, Plaintiffs, or Washington State Class

13   members, did not generally know such facts.

14       3333.  Because of the concealment and/or suppression of the facts, Plaintiffs and

15   Washington State Class members have sustained damage because they own vehicles that are

16   diminished in value as a result of FCA's concealment of the true quality and quantity of those

17   vehicles' emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective

18   design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and

19   the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Washington State

20   Class members been aware of the true emissions facts with regard to the Defective Vehicles, and

21   FCA's disregard for the truth and compliance with applicable federal and state laws and regulations,

22   and its failure to meet and maintain the advertised MPG rate, Plaintiffs and Washington State Class

23   members who purchased or leased new or certified pre-owned vehicles would have paid less for

24   their vehicles or would not have purchased or leased them at all.

25       3334.  The value of Plaintiffs' and Washington State Class members' vehicles has

26   diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the

27   Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-

28

1336321.4

compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Washington State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

3335.  Accordingly, FCA is liable to Plaintiffs and Washington State Class members for damages in an amount to be proven at trial.

3336.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Washington State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## WASHINGTON STATE COUNT III
### Breach of Express Warranty,
### Wash Rev. Code §§ 62A.2-313 and 62A.2A-210
### (On Behalf of the Washington State Class)

3337.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3338.  This Count is brought on behalf of the Washington State Class against FCA.

3339.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

3340.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

3341.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

3342.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your

1336321.4

vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

3343.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

3344.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

3345.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

3346.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

1336321.4

3347.  FCA's warranties formed a basis of the bargain that was reached when Washington State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3348.  Despite the existence of warranties, FCA failed to inform Washington State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

3349.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

3350.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

3351.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Washington State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3352.  Accordingly, recovery by the Washington State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

3353.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Washington State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

3354.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and

1336321.4

consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Washington State Class members' remedies would be insufficient to make them whole.

3355.   Finally, because of FCA's breach of warranty as set forth herein, Washington State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3356.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

3357.   As a direct and proximate result of FCA's breach of express warranties, Washington State Class members have been damaged in an amount to be determined at trial.

**WASHINGTON STATE COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Wash Rev. Code §§ 62A.2-314 and 62A.2A-212**
**(On Behalf of the Washington State Class)**

3358.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3359.   This Count is brought on behalf of the Washington State Class, against FCA.

3360.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

3361.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

3362.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

1336321.4

3363.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

3364.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3365.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

3366.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Washington State Class members have been damaged in an amount to be proven at trial.

## XLVIII.   WEST VIRGINIA COUNTS

### WEST VIRGINIA COUNT I
**Violations of the West Virginia Consumer Credit and Protection Act,**
**W. Va. Code § 46A-1-101 *et seq*.**
**(On Behalf of the West Virginia State Class)**

3367.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3368.   Plaintiffs bring this Count on behalf of the West Virginia State Class against FCA.

3369.   Plaintiffs intend to assert a claim under the West Virginia Consumer Credit and Protection Act ("West Virginia CCPA"), which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce ...."  W. VA. CODE § 46A-6-104.  Plaintiffs will make a demand in satisfaction of W. VA. CODE § 46A-6-106(b), and may amend this Complaint to assert claims under the CCPA once the required 20 days have elapsed.  This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the CCPA.

1336321.4

**WEST VIRGINIA COUNT II**
**Fraud**
**(Based on West Virginia Law)**
**(On Behalf of the West Virginia State Class)**

3370.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3371.   This claim is brought on behalf of the West Virginia State Class against FCA.

3372.   FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other West Virginia State Class members information that is highly relevant to their purchasing decision.

3373.   FCA further affirmatively misrepresented to Plaintiffs and West Virginia State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

3374.   FCA knew these representations were false when made.

3375.   The Defective Vehicles purchased or leased by Plaintiffs and the other West Virginia State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other West Virginia State Class members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

3376.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were

1336321.4

1    defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

2    pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

3    those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

4    Plaintiffs and the other West Virginia State Class members relied on FCA's material representations

5    that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free

6    from defects.

7        3377.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective

8    Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its

9    EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx

10   reduction system in the Defective Vehicles turns off or is limited during normal driving conditions,

11   and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted

12   higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels

13   of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures

14   about the emission system deceptive.

15       3378.  The truth about the defective emissions controls and FCA's manipulations of those

16   controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the

17   "defeat device," and non-compliance with EPA emissions requirements was known only to FCA;

18   Plaintiffs and the West Virginia State Class members did not know of these facts and FCA actively

19   concealed these facts from Plaintiffs and West Virginia State Class members.

20       3379.  Plaintiffs and West Virginia State Class members reasonably relied upon FCA's

21   deception.  They had no way of knowing that FCA's representations were false and/or misleading.

22   As consumers, Plaintiffs and West Virginia State Class members did not, and could not, unravel

23   FCA's deception on their own.  Rather, FCA intended to deceive Plaintiffs and West Virginia State

24   Class members by concealing the true facts about the Defective Vehicles' emissions.

25       3380.  FCA also concealed and suppressed material facts concerning what is evidently the

26   true culture of FCA—one characterized by an emphasis on profits and sales above compliance with

27   federal and state clean air laws and emissions regulations that are meant to protect the public and

28

CLASS ACATION COMPLAINT

1336321.4

1    consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and West Virginia

2    State Class members placed in its representations.  Consumers buy diesel cars from FCA because

3    they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the

4    environment.  And yet, that is precisely what the Defective Vehicles are doing.

5        3381.  FCA's false representations were material to consumers because they concerned the

6    quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with

7    applicable federal and state laws and regulations regarding clean air and emissions, and also because

8    the representations played a significant role in the value of the vehicles.  As FCA well knew, its

9    customers, including Plaintiffs and West Virginia State Class members, highly valued that the

10   vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced

11   emissions, and they paid accordingly.

12       3382.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

13   turns off or is limited during normal driving conditions and that the Defective Vehicles were

14   defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

15   pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

16   those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

17   details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

18   knowledge as to such facts, and because FCA knew these facts were not known to or reasonably

19   discoverable by Plaintiffs or West Virginia State Class members.  FCA also had a duty to disclose

20   because it made general affirmative representations about the qualities of the vehicles with respect to

21   emissions, starting with references to them as reduced-emissions diesel cars and as compliant with

22   all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of

23   the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual

24   philosophy with respect to compliance with federal and state clean air laws and emissions

25   regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to

26   provide information to Plaintiffs and West Virginia State Class members, FCA had the duty to

27   disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were

28

1336321.4

material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and West Virginia State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and West Virginia State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

3383.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and West Virginia State Class members.

3384.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and West Virginia State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

3385.  Plaintiffs and West Virginia State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'   and West Virginia State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or West Virginia State Class members, did not generally know such facts.

3386.  Because of the concealment and/or suppression of the facts, Plaintiffs and West Virginia State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles'

1336321.4

emissions and fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies. Had Plaintiffs and West Virginia State Class members been aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, and its failure to meet and maintain the advertised MPG rate, Plaintiffs and West Virginia State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

3387. The value of Plaintiffs' and West Virginia State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and West Virginia State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

3388. Accordingly, FCA is liable to Plaintiffs and West Virginia State Class members for damages in an amount to be proven at trial.

3389. FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and West Virginia State Class members' rights and the representations that FCA made to them, in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**WEST VIRGINIA COUNT III**
**Breach of Express Warranty,**
**W. Va. Code §§ 46-2-313 and 46-2A-210**
**(On Behalf of the West Virginia State Class)**

3390. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3391.   This Count is brought on behalf of the West Virginia State Class against FCA.

3392.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under W. Va. Code § 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

3393.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

3394.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

3395.   In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

3396.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:   a "Performance Warranty" and a "Design and Defect Warranty."

3397.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1336321.4

3398.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

3399.   As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

3400.   FCA's warranties formed a basis of the bargain that was reached when West Virginia State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3401.   Despite the existence of warranties, FCA failed to inform West Virginia State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

3402.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

3403.   Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

3404.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make West Virginia State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1336321.4

3405.  Accordingly, recovery by the West Virginia State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

3406.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  West Virginia State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

3407.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the West Virginia State Class members' remedies would be insufficient to make them whole.

3408.  Finally, because of FCA's breach of warranty as set forth herein, West Virginia State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3409.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

3410.  As a direct and proximate result of FCA's breach of express warranties, West Virginia State Class members have been damaged in an amount to be determined at trial.

**WEST VIRGINIA COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**W. Va. Code §§ 46-2-314 and 46-2A-212**
**(On Behalf of the West Virginia State Class)**

3411.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1336321.4

3412. This Count is brought on behalf of the West Virginia State Class, against FCA.

3413. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under W. Va. Code § 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

3414. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

3415. The Defective Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

3416. A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to W. Va. Code §§ 46-2-314 and 46-2A-212.

3417. These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3418. FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

3419. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, West Virginia State Class members have been damaged in an amount to be proven at trial.

1336321.4

## XLIX. <u>WISCONSIN COUNTS</u>

**WISCONSIN COUNT I**
**Violations of the Wisconsin Deceptive Trade Practices Act,**
**Wis. Stat. § 110.18 *et seq*.**
**(On Behalf of the Wisconsin State Class)**

3420.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

3421.   Plaintiffs bring this claim on behalf of the Wisconsin State Class against FCA.

3422.   FCA is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

3423.   Plaintiffs and Wisconsin State Class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1).   Plaintiffs and Wisconsin State Class members purchased or leased one or more Defective Vehicles.

3424.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading."   Wis. Stat. § 100.18(1).   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.   Accordingly, FCA engaged in deceptive business practices prohibited by the Wisconsin DTPA.

3425.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.   Accordingly, FCA

1336321.4

engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner. In purchasing or leasing the Defective Vehicles, Plaintiffs and the other Wisconsin State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Plaintiffs and Wisconsin State Class members reasonably relied upon FCA's false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and Wisconsin State Class members did not, and could not, unravel FCA's deception on their own.

3426. FCA's actions as set forth above occurred in the conduct of trade or commerce.

3427. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

3428. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiffs and the Wisconsin State Class.

3429. FCA knew or should have known that its conduct violated the Wisconsin DTPA.

3430. FCA owed Plaintiffs and the Wisconsin State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

3431. Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

3432.    Intentionally concealed the foregoing from Plaintiffs and the Wisconsin State Class; and/or

3433.    Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Wisconsin State Class that contradicted these representations.

3434.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Wisconsin State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

3435.    FCA's conduct proximately caused injuries to Plaintiffs and the other Wisconsin State Class members.

3436.    Plaintiffs and the other Wisconsin State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other Wisconsin State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

3437.    FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA' s unlawful acts and practices complained of herein affect the public interest.

3438.    Plaintiffs and Wisconsin State Class members are entitled to damages and other relief provided for under Wis. Stat. § 100.18(11)(b)(2).    Because FCA's conduct was committed knowingly and/or intentionally, Plaintiffs` and Wisconsin State Class members are entitled to treble damages.

3439.  Plaintiffs and Wisconsin State Class members also seek court costs and attorneys' fees under Wis. Stat. § 110.18(11)(b)(2).

### WISCONSIN COUNT II
### Fraud
### (Based on Wisconsin Law)
### (On Behalf of the Wisconsin State Class)

3440.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3441.  This claim is brought on behalf of the Wisconsin State Class against FCA.

3442.  FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Wisconsin State Class members information that is highly relevant to their purchasing decision.

3443.  FCA further affirmatively misrepresented to Plaintiffs and Wisconsin State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

3444.  FCA knew these representations were false when made.

3445.  The Defective Vehicles purchased or leased by Plaintiffs and the other Wisconsin State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, costly in that Plaintiffs and other Wisconsin State Class members had to pay more for fuel than they reasonably expected, and unreliable because the

CLASS ACACTION COMPLAINT

1336321.4

NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

3446.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Wisconsin State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

3447.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

3448.  The truth about the defective emissions controls and FCA's manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to FCA; Plaintiffs and the Wisconsin State Class members did not know of these facts and FCA actively concealed these facts from Plaintiffs and Wisconsin State Class members.

3449.  Plaintiffs and Wisconsin State Class members reasonably relied upon FCA's deception.  They had no way of knowing that FCA's representations were false and/or misleading. As consumers, Plaintiffs and Wisconsin State Class members did not, and could not, unravel FCA's

1336321.4

1   deception on their own.  Rather, FCA intended to deceive Plaintiffs and Wisconsin State Class

2   members by concealing the true facts about the Defective Vehicles' emissions.

3       3450.  FCA also concealed and suppressed material facts concerning what is evidently the

4   true culture of FCA—one characterized by an emphasis on profits and sales above compliance with

5   federal and state clean air laws and emissions regulations that are meant to protect the public and

6   consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Wisconsin

7   State Class members placed in its representations.  Consumers buy diesel cars from FCA because

8   they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the

9   environment.  And yet, that is precisely what the Defective Vehicles are doing.

10      3451.  FCA's false representations were material to consumers because they concerned the

11  quality and cost-effectiveness of the Defective Vehicles, because they concerned compliance with

12  applicable federal and state laws and regulations regarding clean air and emissions, and also because

13  the representations played a significant role in the value of the vehicles.  As FCA well knew, its

14  customers, including Plaintiffs and Wisconsin State Class members, highly valued that the vehicles

15  they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and

16  they paid accordingly.

17      3452.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles

18  turns off or is limited during normal driving conditions and that the Defective Vehicles were

19  defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

20  pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

21  those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

22  details of the true facts were known and/or accessible only to FCA, because FCA had exclusive

23  knowledge as to such facts, and because FCA knew these facts were not known to or reasonably

24  discoverable by Plaintiffs or Wisconsin State Class members.  FCA also had a duty to disclose

25  because it made general affirmative representations about the qualities of the vehicles with respect to

26  emissions, starting with references to them as reduced-emissions diesel cars and as compliant with

27  all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of

28

CLASS ACACTION COMPLAINT

the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Wisconsin State Class members, FCA had the duty to disclose not just the partial truth, but also the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Wisconsin State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Wisconsin State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

3453.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Wisconsin State Class members.

3454.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Wisconsin State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

3455.  Plaintiffs and Wisconsin State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'    and Wisconsin State Class members' actions were justified.  FCA was in

1    exclusive control of the material facts, and the public, Plaintiffs, or Wisconsin State Class members,

2    did not generally know such facts.

3        3456.   Because of the concealment and/or suppression of the facts, Plaintiffs and Wisconsin

4    State Class members have sustained damage because they own vehicles that are diminished in value

5    as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and

6    fuel efficiency and FCA's failure to timely disclose the defect or defective design of the EcoDiesel

7    engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues

8    engendered by FCA's corporate policies.  Had Plaintiffs and Wisconsin State Class members been

9    aware of the true emissions facts with regard to the Defective Vehicles, and FCA's disregard for the

10   truth and compliance with applicable federal and state laws and regulations, and its failure to meet

11   and maintain the advertised MPG rate, Plaintiffs and Wisconsin State Class members who purchased

12   or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not

13   have purchased or leased them at all.

14       3457.   The value of Plaintiffs' and Wisconsin State Class members' vehicles has diminished

15   as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective

16   Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with

17   EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is

18   attached to Plaintiffs' and Wisconsin State Class members' vehicles, and made any reasonable

19   consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would

20   have been fair market value for the vehicles.

21       3458.   Accordingly, FCA is liable to Plaintiffs and Wisconsin State Class members for

22   damages in an amount to be proven at trial.

23       3459.   FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent

24   to defraud, and in reckless disregard of Plaintiffs' and Wisconsin State Class members' rights and

25   the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an

26   assessment of punitive damages in an amount sufficient to deter such conduct in the future, which

27   amount is to be determined according to proof.

28

CLASS ACACTION COMPLAINT

1336321.4

**WISCONSIN COUNT III**
**Breach of Express Warranty,**
**Wis. Stat. §§ 402.313 and 411.210**
**(On Behalf of the Wisconsin State Class)**

3460.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3461.  This Count is brought on behalf of the Wisconsin State Class against FCA.

3462.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

3463.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

3464.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

3465.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

3466.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

3467.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission

631

1336321.4

1   control components are covered for the first eight years or 80,000 miles, whichever comes first.

2   These major emission control components subject to the longer warranty include the catalytic

3   converters, the electronic emission control unit, and the onboard emission diagnostic device or

4   computer.

5       3468.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with

6   respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their

7   vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect

8   Warranty required by the EPA covers repair of emission control or emission related parts which fail

9   to function or function improperly because of a defect in materials or workmanship.  This warranty

10  provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission

11  control components, for eight years or 80,000 miles, whichever comes first.

12      3469.   As manufacturers of light-duty vehicles, FCA were required to provide these

13  warranties to purchasers or lessees of Defective Vehicles.

14      3470.   FCA's warranties formed a basis of the bargain that was reached when Wisconsin

15  State Class members purchased or leased their Defective Vehicles equipped with the non-compliant

16  "clean" diesel engine and emission systems.

17      3471.   Despite the existence of warranties, FCA failed to inform Wisconsin State Class

18  members that the Defective Vehicles were intentionally designed and manufactured to be out of

19  compliance with applicable state and federal emissions laws, and failed to fix the defective emission

20  components free of charge.

21      3472.   FCA breached the express warranty promising to repair and correct a manufacturing

22  defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted,

23  and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship

24  defects.

25      3473.   Affording FCA a reasonable opportunity to cure their breach of written warranties

26  would be unnecessary and futile here.

27

28

CLASS ACACTION COMPLAINT

1336321.4

3474.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Wisconsin State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3475.   Accordingly, recovery by the Wisconsin State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

3476.   Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.   Wisconsin State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

3477.   Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Wisconsin State Class members' remedies would be insufficient to make them whole.

3478.   Finally, because of FCA's breach of warranty as set forth herein, Wisconsin State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3479.   FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

3480.   As a direct and proximate result of FCA's breach of express warranties, Wisconsin State Class members have been damaged in an amount to be determined at trial.

1336321.4

**WISCONSIN COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Wis. Stat. §§ 402.314 and 411.212**
**(On Behalf of the Wisconsin State Class)**

3481.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3482.   This Count is brought on behalf of the Wisconsin State Class, against FCA.

3483.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

3484.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

3485.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

3486.   A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wis. Stat. §§ 402.314 and 411.212.

3487.   These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3488.   FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

3489.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Wisconsin State Class members have been damaged in an amount to be proven at trial.

1336321.4

## L.    WYOMING COUNTS

### WYOMING COUNT I
**Violations of the Wyoming Consumer Protection Act,**
**Wyo. Stat. §§ 40-12-101, *et seq*.**
**(On Behalf of the Wyoming State Class)**

3490.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

3491.  This claim is brought on behalf of the Wyoming State Class against FCA.

3492.  The Wyoming Class and FCA are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i).

3493.  The Defective Vehicles are "merchandise" pursuant to Wyo. Stat. § 40-12-102(a)(vi).

3494.  Each sale or lease of an Class Vehicle to a Wyoming Class member was a "consumer transaction" as defined by Wyo. Stat. § 40-12-102(a)(ii).  These consumer transactions occurred "in the course of [FCA's] business" under Wyo. Stat. § 40-12-105(a).  Wyoming Class members purchased or leased one or more Class Vehicles.

3495.  The Wyoming Consumer Protection Act ("Wyoming CPA") prohibits lists unlawful deceptive trade practices, including when a seller:  "(i) Represents that merchandise has a source, origin, sponsorship, approval, accessories, or uses it does not have;" "(iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not;" "(x) Advertises merchandise with intent not to sell it as advertised;" "(xv) Engages in unfair or deceptive acts or practices."  Wyo. Stat. §§ 40-12-105(a).

3496.  In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Defective Vehicles emit far more pollution than a reasonable consumer would expect in light of FCA's advertising campaign, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.  Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive

635

1336321.4

acts or practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner. In purchasing or leasing the Defective Vehicles, Wyoming State Class members were deceived by FCA's failure to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Defective Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Wyoming State Class members reasonably relied upon FCA's false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. As alleged herein, FCA engaged in extremely sophisticated methods of deception. Wyoming State Class members did not, and could not, unravel FCA's deception on their own.

3497. FCA's actions as set forth above occurred in the conduct of trade or commerce.

3498. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

3499. FCA intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead the Wyoming State Class.

3500. FCA knew or should have known that its conduct violated the Wyoming CPA.

3501. FCA owed the Wyoming State Class a duty to disclose the truth about its emissions systems manipulation because FCA:

3502. Possessed exclusive knowledge that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions;

3503. Intentionally concealed the foregoing from the Wyoming State Class; and/or

1336321.4

3504.   Made incomplete representations that it manipulated the emissions system in the Defective Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Wyoming State Class that contradicted these representations.

3505.   FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Wyoming State Class members relied on FCA's material representations that the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

3506.   FCA's conduct proximately caused injuries to Wyoming State Class members.

3507.   Wyoming State Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Wyoming members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.   These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

3508.   Pursuant to Wyo. Stat. § 40-12-108(a), the Wyoming Class seek damages as determined at trial, and any other just and proper relief available under the Wyoming CPA, including but not limited to court costs and reasonable attorneys' fees as provided in Wyo. Stat. § 40-12-108(b).

3509.   Plaintiffs will send a letter complying with Wyo. Stat. § 40-12-109 and will amend the Complaint thereafter.  If FCA fails to offer to cure or to complete a remedy of its deceptive trade acts and practices within the required time period, see Wyo. Stat. § 40-12-102(a)(ix), Plaintiffs will seek all damages and relief available under the Wyoming CPA.  This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Wyoming CPA.

1336321.4

**WYOMING COUNT II**
**Fraud**
**(Based on Wyoming Law)**
**(On Behalf of the Wyoming State Class)**

3510.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3511.    This claim is brought on behalf of Plaintiffs and the Wyoming State Class against FCA.

3512.    FCA intentionally concealed that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions, that the Defective Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of FCA's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were noncompliant with EPA emission requirements, or FCA acted with reckless disregard for the truth and denied Plaintiffs and the other Wyoming State Class members information that is highly relevant to their purchasing decision.

3513.    FCA further affirmatively misrepresented to Plaintiffs and Wyoming State Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Defective Vehicles it was selling had no significant defects, were low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

3514.    FCA knew these representations were false when made.

3515.    The Defective Vehicles purchased or leased by Plaintiffs and the other Wyoming State Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of FCA's advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions.

3516.    FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted

1336321.4

1   pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded

2   those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because

3   Plaintiffs and the other Wyoming State Class members relied on FCA's material representations that

4   the Defective Vehicles they were purchasing were reduced-emission vehicles, efficient, and free

5   from defects.

6       3517.  As alleged in this Complaint, at all relevant times, FCA has held out the Defective

7   Vehicles to be reduced-emissions, EPA-compliant vehicles.  FCA disclosed certain details about its

8   EcoDiesel, but nonetheless, FCA intentionally failed to disclose the important facts that the NOx

9   reduction system in the Defective Vehicles turns off or is limited during normal driving conditions,

10  and that the Defective Vehicles had defective emissions controls, deploy a "defeat device," emitted

11  higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels

12  of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures

13  about the emission system deceptive.

14      3518.  The truth about the defective emissions controls and FCA's manipulations of those

15  controls, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions

16  requirements was known only to FCA; Plaintiffs and the Wyoming State Class members did not

17  know of these facts and FCA actively concealed these facts from Plaintiffs and Wyoming State Class

18  members.

19      3519.  Plaintiffs and Wyoming State Class members reasonably relied upon FCA's

20  deception.  They had no way of knowing that FCA's representations were false and/or misleading.

21  As consumers, Plaintiffs and Wyoming State Class members did not, and could not, unravel FCA's

22  deception on their own.  Rather, FCA intended to deceive Plaintiffs and Wyoming State Class

23  members by concealing the true facts about the Defective Vehicles' emissions.

24      3520.  FCA also concealed and suppressed material facts concerning what is evidently the

25  true culture of FCA—a culture characterized by an emphasis on profits and sales above compliance

26  with federal and state clean air laws and emissions regulations that are meant to protect the public

27  and consumers.  FCA also emphasized profits and sales above the trust that Plaintiffs and Wyoming

28

639

State Class members placed in its representations.  Consumers buy diesel cars from FCA because they feel they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Defective Vehicles are doing.

3521.  FCA's false representations were material to consumers because they concerned the quality of the Defective Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.  As FCA well knew, its customers, including Plaintiffs and Wyoming State Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

3522.  FCA had a duty to disclose that the NOx reduction system in the Defective Vehicles turns off or is limited during normal driving conditions and that the Defective Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because FCA had exclusive knowledge as to such facts, and because FCA knew these facts were not known to or reasonably discoverable by Plaintiffs or Wyoming State Class members.  FCA also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, FCA's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and FCA's actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Wyoming State Class members, FCA had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the value of the Defective Vehicles purchased or leased by Plaintiffs and Wyoming State Class members.  Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that

1336321.4

manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass.  FCA represented to Plaintiffs and Wyoming State Class members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

3523.  FCA actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost FCA money, and it did so at the expense of Plaintiffs and Wyoming State Class members.

3524.  FCA still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Wyoming State Class members by concealing material information regarding the emissions qualities of the Defective Vehicles.

3525.  Plaintiffs and Wyoming State Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by FCA, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs'  and Wyoming State Class members' actions were justified.  FCA was in exclusive control of the material facts, and the public, Plaintiffs, or Wyoming State Class members, did not generally know such facts.

3526.  Because of the concealment and/or suppression of the facts, Plaintiffs and Wyoming State Class members have sustained damage because they own vehicles that are diminished in value as a result of FCA's concealment of the true quality and quantity of those vehicles' emissions and FCA's failure to timely disclose the defect or defective design of the EcoDiesel engine, the actual emissions qualities and quantities of FCA's vehicles, and the serious issues engendered by FCA's corporate policies.  Had Plaintiffs and Wyoming State Class members been aware of the true

1336321.4

emissions facts with regard to the Defective Vehicles, and FCA's disregard for the truth and compliance with applicable federal and state laws and regulations, Plaintiffs and Wyoming State Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

3527.  The value of Plaintiffs' and Wyoming State Class members' vehicles has diminished as a result of FCA's fraudulent concealment of the defective emissions controls of the Defective Vehicles, the unlawfully high emissions of the Defective Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished FCA's brand name, which is attached to Plaintiffs' and Wyoming State Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

3528.  Accordingly, FCA is liable to Plaintiffs and Wyoming State Class members for damages in an amount to be proven at trial.

3529.  FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Wyoming State Class members' rights and the representations that FCA made to them, in order to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**WYOMING COUNT III**
**Breach of Express Warranty,**
**Wyo. Stat. §§ 34.1-2-313 and 34.1-.2A-210**
**(On Behalf of the Wyoming State Class)**

3530.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3531.  This Count is brought on behalf of the Wyoming State Class against FCA.

3532.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Wyo.

1336321.4

Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

3533.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

3534.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

3535.  In connection with the purchase or lease of each one of its new vehicles, FCA provided an express 5-year/100,000-mile Diesel Powertrain Limited Warranty, whichever comes first.  This warranty exists to cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation"  FCA also provided two express California Emissions Standard Warranties.  One for 3 years or 50,000 miles (whichever occurs first) and another for 7 years or 70,000 miles (whichever occurs first).

3536.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties:  a "Performance Warranty" and a "Design and Defect Warranty."

3537.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

3538.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, FCA also provides an express warranty for their

1336321.4

vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

3539.  As manufacturers of light-duty vehicles, FCA were required to provide these warranties to purchasers or lessees of Defective Vehicles.

3540.  FCA's warranties formed a basis of the bargain that was reached when Wyoming State Class members purchased or leased their Defective Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3541.  Despite the existence of warranties, FCA failed to inform Wyoming State Class members that the Defective Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

3542.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not repaired or adjusted, and have been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

3543.  Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

3544.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Wyoming State Class members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3545.  Accordingly, recovery by the Wyoming State Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and they seek all remedies as allowed by law.

CLASS ACATION COMPLAINT

3546.  Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Defective Vehicles, they knew that the Defective Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Defective Vehicles.  Wyoming State Class members were therefore induced to purchase or lease the Defective Vehicles under false and/or fraudulent pretenses.

3547.  Moreover, many of the injuries flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Wyoming State Class members' remedies would be insufficient to make them whole.

3548.  Finally, because of FCA's breach of warranty as set forth herein, Wyoming State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Defective Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3549.  FCA was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

3550.  As a direct and proximate result of FCA's breach of express warranties, Wyoming State Class members have been damaged in an amount to be determined at trial.

**WYOMING COUNT IV**
**Breach of Implied Warranty of Merchantability,**
**Wyo. Stat. §§ 34.1-2-314 and 34.1-.2A-212**
**(On Behalf of the Wyoming State Class)**

3551.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3552.  This Count is brought on behalf of the Wyoming State Class, against FCA.

1336321.4

3553.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

3554.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

3555.  The Defective Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

3556.  A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wyo. Stat. §§ 34.1-2-314 and 34.1-2.A-212.

3557.  These Defective Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3558.  FCA was provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Wyoming State Class members have been damaged in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this case be certified and maintained as a class action pursuant to one or more of the proposed Classes, as they may be modified or amended, and respectfully requests this Court:

a.  Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

1336321.4

b.    Appoint Plaintiffs as the representatives of the Classes and their counsel as Class counsel;

c.    Award damages, including compensatory and exemplary damages, to Plaintiffs and all other Class members;

d.    Award Plaintiffs and Class members actual damages sustained;

e.    Award Plaintiffs and Class members such additional damages, over and above the amount of their actual damages, that are authorized and warranted by law, applicable;

f.    Grant restitution to Plaintiffs and Class members and require Defendants to disgorge inequitable gains;

g.    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Defective Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the defect;

h.    Award Plaintiffs and Class members punitive damages;

i.    Award Plaintiffs and Class members their reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and

j.    Award such other relief as this Court deems just and appropriate.

CLASS ACACTION COMPLAINT

1

## **JURY DEMAND**

2        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on

3   all issues so triable.

4   Dated:  February 1, 2017                Respectfully submitted,

5                                           /s/ *Elizabeth J. Cabraser*

6                                               Elizabeth  J. Cabraser

7                                           Elizabeth J. Cabraser (SBN 083151)
                                            Kevin R. Budner (SBN 287271)
8                                           Phong-Chau G. Nguyen (SBN 286789)
                                            Wilson M. Dunlavey (SBN 307719)
9                                           LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                            275 Battery Street, 29th Floor
10                                          San Francisco, CA 94111-3339
                                            Telephone: 415.956.1000
11                                          Facsimile: 415.956.1008
                                            ecabraser@lchb.com
12                                          pgnguyen@lchb.com
                                            kbudner@lchb.com
13                                          wdunlavey@lchb.com

14                                          David S. Stellings (to be admitted *Pro Hac Vice*)
                                            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
15                                          250 Hudson Street, 8th Floor
                                            New York, NY 10013-1413
16                                          Telephone: 212.355.9500
                                            Facsimile: 212.355.9592
17                                          dstellings@lchb.com

18                                          Roland Tellis (SBN 186269)
                                            Mark Pifko (SBN 228412)
19                                          David Fernandes (SBN 280944)
                                            BARON & BUDD, P.C.
20                                          15910 Ventura Boulevard, Suite 1600
                                            Encino, California  91436
21                                          Telephone:     (818) 839-2333
                                            Facsimile:     (818) 986-9698
22                                          rtellis@baronbudd.com
                                            mpifko@baronbudd.com
23                                          dfernandes@baronbudd.com

24                                          Paul J. Geller (to be admitted *Pro Hac Vice*)
                                            ROBBINS GELLER RUDMAN & DOWD LLP
25                                          120 East Palmetto Park Road, Suite 500
                                            Boca Raton, FL  33432
26                                          Telephone:  561.750.3000
                                            Facsimile:  561.750.3364
27                                          Email:   pgeller@rgrdlaw.com

28
                                            648
                                                        CLASS ACATION COMPLAINT

1336321.4

David Boies (to be admitted *Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY  10504
Telephone:  914.749.8200
Facsimile:  914.749.8300
dboies@bsfllp.com

Lynn Lincoln Sarko (to be admitted *Pro Hac Vice*)
KELLER ROHRBACK L.L.P.
1201 3rd Avenue, Suite 3200
Seattle, WA  98101-3052
Telephone:  206.623.1900
Facsimile:  206.623.3384
E-mail:  lsarko@kellerrohrback.com

Peter Prieto (to be admitted *Pro Hac Vice*)
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue, Suite 2700
Miami, Florida 33131
Telephone:  (305) 358-2800
Facsimile:  (305) 358-2382
E-mail: pprieto@podhurst.com

Robert C. Gilbert (to be admitted *Pro Hac Vice*)
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2525 Ponce de Leon Blvd.
Colal Gables, FL  33131
Telephone:  305-529-8858
Facsimile:  954-525-4300
Email:  gilbert@kolawyers.com

*Attorneys for Plaintiffs and the Proposed Classes*

649

CLASS ACATION COMPLAINT

1336321.4